*Unsealed pursuant to this 35 Order.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *ex rel.*
THE SAINT REGIS MOHAWK TRIBE,

                 Plaintiff,

    -against-                         Civil Action No: 02-CV-0845  (TJM/DEP)

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

                 Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## TO SEAL CERTAIN PAPERS HEREIN

     Plaintiff St. Regis Mohawk Tribe (hereinafter the "Tribe") acting on behalf of the United States submits this Memorandum of Law in support of its motion for an order requiring the parties to treat portions of the August 23, 2000 Declaration of Gary Melius (hereinafter "Melius Declaration") as confidential and ordering that all copies of the Melius Declaration, or of any papers referencing certain facts set forth in that Declaration, be filed in redacted form or under seal.

## FACTUAL BACKGROUND

This is an action in which the Tribe seeks to void a January 1998 construction contract between the Tribe and Defendants for the construction of a casino on the Tribe's reservation at Akwesasne (hereinafter "Akwesasne Casino") on the ground that the contract did not receive the required federal approval.  Further, the Tribe alleges that the subject contract was entered into in direct violation of a determination made by the National Indian Gaming Commission (hereinafter "NIGC") barring Gary Melius from any involvement in the Akwesasne Casino.

The Tribe asserts that Melius, in fact, had direct involvement in the development of the Akwesasne Casino and owned and controlled both the construction company - - whose contract for the construction of the Casino the Tribe seeks to void - - and the "independent" architectural firm which was hired to oversee the work of the construction company.  See Complaint at ¶¶ 33 to 53, attached as Exhibit A to the Declaration of Daniel Seff, Esq. (hereinafter "Seff Declaration") and the Declaration of Lorraine White, Esq. at ¶¶ 18 to 54, attached as Exhibit B to the Seff Declaration (hereinafter "White Declaration").

Defendants have moved to dismiss the Complaint.  In opposition to the Motion to Dismiss, Plaintiff submitted the Melius Declaration, executed on August 13, 2000, which supports the Tribe's contention that Mr. Melius retained an interest in the Akwesasne Casino.  In particular, Mr. Melius admits in the Declaration that he was owed $2 million by the manager of the Casino for construction services and an additional $5 million as

payment for a purported buyout of Melius' interest in the Casino.  White Declaration at ¶ 42 and Exhibit 20 thereto at ¶ 8.

The Melius Declaration was executed in connection with an action that he brought in the United States District Court for the Eastern District of New York entitled *Native American Management Corp., et al. v. Park Place Entertainment Corp., et al.*, No. 01-2267.  The Melius Declaration was never filed with the Court.  That action since has been settled.  Declaration of Jason Gross (hereinafter "Gross Declaration") at ¶ 2.

The Melius Declaration makes numerous unsubstantiated allegations against a third party, Park Place Entertainment Corp., and its former senior officers who were defendants in Mr. Melius's action in the Eastern District of New York.  These allegations of wrongdoing have never been established in a court of law, and it is unlikely that Park Place and these individuals (one of whom is deceased) will have an opportunity to rebut these allegations since those allegations are not relevant to this proceeding.

Park Place has requested that, in light of these unsubstantiated and scurrilous allegations, the Melius Declaration and any references to the allegations against Park Place and its former officers contained in the Melius Declaration be kept confidential by the parties herein and filed in redacted form or under seal.  See Gross Declaration at ¶ 6 and Exhibit A thereto.  Defendants were previously asked to consent to the filing of Melius's Declaration under seal and have refused.  Seff Declaration at ¶ 10 and Exhibits C and D thereto.

**ARGUMENT**

The determination of whether a document should be treated as confidential and filed under seal is left to the sound discretion of the district court in light of the facts and circumstances of the particular case.  <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 599 (1978); <u>DiRussa v. Dean Witter Reynolds Inc.</u>, 121 F.3d 818, 826 (2d Cir. 1997); <u>United States v. Amodeo</u>, 71 F.3d 1044, 1053 (2d Cir. 1995).

Generally, there is a presumption that records filed with the court are open for public inspection.  <u>Amodeo</u>, 71 F.3d at 1048.  However, against that presumption of openness must be weighed other factors, including the right to privacy of parties who are not litigants to the action.  The Second Circuit in <u>Amodeo</u> has set forth a number of factors to be considered by the district court in determining whether a particular document should be filed under seal.

The first and most important factor is the extent to which the document is necessary for any judicial determination in the action.  Where the Court relies upon the document to make a determination, the presumption of openness is greatest.  However, if the document contains information that is not relevant to any court determination, the public's need to have access to the information is minimal.  71 F.3d at 1049-50.  <u>See also</u>, <u>Policy Mgmt. Sys. Corp. v. Erst & Young</u>, 1995 WL 541623, at *4, (4th Cir. Sept. 13, 1995) (relying on <u>Amodeo</u>, and holding that "a document must play a relevant and useful role in the adjudication process in order for the common law right of public access to attach.") (attached as Appendix A).

Second, the court must be particularly sensitive to whether or not the allegations have been proven to be true:

> Unlimited access to every item turned up in the course of litigation would be unthinkable.  Reputations would be impaired, personal relationships ruined, and businesses destroyed on the basis of misleading or downright false information.

Amodeo, 71 F.3d at 1048-49.  The Amodeo Court emphasized that "[r]aw, unverified information should not be as readily disclosed as matters that are verified." Id. at 1051.

Third, the Second Circuit has emphasized that the court should be particularly sensitive to the privacy interests of third parties who are not litigants before the Court. Amodeo, 71 F.3d at 1050-51.  Finally, the court should consider whether "the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." Id. at 1051.

Following Amodeo, the courts of this District and Circuit have not hesitated to seal or redact records where scurrilous, unsubstantiated and irrelevant allegations are made in papers, see General Media, Inc. v. Shooker, 1998 WL 401530, at *13 (S.D.N.Y. July 16, 1998) (attached as Appendix B); where the papers invade the privacy of non-parties, see In re Savitt / Adler Litigation, 1997 WL 797511, at *3 (N.D.N.Y. Dec. 23, 1997) (redacting documents to remove names of non-parties) (attached as Appendix C) or cast aspersions on non-parties, see United States v. Chandler, 2002 WL 31094782, at *4 (S.D.N.Y. Sept. 19, 2002) (attached as Appendix D); where the documents play no significant role in the exercise of a court's judicial power, see United States v. Lawrence,

167 F.Supp.2d 504, 509 (N.D.N.Y. 2001), <u>United States v. Town of Moreau</u>, 979 F.Supp. 129, 134-35 (N.D.N.Y. 1997); or where the information, even if relevant, has a "high potential for embarrassment or harm" to the reputation of an individual or entity, <u>see</u> <u>Sterbens v. Sound Shore Medical Center of Westchester</u>, 2001 WL 1549228, at *3 (S.D.N.Y. Dec. 5, 2001) (attached as Appendix E).

In this case, Plaintiff seeks a limited sealing or redaction order relating only to allegations made against Park Place and two former senior officers of Park Place that have no relevance to this proceeding. The accusations are potentially embarrassing since they accuse Park Place and its former senior officers of various acts of wrongdoing. Since Park Place and its one living former senior officer are not parties to this action, and since the allegations are not relevant to the case, the named individuals and entities will have no opportunity to defend against these accusations. Finally, these accusations have never been substantiated in a court of law.

## CONCLUSION

For all the foregoing reasons, the Tribe respectfully requests an order directing that the subject portions of the Melius Declaration be treated as confidential by the parties; that they be redacted from any filing or filed under seal; and that such Declaration not be distributed to any third persons except in redacted form.

Dated: October 15, 2002

Barr & Associates, P.C.

By: _____
Russell D. Barr (RDB-3843)

*Attorneys for Plaintiff United States of America ex
rel. The Saint Regis Mohawk Tribe*

125 Mountain Road
Stowe, VT   05672
Phone:  802-253-6272

On the brief:   Daniel A. Seff, Esq.

# APPENDIX A

67 F.3d 296 (Table)
23 Media L. Rep. 2486
**Unpublished Disposition**
(Cite as: 67 F.3d 296, 1995 WL 541623 (4th Cir.(S.C.)))
<KeyCite History>

Page    1

NOTICE:    THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.  Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

In re: POLICY MANAGEMENT SYSTEMS CORPORATION, Appellant,
Samuel SPEAR; Lee Foy Early; D.A. Early, III; Frederick R. Ennis; Jerry Rosenbaum; Barry Roseman, Trustee of Barry Roseman Profit Sharing Plan; Thomas Moore, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
KNIGHT RIDDER, Incorporated, Intervenor,
v.
ERNST & YOUNG;  Arthur Andersen & Company, Defendants.
Samuel SPEAR, on his own behalf and on behalf of all similarly situated;  jerry Rosenbaum;  Barry Roseman, Trustee of Barry Roseman Profit Sharing Plan; Frederick R. Ennis;  D.A. Early, III;  William Thomas Moore;  Lee Foy Early, Plaintiffs-Appellees,
KNIGHT RIDDER, Incorporated, Intervenor,
v.
POLICY MANAGEMENT SYSTEMS CORPORATION, Defendant-Appellant, and
George L. Wilson;  Robert L. Gresham;  David T. Bailey;  Charles E. Callahan; Bernard C. Mazon;  Donald A. Coggiola; Sterling E. Beale;  Lutz F. Hahne; John P. Seibels;  Richard G. Trub;  Donald W. Fedderson, Defendants.

Nos. 94-2254, 94-2341.

Argued Dec. 7, 1994.
Decided Sept. 13, 1995.

Appeals from the United States District Court for the District of South Carolina, at Columbia.   Joseph F. Anderson, Jr., District Judge.  (CA-93-807, CA-94-1150)

D.S.C.

REVERSED.

ARGUED:  George Taylor Manning, JONES, DAY, REAVIS & POGUE, Washington, DC, for appellant.   Terry E. Richardson, Jr., Barnwell, SC, for appellees.  James M. Brailsford, III, ROBINSON, MCFADDEN & MOORE, P.C., Columbia, SC, for intervenor. ON BRIEF:  R. Dal Burton, David J. Schenck, JONES,  DAY,  REAVIS  &  POGUE, Washington, DC, for appellant.   Sherrie R. Savett, Catherine A. Sullivan, Genna C. Driscoll, BERGER & MONTAGUE, P.C., Philadelphia, PA;  Robert P. Sugarman, Paul D. Young, MILBERG, WEISS, BERSHAD, HYNES & LERACH, New York, NY, for appellees.     David W. Robinson, II, ROBINSON, MCFADDEN & MOORE, P.C., Columbia, SC, for intervenor.

Before RUSSELL and MICHAEL, Circuit Judges,  and  MESSITTE,  United  States District Judge for the District of Maryland, sitting by designation.

OPINION

PER CURIAM:

**\*\*1** Appellant Policy Management Systems Corporation ("PMSC") appeals the district court's order to release sealed documents to the public.  The documents had been filed as exhibits to a memorandum in opposition to a motion to dismiss in a related case, but the court did not consider them in ruling on the motion.    Because we hold that such documents are not entitled to a presumption of public access under either the common law or the First Amendment, we reverse.

I.


Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



67 F.3d 296 (Table)
(Cite as: 67 F.3d 296, 1995 WL 541623, **1 (4th Cir.(S.C.)))

Page   2

PMSC shareholders (the "plaintiffs") filed two shareholder class actions in the United States District Court for the District of South Carolina. In April 1993, the plaintiffs sued PMSC for alleged violations of federal and state securities laws, and for negligent misrepresentation under South Carolina common law. *In re Policy Management Sys. Corp.*, Civ. A. No. 3-93-0807-17 (D.S.C.) ("*PMSC* "). In April 1994, the plaintiffs filed a complaint alleging similar claims against PMSC's former auditors, Ernst & Young and Arthur Andersen & Co. *Spear v. Ernst & Young*, Civ. A. No. 3-94-1150-17 (D.S.C.) ("*Ernst & Young* ").

During the course of the *PMSC* action, the plaintiffs and PMSC reached an agreement to facilitate discovery. On August 26, 1993, the district court entered a confidentiality order consistent with that agreement. The order directed the parties to identify and mark confidential documents, which the clerk of the court would maintain under seal. On September 20, 1993, the court amended the order to comply with the notice and hearing procedures of *In re Knight Publishing Co.*, 743 F.2d 231 (4th Cir.1984), and *Rushford v. The New Yorker Magazine, Inc.*, 846 F.2d 249 (4th Cir.1988). When the plaintiffs filed their complaint against PMSC's auditors, the parties agreed to a similar confidentiality order. PMSC was not a defendant in the *Ernst & Young* action, but it also signed the order.

On June 8, 1994, Ernst & Young and Arthur Andersen & Co. filed motions to dismiss in *Ernst & Young* under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. On July 12, 1994, the plaintiffs filed under seal a memorandum of law in opposition to the motions to dismiss and attached to it an affidavit with exhibits. These exhibits included documents designated as confidential that were produced by Ernst & Young and PMSC's current accountants, Coopers & Lybrand, during discovery in *PMSC*. The plaintiffs provided notice of the filing to PMSC and to PMSC's auditors. On July 26, 1994, PMSC and Ernst & Young moved to maintain the confidentiality of the documents.

On August 15, 1994, the district court granted in part the auditors' motions to dismiss. The court also issued an order requesting the parties to inform the court of their positions on the sealed documents filed by the plaintiffs. In this order, the court stated that it "did not rely upon the documents filed and designated as confidential." After providing notice to the local press, the court conducted a hearing, heard all interested parties, and ordered the unsealing of the documents. On September 30, 1994, the court entered a written order requiring the clerk to release the documents, in redacted form, [FN1] to the public at 4:00 p.m. on October 3, 1994.

**2 On October 3, 1994, PMSC filed in the district court a notice of appeal and a request for a stay of the order to unseal the documents in *Ernst & Young.* [FN2] The district court granted the stay pending this appeal. On November 16, 1994, this Court allowed Knight Ridder, Inc., the publisher of *The State*, a daily newspaper in Columbia, South Carolina, to intervene as an appellee and file a brief. On December 6, 1994, one day prior to oral argument before this Court, PMSC, Ernst & Young, Arthur Andersen & Co., and the plaintiffs notified the district court that they had reached a settlement agreement in both underlying actions. PMSC proceeded with this appeal, however, in order to reverse the district court's order to release the documents. [FN3] II.

As a preliminary matter, we note that this Court has jurisdiction over PMSC's appeal under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949). A collateral order is immediately appealable if it: (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) cannot be effectively reviewed on appeal from a final judgment. *Johnson v. Jones*, 115 S.Ct. 2151, 2155 (1995). As indicated by its recent restatement of *Cohen*, the Supreme Court has abandoned the requirement that the issue on appeal must present a serious and unsettled question. *Id.; see Carolina Power & Light Co. v. United States Dep't of Labor*, 43 F.3d 912, 916 &

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



n. 3 (4th Cir.1995) (noting that the Supreme Court had omitted the fourth factor from its analysis in *Digital Equip.   Corp. v. Desktop Direct, Inc.*, 114 S.Ct. 1992, 1995-96 (1994), but declining to confront the issue of the factor's continued vitality).

We find that the district court's order to unseal the documents readily satisfies the three requirements of the collateral order doctrine.   First, the court's order has conclusively determined the question of whether the documents are to be unsealed. Second, the issue of public access to documents is important and completely separate from the issues raised in a shareholder derivative action.   Finally, PMSC cannot receive effective review on appeal from a final judgment--even if the parties had not settled-- because once the documents are released to the public, they cannot be unreleased. Having established this Court's jurisdiction, we turn to the merits of this appeal.

### III.

The narrow issue on appeal is whether the documents filed by the plaintiffs are subject to a right of public access. [FN4]  The right of public access derives from two independent sources:   the common law and the First Amendment. The common law presumes a right of public access to inspect and copy all judicial records and documents.   *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 178, 180 (4th Cir.1988).   A court may seal judicial documents if competing interests outweigh the public's common law right of access. *Nixon*, 435 U.S. at 598-99, 602-03; *In re Knight Publishing Co.*, 743 F.2d 231, 235 (4th Cir.1984).   The court's balancing of interests is reviewable only for abuse of discretion. *Nixon*, 435 U.S. at 599; *Stone*, 855 F.2d at 180.

**3  Unlike the common law right, the First Amendment guarantee of access has a more limited scope that "has been extended only to particular judicial records and documents." *Stone*, 855 F.2d at 180.   The right of access attaches under the First Amendment if:   (1)

"the place and process have historically been open to the press and general public;   and (2) "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986), *quoted in The Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir.1989) .   The First Amendment guarantee of access, however, provides much greater protection than the common law right because "it must be shown that the denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07 (1982); *Stone*, 855 F.2d at 180.

### A.

We first address the district court's conclusion that "First Amendment considerations arise" when materials are filed with the court. Neither the Supreme Court nor this Court has ever held that the mere filing of a document triggers the First Amendment guarantee of access.   In *Rushford v. The New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir.1988), we held that the First Amendment guarantee applies to documents filed in connection with a summary judgment motion.   We noted in *Rushford* that documents filed as part of a dispositive motion, such as a summary judgment motion, "lose their status as being 'raw fruits of discovery.' " *Id.* at 252 (quoting *In re "Agent Orange" Prod. Liability Litig.*, 98 F.R.D. 539, 544-45 (E.D.N.Y.1983)).   We made this distinction because "discovery, which is ordinarily conducted in private, stands on a wholly different footing than does a motion filed by a party seeking action by the court." *Id.* We also reasoned that the First Amendment guarantee attached in *Rushford* "[b]ecause summary judgment adjudicates substantive rights and serves as a substitute for a trial." *Id.*

We conclude that the First Amendment guarantee of access should not be extended to documents filed in connection with a motion to dismiss.   Because such documents are not considered by the court, they do not serve as a substitute for a trial and are more akin to



discovery materials. A summary judgment motion requires a district court to examine the entire record, including affidavits and materials beyond the pleadings, to determine whether there is a genuine issue of any material fact and whether the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir.1995). A motion to dismiss tests only the facial sufficiency of the complaint; a court may not consider any materials outside the pleadings without providing proper notice and converting the motion into a summary judgment motion. Fed.R.Civ.P. 12(b); *see Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1471 & n. 9 (4th Cir.1991).

**4 Although a party can file materials outside the pleadings while seeking court action on a motion to dismiss, the court can rule on the motion without considering the materials. Because documents filed with a motion to dismiss that are excluded by the court do not play any role in the adjudicative process, we find that the documents essentially retain their status as discovery materials and therefore are not subject to the First Amendment guarantee of access. [FN5] Moreover, public access to documents that a court did not consider would not "play a significant positive role in the functioning of the particular process in question." *Press-Enterprise*, 478 U.S. at 8.

B.

We turn next to the question of whether documents filed in connection with a motion to dismiss and excluded by the court constitute "judicial documents" subject to the common law presumption of access. Although we have not previously addressed this issue, we note that other circuit courts have applied two standards to determine whether documents filed with a court may be classified as judicial documents. The Third Circuit applies a standard that focuses on the "technical question of whether a document is physically on file with the court." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 782 (3d Cir.1994); *see Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161-62 (3d Cir.1993) (listing cases in which "other courts have also recognized the principle that the filing of a document gives rise to a presumptive right of public access."). The Second Circuit applies a different standard that focuses on the document's use and requires that the document be "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir.1995); *see Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986) (stating that "courts have not extended [the common law presumption] beyond materials on which a court relies in determining the litigants' substantive rights").

We hold that the mere filing of a document with a court does not render the document judicial. *Amodeo*, 44 F.3d at 145. We agree with the Second Circuit that a document becomes a judicial document when a court uses it in determining litigants' substantive rights. *Id.* Therefore, we conclude that a document must play a relevant and useful role in the adjudication process in order for the common law right of public access to attach. *See id.*

As we discussed above, the documents in this case did not play *any* role in the district court's adjudication of the motion to dismiss. The documents were filed with the court in connection with a motion to dismiss, but the court did not convert the motion into a motion for summary judgment, and thus excluded the documents from consideration. Because the documents played no role in the court's adjudication of the motion to dismiss, we hold that the documents did not achieve the status of judicial documents to which the common law presumption of public access attaches.

IV.

**5 For the foregoing reasons, we reverse the district court's order to unseal the documents filed by the plaintiffs.

*REVERSED*

MICHAEL, Circuit Judge, dissenting:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Westlaw.

The question before us is whether the common law *presumption* of public access should apply to sealed documents submitted on a motion to dismiss. If (as the majority decides today) it does not, then a judge alone may determine the worth of such documents without any prospect of public scrutiny or accountability. Because our history and tradition dictate that the ultimate review of judicial decisions rests with the public, I must respectfully dissent.

"[T]he courts in this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978). This common law right of access is not absolute. It is subject to an inclusive balancing test. The balancing test permits the common law presumption of access to be "overcome if competing interests outweigh the interest in access." *Stone v. University of Md. Medical Sys. Corp.,* 855 F.2d 178, 180 (4th Cir.1988). And, "the decision as to access is one best left to the sound discretion of the trial court." *Nixon,* 435 U.S. at 599. Therefore, we reverse a district court's decision to grant or deny access on common law grounds only for abuse of discretion. *Stone,* 855 F.2d at 180; *Rushford v. The New Yorker Magazine Inc.,* 846 F.2d 249, 253 (4th Cir.1988).

We also recognize a First Amendment right of public access to certain documents and exhibits in the possession of a court. *See, e.g., Rushford,* 846 F.2d at 252 (documents filed in connection with a summary judgment motion in a civil case); *In re Washington Post Co.,* 807 F.2d 383, 390 (4th Cir.1986) (documents filed in connection with plea hearings and sentencing hearings in a criminal case). If the First Amendment right attaches, then public access may be denied only if a "compelling governmental interest" exists, and the denial is "narrowly tailored to serve that interest." *Stone,* 855 F.2d 180; *accord Rushford,* 846 F.2d at 253.

In this case the district court did note that background constitutional considerations arise whenever a document is filed with a court, but it applied only the common law balancing test to determine that the public should have access to the documents. Specifically, the court cited the following proposition from *In re Knight Publishing Co.,* 743 F.2d 231, 235 (4th Cir.1984):
The Supreme Court has suggested that the factors to be weighed in the balancing test include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records.
**6 The citation from *Knight* is based on *Nixon.* Both *Knight* and *Nixon* involved only the common law right of access; neither decision applied the First Amendment. Therefore, despite the district court's passing reference to the First Amendment, it clearly applied the common law test to determine that the documents should be released.

The majority says that was error, not because the district court misapplied the common law test but because the common law test does not apply. The majority opines that the common law right of public access does not attach to documents merely filed with the court. Under the majority's rule, the common law right of public access only attaches when a document plays a "relevant and useful role in the adjudication process." *Ante* at 9.

While I might agree that the presumption of openness does not automatically attach to every document filed with the court, *cf. Seattle Times v. Rhinehart,* 467 U.S. 20, 33 n. 19 (1984), where, as here, the documents are filed in connection with a potentially dispositive motion, the presumption must attach. To hold otherwise makes the court both the judge on the motion *and* the unchallengeable censor who may deny public access to materials offered on a motion that may end the case. It is, of course, the court's duty and responsibility to act as judge. But absent compelling reasons, the court is without authority to act as censor.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



67 F.3d 296 (Table)
(Cite as: 67 F.3d 296, 1995 WL 541623, **6 (4th Cir.(S.C.)))

The reason for this is quite simple: like a decision on a motion for summary judgment, a decision on a motion to dismiss determines substantive rights. Under Federal Rule of Civil Procedure 12(b)(6), a court decides whether a party has stated a claim upon which relief can be granted. In doing this, a court must measure the factual allegations in the complaint against the legal theory invoked. The resulting decision is a determination of substantive rights. Because substantive rights are being determined, the presumption of openness must attach. *Rushford,* 846 F.2d at 252 ("Once documents are made part of a dispositive motion, such as a summary judgment motion, they lose their status of being raw fruits of discovery.") (citation and internal quotes omitted). [FN1]

The majority sidesteps this logic, asserting that a court is not required to consider documents submitted on a motion to dismiss. *Ante* at 8. That is true, but before a court can decide not to consider documents submitted on the motion, the court must decide (1) whether the documents are necessary to reach a decision on the motion, (2) whether the documents may be considered without converting the motion into a summary judgment motion, or (3) whether to convert the motion into a summary judgment motion. [FN2] Unless our position is that a district court can arbitrarily reject or ignore documents submitted on a motion to dismiss, a court's decision not to rely on documents still means that at some level the documents were in fact considered. [FN3]

**7 Because the documents are examined at some level, the common law right of access must attach in order to protect the public's ability to keep a "watchful eye on the workings of public agencies" and a newspaper's ability to comment upon the "operation of government." *Nixon,* 435 U.S. at 597-98. Indeed, the documents become "relevant and useful" because it is the public's function to evaluate the judge's performance and to determine whether the documents *should* have been used in deciding the motion. Under the majority's approach, however, the public's right to watch the operation of its

government becomes solely dependent on the judge's view of the importance of any given document. That is not a sufficient check under our system.

In addition, the majority's rule undermines the procedural protections our prior cases have routinely afforded the public. If the majority is correct, then a court can seal records which it deems irrelevant or useless without notice. If a judge can seal documents without notice, then only a mind reader could contest the judge's decision. In short, the judge has been shielded from public scrutiny. The majority goes against our time-honored practice of giving the public notice of any intention to seal a judicial record and an opportunity to contest such sealing. *Knight,* 743 F.2d at 231; *Stone,* 855 F.2d at 181. These procedural protections guard the interests identified in *Nixon.* They preserve the public's right to observe the operation of its courts. They insure that abrogation of the public's access right only occurs in special circumstances. And they permit meaningful appellate review of a district court's decision to seal a record. *Stone,* 855 F.2d at 182. However, under the majority's approach, these protections no longer attach if the district court deems documents useless. I believe this undermines our circuit's *Knight/Stone* line of cases which established and applied procedures to protect a broad public right of access.

Finally, I do not doubt that the occasion may arise where a party submits documents in bad faith on a motion to dismiss--an allegation made by PMSC (and rejected by the district court) in this case. Yet, to remedy this concern, we should not restrict the common law right of access. Even though the presumption of openness attaches to documents submitted in bad faith, a court has appropriate measures available. If action is warranted, then the imposition of sanctions, not censorship, should be considered. Moreover, the balancing test should apply in all events, and that allows the good (or bad) faith of the offeror of documents to be taken into account.

The majority's holding is an alarming (albeit

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



fairly narrow) exception to the venerable common law presumption of public access to judicial records. The district court was right to apply the common law balancing test here and to order "the majority of the documents ... unsealed." [FN4] I would therefore affirm.

FN1. The court ordered that all customer lists, revenues generated by those accounts, and fees charged by the accounting firms would be redacted. Additionally, the court found that an in-house check list prepared by Coopers & Lybrand was proprietary information that should remain sealed.

FN2. Apparently the clerk of the district court also filed the notice in *PMSC*, causing the clerk of the Fourth Circuit to create a separate case number, which was consolidated with this action.

FN3. We note that the settlement, which was approved by the district court on May 26, 1995, does not moot PMSC's appeal because the settlement did not include Knight-Ridder. Furthermore, "the right of access to judicial records and documents is independent of the disposition of the merits of the case." *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 178, 180 n.* (4th Cir.1988) (citing *Knight*, 743 F.2d at 233).

FN4. The plaintiffs filed a motion requesting this Court to amend the docketing statement to reflect their reformulation of the issue on appeal. We deny the plaintiffs' motion because it is sufficient for an appellee "dissatisfied with the statement of the appellant" to present a statement of the issue in its brief, which the plaintiffs did. *See* Fed. R.App. P. 28.

FN5. Naturally, if the court converts the motion to dismiss into a motion for summary judgment, then the First Amendment guarantee of access attaches under *Rushford*.

FN1. If a First Amendment right of access attaches to documents filed as part of a dispositive motion, then the less protective common law right of access attaches as well. *In re Washington Post Co.*, 807 F.2d at 390 ("The common law does not afford as much substantive protection to the interests of the press and public as the First Amendment does.").

FN2. The majority apparently believes that when documents are submitted on a motion to dismiss, the court may decide only to reject the documents or convert the motion into one for summary judgment. *Ante* at 8 & 9. In practice, however, courts do on occasion (particularly in securities fraud cases) consider tendered documents in deciding Rule 12(b)(6) motions. *See, e.g.*, *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 957 n. 3 (D.Md.1995) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir.1991), *cert. denied*, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)). *See also New Beckley Min. v. International Union, UMWA*, 18 F.3d 1161, 1164 (4th Cir.1994) (affirming district court's decision to consider certain documents on motion to dismiss in RICO action).

FN3. The district court here said that in deciding the motion to dismiss, it "didn't see a need to rely on" the documents filed under seal with plaintiffs' memorandum in opposition.

FN4. In applying the balancing test, the district court decided to "redact those portions of the documents ... which the court finds to be proprietary and trade secret information deserving of confidentiality."

67 F.3d 296 (Table), 1995 WL 541623 (4th Cir.(S.C.)), 23 Media L. Rep. 2486 Unpublished Disposition

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



# APPENDIX B

1998 WL 401530
(Cite as: 1998 WL 401530 (S.D.N.Y.))
< KeyCite Citations >

Page   1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

GENERAL MEDIA, INC., and General Media Communications, Inc., Plaintiffs,
v.
Douglas R. SHOOKER, Deluxe Entertainment Corp., Richard Abernathy, Starus Corp., Steven Aaronoff, Pacific Rim, Inc., Seth Warshavsky, Anthony J. Guccione II, Internet Entertainment Group, Inc., Daniel Gath Jr., and Directcell International Corp., Defendants.
INTERNET ENTERTAINMENT GROUP, INC., Cross-Claimant,
v.
Douglas R. SHOOKER, Deluxe Entertainment Corp., Anthony J. Guccione, II, Cross-Defendants.

No. 97 Civ. 510(DAB).

July 16, 1998.

Levanthal & Slade, New York, New York, for Plaintiffs, Jeffrey C. Slade, of counsel.

Wilson, Elser, Moskowitz, Edelman, & Dicker, New York, New York, for Defendants Douglas R. Shooker, Deluxe Entertainment Corporation, and Directcell International Corporation, Edward J. Boyle, Kathleen Murren-Koether, of counsel.

Rubin, Baum, Leven, Constant & Friedman, New York, New York, for Defendant and Cross Claimant Internet Entertainment Group, Inc, Paul Aloe, of counsel.

*MEMORANDUM & ORDER*

BATTS, J.

*1 Plaintiffs General Media, Inc., and General Media Communications, Inc., (hereafter collectively "GMI"), commenced an action claiming that Defendants utilized a series of shell corporations to cause GMI to enter into fraudulent contracts that

transferred rights in Internet and other services to Defendants, in violation of 18 U.S.C. § 1962(c) and 1962(d). In addition, Plaintiffs claim that the use of the "Penthouse" name on the website established under the allegedly fraudulent contracts infringed upon and diluted the "Penthouse" trademark in violation of 15 U.S.C. §§ 1114, 1125(c), 1125(a)(1)(A) and 1125(a)(1)(B).

Defendant Deluxe Entertainment Corporation ("Deluxe") filed for arbitration of their contract with GMI for the provision of Internet services, pursuant to an arbitration provision contained therein. GMI then moved this Court for a temporary restraining order and a preliminary injunction enjoining arbitration. Defendants Deluxe, Douglas Shooker and Directcell International Corporation opposed GMI's motion, and made a cross-motion for a stay of these proceedings and an order compelling arbitration.

In addition, Defendant Internet Entertainment Group ("IEG") cross claimed for recision of their subcontract agreement with Deluxe for the provision of Internet services to GMI under the Internet agreement. Defendants Deluxe, Douglas Shooker, and Anthony Guccione II moved for an order compelling Defendant IEG to arbitrate its cross claim, which IEG has opposed.

After numerous extensions of the briefing schedule, and adjournments for settlement discussions, both motions were submitted to the Court. Arbitration proceedings were stayed pending the resolution of the motions presented to the Court.

I. BACKGROUND

GMI is a corporation whose holdings include *Penthouse* Magazine, the "Penthouse" trademarks, and the "penthousemag.com" web site on the Internet. (Compl.¶ 3). GMI is owned by Robert Guccione and Eugene Boffa, Jr. has been the president since May, 1996. (Boffa Aff. ¶¶ 3, 5, 19).

Anthony Guccione II, the son of Robert

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



1998 WL 401530
**(Cite as: 1998 WL 401530, \*1 (S.D.N.Y.))**

Page   2

Guccione, was the Executive Vice President for New Media at GMI from May, 1995, until his resignation on June 14, 1996. (A. Guccione Aff. ¶ 1). In this capacity, Anthony Guccione was responsible for GMI's operations in the "audiotext," [FN1] Internet, and any other electronic media. (*Id.* ¶ 10). Douglas R. Shooker ("Shooker") is the sole owner of Deluxe, as well as its President and Chief Executive Officer. (Compl. ¶ 4; Shooker Aff. ¶ 1).

> FN1. The term "audiotext" refers to services that provide recorded and live information on 1-900 and 1-800 telephone numbers. (*See* Pl.'s Mem. Law at 8; Def.'s Mem. Law at 9, n. 8).

This litigation arises out of three disputed contracts: 1) between GMI and Deluxe for Deluxe to obtain live feed programming from other providers for an interactive web site under the Penthouse name ("Internet contract"); 2) between GMI and Deluxe requiring the reservation of certain advertising pages in *Penthouse* magazine for an audiotext provider selected by Deluxe ("audiotext contract"); and 3) between Defendants Shooker and ING, an investment banking company, for the splitting of any fees that may arise from ING working on behalf of GMI ("ING contract"). (*See generally* Pl.'s Mem. Law at 3-13; Defs.' Mem. Law at 2-12). On January 17, 1997, counsel for Deluxe wrote to GMI to demand arbitration of GMI's alleged non-performance of the Internet contract. (Shooker Aff., Ex. O). On January 23, 1997, GMI filed civil RICO and Lanham Act claims in this Court, alleging that the above contracts are fraudulent and constitute a pattern of racketeering by Defendants to deprive GMI of valuable rights and assets, and that the "Penthouse" trademark has consequently been infringed. (*See* Pl.'s Mem. Law at 1-2). [FN2]

> FN2. Defendants Daniel Gath, Seth Warshavsky, and Internet Entertainment Group, have since been dismissed from this action.

**\*2** On January 24, 1997, Deluxe filed a demand for arbitration of the Internet contract with the Los Angeles office of the American Arbitration Association ("AAA"). (Shooker Aff. ¶ 21). On February 4, 1997, the AAA notified GMI of the demand for arbitration. (Boffa Aff., Ex. G). After GMI received a one-week extension of the response date to the demand, GMI filed the instant motion with this Court seeking a preliminary injunction to stay the arbitration proceedings. (Defs.' Mem. Law at 6). Defendant Deluxe opposed the motion for a preliminary injunction, and cross moved to compel arbitration on the Internet contract and stay the remainder of the court proceedings. (Defs.' Mem. Law at 1). On March 7, 1997, this Court ordered that Deluxe be enjoined from proceeding with arbitration pending decision on these motions.

a) *The Internet Contract*

The Internet contract provides for Deluxe to establish a "live feed" [FN3] adult entertainment web site under the "Penthouse" name. (*See* Boffa Aff., Ex. A, ¶ 1A). This contract is dated February 6, 1996, and is signed by Shooker and Anthony Guccione. (*Id.* at 15). This contract also contains a provision that any disputes arising out of the agreement shall be submitted to final and binding arbitration, to be held in Los Angeles, California (*Id* . ¶ 10A). The arbitration provision states in relevant part:

> FN3. A "live feed" website enables users to view live performances from remote locations. (*see* A. Guccione Aff. ¶ 15).

Any dispute arising out of or relating to this Agreement that cannot be settled by direct negotiations will be submitted to final and binding arbitration in accordance with the then prevailing rules of the American Arbitration Association.

(*Id.*).

Shooker asserts that after the contract was executed in February, 1996, Anthony Guccione asked him to wait on the selection of a live feed provider pursuant to the contract because of the pending bills in Congress regarding the transmission of adult material over the Internet and his desire to combine the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



live feed provider with an equity investment. (Shooker Aff. ¶ 5; A. Guccione Aff. ¶ 20). On March 13, 1996, Shooker and Anthony Guccione executed an amendment providing for such delay until October 13, 1996. (Shooker Aff. ¶ 5, Ex. B; A. Guccione ¶ 20).

Over the summer of 1996, Shooker began to reconsider whether he wanted to become the legal holder of adult entertainment rights on the Internet as called for in the contract, preferring instead to receive a fee for introducing GMI to live feed providers. (Shooker Aff. ¶¶ 6-7). To that end, Shooker negotiated a fee from the live feed provider IEG, and also worked with Boffa on setting up an 'in-house' live feed provider to be called "Starus." (*Id.* ¶ 8). Further, Shooker states that in the summer of 1996, Boffa offered to pay him a one time fee to be released from "all" contracts with GMI, an offer to which Boffa alluded in an August letter to Shooker. (*Id.* ¶ 10; Ex. C). When these developments failed to come to fruition, Shooker decided to enforce the Internet agreement as it stood. (*Id.* ¶¶ 13-14).

*3 Even during the period where Shooker was reconsidering the Internet agreement, Shooker maintains that he was careful to preserve his rights under the Internet contract. (*Id.* ¶ 12). For example, Shooker cautioned Boffa in an October, 1996 letter regarding the appropriate language to use in any discussions with potential live feed providers, so that such talks could not be construed as oral agreements for Internet services. (*Id.,* Ex. D). In a second letter to Boffa at the end of October, 1996, Shooker explicitly stated that any such agreement would be in contravention of the existing Internet contract between GMI and Deluxe. (*Id.,* Ex. E). Boffa states he was "confused" by the mention of an Internet agreement in the second letter, and then asked various people at GMI if they knew of such an agreement, and they responded in the negative. (Boffa Reply Aff. ¶ 16).

The subcontract between Deluxe and IEG for the provision of live feed services to GMI dated November 26, 1996, describes a "dispute" between Deluxe and GMI regarding

the enforcement of the Internet contract. (Boffa Aff., Ex. F). Boffa contends that the language in that contract regarding a dispute over the enforcement of the Internet agreement is "totally false" since he was unaware of the existence of any such agreement between GMI and Deluxe at that time. (Boffa Reply Aff., ¶ 19).

Boffa maintains that the first notice he received of the Internet agreement was on December 4, 1996, when Shooker faxed it to him upon Boffa's request during a telephone conversation. (*Id.* ¶¶ 19-20). Boffa surreptitiously taped this telephone conversation. (Boffa Reply Aff. ¶ 20, Ex. A; Shooker Reply Aff. ¶ 4). From the transcript, it appears that Boffa stated that "no one ever said squat to [him]" about the Internet contract and that he is "very upset" about not being informed. (Boffa Reply Aff., Ex. A). Boffa later comments "let's try to be constructive and go forward [ ... ] because if you can make a deal with me, then whether you have an agreement or not, I don't care. If you can't make a deal, then it's going to matter. So I don't even want to talk about the agreement." (*Id.*).

After the alleged "surfacing" of the Internet agreement in December, 1996, Boffa and Shooker engaged in a series of negotiations to change its terms. Shooker states that he met with Boffa in his New York office in mid-December of 1996 where they looked at the quality of the live feed source Deluxe had provided, and discussed proposed amendments set forth in a memo Boffa's "Internet guy" had written after reviewing the Internet contract. (*Id.,* ¶ 17; Ex. K). This memo, which Boffa gave to Shooker at the meeting, is stamped as "received" on December 16, 1996, and has "To: Gene Boffa" handwritten across the top. (*See* Ex. K). Boffa acknowledges that during these discussions with Shooker, the Internet deal was becoming "a little bit more palatable." (Boffa Reply Aff. ¶ 24).

*4 Also, as Shooker departed from the December meeting with Boffa, Shooker gave notice of live feed readiness as required under the Internet contract to Boffa's assistant,



Keicha De La Cruz, because Boffa had intimated that he would not accept it directly from him. (*Id.* ¶ 18, and Ex. L.). Boffa states that he would not accept the notice from Shooker because he did not believe the contract was valid. (Boffa Reply Aff. ¶ 27).

Despite further negotiations between Shooker and Boffa during December, 1996, no resolution regarding the proposed amendments was reached. (*Id.* ¶ 20). Therefore, on January 13, 1997, Shooker sent a letter to Boffa notifying him of GMI's breach of the Internet contract. (*Id.* ¶ 21). On January 17, 1997, Deluxe's counsel sent a demand for arbitration. (*See* Def.'s Mem. Law at 5).

GMI contends that the Internet contract is a fabrication. [FN4] (Pl.'s Mem. Law at 1-2). Specifically, GMI claims that Shooker and Anthony Guccione created the Internet contract sometime in the fall of 1996 after Anthony Guccione had resigned from GMI, and then fraudulently backdated it. (*Id.* ¶ 20). In support of this contention, Boffa asserts that he saw the Internet contract for the first time on December 4, 1996, that he could not find a copy of such a contract in GMI's files, and that neither Anthony Guccione's secretary, Keicha De La Cruz, nor GMI's legal department had ever heard of the contract. (Boffa Aff. ¶¶ 16-19). Boffa also asserts that Shooker never mentioned the Internet contract during their discussions regarding the Internet site that had been occurring since May, 1996, and that both Shooker and Anthony Guccione were informing Internet providers that this area was "wide open" at GMI. (*Id.* ¶ 19). Boffa further argues that the Internet contract was the most "one-sided, unfair agreement" he had seen in his thirty year legal career. (*Id.* ¶ 17).

FN4. Plaintiffs have also included allegations that the contracts with different Defendants for other services were also fabrications. Since the motion properly before the Court at this time is solely directed to the validity of the internet contract, this decision will not discuss the validity of the other contracts.

Deluxe contends that the Internet contract was validly rendered on February 6, 1996 by Shooker and Anthony Guccione. In response to GMI's contentions of facts "inconsistent" with that assertion, Anthony Guccione states that his father asked Shooker directly to help GMI develop an Internet service during a meeting at his father's townhouse around December, 1995. (A. Guccione Aff. ¶ 15). He further claims that copies of the Internet contract were kept in the confidential files at Robert Guccione's townhouse for security reasons, and that he discussed the contract directly with his father. (*Id.* ¶¶ 19, 21). In addition, Anthony Guccione claims that he was never contacted by GMI after his resignation regarding the existence or location of the Internet contract, despite the allegedly "exhaustive" search for the contract undertaken by GMI. (*Id.* ¶ 9).

However, Bob Guccione denies that he was aware of an Internet contract with Deluxe. (Robert Guccione Aff. ¶ 3). Further, Bob Guccione states that he did not keep any company records at his house, nor would there be a security reason to do so, and that it is "preposterous" to suggest that he would agree to contract that was such a bad deal for GMI. (*Id.*). Bob Guccione was "furious" with this son's performance at GMI, because "by May of 1996, all Tony had to show for his year on the job were a series of incredibly disadvantageous contracts," such as two website agreements and a licensing agreement, which his father asserts to have been made without authorization and against GMI's practice. (*Id.* ¶¶ 8-9). Bob Guccione also states that his son "played a central role in causing me to sign a very bad agreement with ING Capital Corporation." (*Id.* ¶ 8).

**\*5** In addition to the events detailed above, there were also various deals struck with Internet Entertainment Group ("IEG"), a company headed by Seth Warshavsky, by Shooker, Anthony Guccione, and GMI over the same time period. As mentioned, IEG was chosen by Shooker as the subcontractee under the Internet agreement for the provision of Internet services. Earlier on, during the period that Shooker was reconsidering the Internet contract, Anthony Guccione's company Media Investment Corporation ("MIC") entered into

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



an agreement with IEG to assist them in obtaining the Internet development work with GMI for a fee. (Reply Aff. of Anthony Guccione, ¶ 2, Ex. A). As a result, Anthony Guccione was then in a position of advocating that the Internet agreement he signed with Shooker not be enforced, since he stood to gain more from the agreement with IEG. (*Id.* ¶ 3). But once Shooker decided to enforce the Internet agreement and chose IEG as the subcontractee, Anthony Guccione states he could not accept a fee from IEG since Anthony had signed the Internet deal between GMI and Deluxe. (*Id.,* ¶ 3). Thus, Anthony Guccione and Seth Warshavsky signed a waiver of the MIC and IEG deal on November 23, 1996. (*Id.,* Ex. B).

Despite the purported existence of the subcontract with IEG, GMI has entered into another contract with IEG for the development of GMI's Internet activity. (Robert Guccione Reply Aff., ¶ 21-23). On April 10, 1997, GMI dismissed Defendant Seth Warshavsky with prejudice from the RICO claim filed in this Court. (Boyle Aff. ¶ 14, Ex. 6). On May 30, 1997, IEG filed an Answer and Cross-Claim in the RICO proceedings. (*See* Boyle Aff., Ex. 1). The IEG cross claims moved for the recision of their subcontract with Deluxe under the Internet agreement, on the grounds that there was no such agreement between GMI and Deluxe. (Answer of IEG, ¶ 109). In addition, IEG cross moved against Deluxe, Shooker, and Anthony Guccione for negligent misrepresentation and indemnity. (*Id.,* ¶¶ 112-121).

On June 6, 1997, this Court so ordered a stipulation dated April 9, 1997, that provided for the dismissal of Defendant IEG from the RICO cause of action. (*Id.,* Ex. 7). On July 28, 1997, Defendants Shooker, Deluxe, and Anthony Guccione moved to compel Defendant IEG to arbitrate its cross claim. IEG opposed the motion.

The question presented to this Court is whether this dispute over the Internet contract should properly be referred to arbitration, pursuant to the arbitration provision contained therein.

## II. DISCUSSION

Section 2 of the United States Arbitration Act ("the Act"), codified at 9 U.S.C. §§ 1-14, states in relevant part that a written arbitration provision "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1970). It is well settled that the Act reflects a strong federal policy towards upholding contractual agreements to arbitrate. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Genesco, Inc. v.. T. Kakiuchi & Co. Ltd.,* 815 F.2d 840, 844 (2d Cir.1987).

*6 Under Section 3 of the Act, if there are issues before the court that are properly under the scope of an arbitration agreement, the court shall issue a stay of the proceedings pending the outcome of arbitration. 9 U.S.C. at § 3. The Act further mandates that the court direct parties to proceed to arbitration where there has been a "failure, neglect or refusal" to honor an arbitration agreement, as long as the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. at § 4. If the making of the arbitration agreement is at issue, the statute directs the court to "proceed summarily to the trial thereof." *Id.*

To put the "making" of a contract sufficiently in question to avoid arbitration, the party opposing arbitration has the burden of showing there is a triable issue. *Doctor's Assoc., Inc. v. Distajo,* 107 F.3d 126, 129-30 (2d Cir.1997); *Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir.1995); *Manning v. Energy Conversion Devices, Inc.,* 833 F.2d 1096, 1103 (2d Cir.1987); *Interocean Shipping Co. v. Nat'l Shipping and Trading Corp.,* 462 F.2d 673, 676, (2d Cir.1972). The *Oppenheimer* court states in relevant part:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



[I]t is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends. If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.

*Id.*, 56 F.3d at 358. *See also Manning,* 833 F.2d at 1103 ("a party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4"). [FN5]

FN5. Plaintiffs argue that the appropriate showing to warrant a trial on the issue of the making of the arbitration agreement within the Second Circuit is for only "some evidence," *see Interocean Shipping Co.,* 462 F.2d at 676, and that this standard has not been raised to that of "sufficient evidentiary facts" by such later cases as *Manning,* that cite the *Interocean* precedent with approval. *See* Pl.'s Reply at 20-21. Since the later cases clearly rely on the earlier standard without differentiation, and other caselaw directly contradicts Plaintiffs' argument, *see Topf v. Warnaco, Inc.,* 942 F.Supp. 762, 766 (D.Conn.1996) (in light of recent cases, applying the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure to 9 U.S.C. § 4), the Court will not waste judicial resources in addressing this point.

a) The Making of an Agreement to Arbitrate

Historically, the decision for the court--whether an agreement to arbitrate was made--has been narrowly construed. Where allegations of fraud are involved, whether the Court should inquire into the validity of the contract depends upon whether the fraud claim is one of "fraud in the inducement" or "fraud in the factum ." [FN6] Under the so-called "severability doctrine," a claim that a contract could be avoided because the agreement was fraudulently induced had to be directed specifically to the arbitration provision itself for it to be proper for the court to decide the issue. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct.

1801, 18 L.Ed.2d 1270 (1967). *See also Genesco,* 815 F.2d 840, 854 (2d Cir.1987) ("fraudulent inducement claims [to entire contract] have long been held to be arbitrable as a matter of law"); *Manning v. Energy Conversion Devices,* 833 F.2d 1096, 1103 (2d Cir.1987) ("... any claim of fraudulent inducement of the agreement containing the clause would be a matter for the arbitrator"). [FN7] However, where the fraud claim is cast instead as "fraud in the factum," and thus challenges whether an agreement had been reached in the first place, the court should examine the validity of the agreement. *Nuclear Elec. Ins. Ltd. v. Cent. Power and Light Co.,* 926 F.Supp. 428, 433 (S.D.N.Y.1996). Commonly, fraud in the factum claims are based on allegations that one party was unaware of, or misdirected, as to what they were signing. *See e.g. Cancanon v. Smith Barney,* 805 F.2d 998, 1000 (11th Cir.1986) (non-English speaking plaintiff signed contract based on misrepresentation of its identity, thus arbitration provision not severable); *Kyung in Lee v. Pacific Bullion (New York) Inc.,* 788 F.Supp. 155, 157-158 (E.D.N.Y.1992) (non-English speaking plaintiff who signed contract based on false misrepresentation of the identity of the document, not compelled to arbitrate). Other bases for fraud in the factum that challenge the existence of an agreement can be that a party's "signature was forged on the contract, or [ ... ] an imposter purported to be an agent of that party with authority to bind it." *Nuclear Elec.,* 926 F.2d at 433.

FN6. Fraud in the "inducement" indicates a misrepresentation that goes to the subject matter underlying the transaction, but does not challenge the fact that an agreement of some kind was reached. Fraud in the "factum," or the execution, is rather when the misrepresentation goes to the contract itself, so that the existence of the agreement is challenged. Farnsworth, Contracts § 4.10 (2d ed 1990). *See Nuclear Elec. Ins. Ltd. v. Cent. Power & Light Co.,* 926 F.Supp. 428, 433 (S.D.N.Y.1996). This distinction arises for the purposes of severability because a fraud in the factum claim challenges the "making" of the agreement, whereas a claim of fraudulent inducement does not dispute that an agreement was reached.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



FN7. The Court notes, but does not examine, that the continuing vitality of the severability doctrine has been questioned in the wake of the Supreme Court in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943-947, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (court is to decide who should decide whether agreement to arbitrate existed, absent clear evidence that parties wanted question of arbitrability itself to be arbitrated). *See e.g. Abram Landau Real Estate v. Benova,* 123 F.3d 69, 73 (2d Cir.1997) (*First Options* standard applies when parties dispute whether an arbitration agreement was ever reached, but not to all possibly arbitrable issues where an agreement is in place); *Aviall, Inc. v. Ryder Sys., Inc.,* 913 F.Supp. 826, 831 (S.D.N.Y.1996) *Berger v. Cantor,* 942 F.Supp. 963, 965 (S.D.N.Y.1996). *Cf. Cular v. Metro. Life Ins. Co.,* 961 F.Supp. 550, 555, n. 4 (S.D.N.Y.1997).

*7 In the instant case, Plaintiffs claim that the Internet contract's  "February 1996 date [ ... ] was forged to bring it within the period when Tony Guccione was still working for GMI." *See* Pl.'s Mem. Law at 17. While Plaintiffs fail to specify their claim further, the Court understands Plaintiffs' argument to be that if the Internet agreement was signed after Anthony Guccione had left GMI, he no longer had authority to bind GMI to this agreement with Shooker. Such a claim could show that no agreement to arbitrate was reached, and is therefore an appropriate question for the Court to examine. *See e.g. Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1139 (9th Cir.1991) (claim that signee had no authority to bind party was properly before court because challenged the very existence of the contract); *Earthtrade, Inc. v. Gen. Brands Int'l Corp.,* No. 95 Civ. 8913, 1996 WL 63067, at *1,*3-4 (S.D.N.Y., Feb. 14, 1996) (evaluating claims that backdating of contract invalidated agreement containing arbitration provision).

The Court notes that the parties have presented voluminous papers with numerous affidavits on this question. Despite the quantity of submissions however, there is little that actually supports Plaintiffs' allegations of fraud. Certainly, the documentary evidence in the record does not indicate any fraudulent conduct. The Internet contract appears to be valid on its face, as does its subsequent amendment. Both signatories to the contract attest to its validity. The letter from Shooker to Boffa dated October 29, 1996, explicitly refers to an existing agreement between GMI and Deluxe for Internet services. His earlier letter also recommends that discussions with Internet services contain a caution that oral contracts have not been made. In addition, the separate contract between Deluxe and IEG of November 26, 1996, refers to problems in enforcing the Internet agreement with GMI.

Plaintiff's argument that these documents should not be taken at face value is that Boffa claims to have been unaware of the Internet agreement's existence until December 4, 1996, that the legal department and other GMI officers were not aware of the contract, [FN8] and that GMI files do not contain either a copy of the alleged agreement or other documentation to support its existence. Even if these facts are assumed to be true, it does not follow that Anthony Guccione could not have entered into an Internet agreement with Shooker in February, 1996. No evidence has been submitted to suggest that Anthony Guccione did not have sufficient authority to contract for GMI, nor that he was under an obligation to acquire the permission of other GMI officers before signing. Indeed, no evidence has been submitted to document the usual practice at GMI when such a contract was signed by an officer of GMI. In the absence of such a showing, that Boffa and Robert Guccione may have been kept in the dark appears irrelevant to the question of Anthony Guccione's authority to sign such an agreement as an officer of GMI, and fails to provide a basis to suggest that the contract could not have existed.

FN8. The Court finds the De La Cruz affidavit submitted by Plaintiff to be of little probative value. The affidavit dated February 21, 1997 states that she "never saw of heard of any agreement with Deluxe Entertainment," but she does not appear to contest that she signed a 'receipt of notice' related to the contract on which is written "from Deluxe Entertainment Corporation" on December 20, 1996. *Compare* De La Cruz Aff. ¶ 4 *with* Shooker Aff.,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



Ex. L.

**\*8** It is abundantly clear that GMI is not happy with the terms of the Internet contract. [FN9] Indeed, even Shooker states that the value of the Internet market was somewhat underestimated, and he was later willing to "sweeten the deal" for GMI accordingly. GMI's dissatisfaction is irrelevant however, to GMI's allegations that the Internet agreement was not actually signed while Anthony Guccione had the authority to bind GMI to a contract. Indeed, GMI's complaints regarding the terms of the Internet contract actually tend to support a conclusion that the Internet contract was indeed signed during Anthony Guccione's tenure. As asserted by his father, Anthony Guccione entered into several contracts while at GMI that were considered such bad deals that they would not have been agreed to by other GMI officers had they known. To have signed away GMI's Internet rights in a manner unfavorable to GMI would thus align with Anthony Guccione's practice while employed there. [FN10]

> FN9. The Court notes that to the extent Plaintiff's assertions could be construed as claims that the internet agreement is unconscionably unfair, that determination is for the arbitrator, not the court. *See e.g. Janmort Leasing, Inc. v. Econo-Car Int'l Inc.,* 475 F.Supp. 1282, 1292 (E.D.N.Y.1979).

> FN10. Further, in the December 4, 1996 conversation between Boffa and Shooker, Boffa's first response to Shooker's statement that the internet agreement was signed in February, 1996, was the question "by Tony?" (Boffa Reply Aff., Ex. A). Boffa also says later "Why did Tony hire you to do this?" (*Id.*). This again suggests that such a decision would be within Anthony Guccione's power, even if the GMI officers considered his use of such discretion unwise.

GMI further argues that certain comments and conduct by Shooker and Anthony Guccione over the summer and fall of 1996 are inconsistent with their current attestations that the Internet agreement was already in existence. The Court is unpersuaded that alleged comments over the summer of 1996 that the Internet area was "wide open," even

if taken as true, support Plaintiffs' argument. Since the Internet contract with Deluxe was to line up an Internet provider for GMI, it is logical and consistent that Shooker and Anthony Guccione would express to competitors within the Internet field that GMI was looking for such services. *See* Shooker Aff. ¶ 33. Further, as an amendment delayed execution of the contract until October, 1996, it is not surprising that the Internet contract would not be in discussion during the summer of 1996.

On one hand, the Court is presented with a contract and an amendment that appear in all respects to be valid, a letter to GMI referring to the contract, and affidavits from both signatories attesting to its validity and proffering explanations for GMI's charges of statements and conduct inconsistent with the contract's existence. On the other hand, the Court has been presented with affidavits from Plaintiffs stating that the contract must have been backdated because key figures were ignorant of its existence and do not consider it to be fair--allegations that even if conceded to be true, do not show that the agreement was not made. In sum, the Court finds that Plaintiffs have not submitted sufficient evidence to raise a triable issue as to whether the Internet agreement was signed in February, 1996.

Further discovery is sometimes warranted before deciding whether an agreement to arbitrate was made. *See e.g. Berger v. Cantor Fitzgerald Sec.,* 942 F.Supp. 963, 966 (S.D.N.Y.1996) (directing further discovery on the issue of notice that was relevant to the making of the agreement and the scope of the arbitration provision, was proper before deciding the request for a trial under 9 U.S.C. § 4). This is not the case here. The quantity of exhibits and affidavits submitted to the Court attests to the ample opportunity afforded to all parties to gather and present relevant evidence to this question. Moreover, Plaintiffs have not indicated what, if any, further evidence would be offered at a trial on the question of the validity of the Internet agreement, nor that desired discovery was in any way impeded during the pendency of the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



instant motions. *Compare* Pl.'s Reply Mem. at 23. *See Oppenheimer*, 56 F.3d at 358-59 (finding that without a showing of more evidence or restricted discovery, a trial on arbitrability need not be given).

**\*9** Therefore, since there is no basis in the record to find the Internet contract was fraudulently backdated, a trial on the issue of the validity of the Internet contract is not warranted. *Doctor's Assoc., Inc.*, 107 F.3d at 129-30; *see Berger v. Cantor Fitzgerald Securities*, 967 F.Supp. 91, 94 (S.D.N.Y.1997) (no trial required where plaintiff's factual evidence failed to show basis for negligent misrepresentation, duress or coercion, as a matter of law); *Acquaire v. Canada Dry Bottling*, 906 F.Supp. 819, 826 (E.D.N.Y.1995) (where claim of fraud in the factum suggested at most coercion, not sufficient to avoid arbitration).

b) *Motion to Compel Arbitration*

Due to the mandatory provisions of the United States Arbitration Act, a court petitioned to compel arbitration of a dispute or to stay proceedings pending arbitration, is limited to four questions it may properly address: 1) whether the parties agreed to arbitrate; 2) the scope of the arbitration agreement; 3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and 4) if some, but not all, claims are found to be arbitrable, whether the balance of the proceedings should be stayed pending arbitration. *Genesco*, 815 F.2d at 844 (citing to *Mitsubishi Motors Corp.*, 473 U.S. at 626). In considering these questions, federal substantive law of arbitrability is to apply, and "[d]oubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp.*, 473 U.S. at 626 (citing to *Moses H. Cone Memorial Hospital*, 460 U.S. at 24- 25).

As to the first issue, Plaintiff has attempted but failed to provide sufficient evidence to question the existence of an agreement to arbitrate, and this Court finds, as a matter of law, that no fraud has been shown. *See* discussion *supra*.

Regarding the scope of the arbitration provision, courts must decide at the onset whether the arbitration agreement is broad or narrow. *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983). In the instant case, the Internet agreement contains an arbitration provision covering "any dispute arising out of or relating to this Agreement." *See* Boffa Aff., Ex. A. This broad language gives rise to a presumption of arbitrability. *Collins & Aikman Products, Co. v. Building Systems, Inc.*, 58 F.3d 16, 20 (2d Cir.1995) (citing identical language as the "paradigm of a broad clause").

In looking at whether a claim falls within an arbitration provision, the Second Circuit has stated that:

we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters" covered by the parties' [ ... ] agreements, then those claims must be arbitrated, whatever the legal labels attached to them.

*Genesco*, 815 F.2d at 846 (internal citations omitted). *See also State of New York v. Oneida Indian Nation of New York*, 90 F.3d 58, 61 (2d Cir.1996). During this determination, the court should keep in mind that arbitration clauses are to be construed as broadly as possible, and arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir.1991).

**\*10** The instant cause of action is brought under federal civil RICO and trademark statutes. *See* Compl. ¶¶ 62, 66, 84, 92, 96. The Complaint alleges that Defendants created an "enterprise" through a series of corporations with interlocking ownership controlled mainly by Shooker, that had as its purpose to deprive GMI of money and valuable property including the use of the "Penthouse" trademark. *Id.* ¶¶ 14-15. This enterprise allegedly induced, or attempted to induce, GMI to enter into a number of contracts, such

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



as the Internet agreement with Deluxe, the IEG subcontract with Deluxe for Internet services, the ING investment deal, the audiotext agreements with DirecTel and DirectCell, and the proposal for a Starus Internet agreement. *See generally id.* 15-59. The Complaint further alleges that the communications by phone, mail and fax regarding these purportedly fraudulent contracts and their negotiations constituted mail fraud and wire fraud, which in turn constitute a pattern of racketeering activity. *Id.* ¶¶ 59-61. The use of the "Penthouse" name on the website established under these allegedly fraudulent contracts, is contended to violate federal trademark protection statues through infringement, dilution, unfair competition and false advertising. *Id.* ¶¶ 67-97.

The making of the Internet agreement is part of the alleged conduct underlying Plaintiffs' Complaint of civil RICO violations. It is axiomatic therefore, that these allegations 'touch matters' covered by the Internet agreement: the agreement itself is alleged to be a racketeering act. Moreover, the trademark violation claims are based on the use of the "Penthouse" name, a term of the Internet agreement. Considering the broadness of the arbitration provision and the high degree of overlap between the allegations underlying the Complaint and the Internet contract, Plaintiffs' claims fall within the scope of the arbitration provision. *See e.g. Genesco,* 815 F.2d at 847. *See also Kerr- McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 469-70 (2d Cir.1991).

The third issue requires a determination of whether claims brought under civil RICO and trademark statutes were intended by Congress to be nonarbitrable. The burden is on the party opposing arbitration to demonstrate that the arbitrability of statutory rights is precluded due to Congressional intent. *DeGaetano v. Smith Barney, Inc.,* No. 95 Civ. 1613, 1996 WL 44226, at *1,*4 (S.D.N.Y. Feb. 5, 1996). Plaintiffs did not address this issue in their opposing papers. *See supra* note 14. Moreover, "[t]here is no longer any doubt that a RICO claim is arbitrable." *Kerr-McGee Refining Corp.,* 924 F.2d at 469 (finding that

arbitrability of RICO claims is not limited to situations where the necessary prior conduct giving rise to RICO claim was governed by agreement to arbitrate). Violations of the Lanham Act have also been held to be arbitrable. *See Acquaire,* 906 F.Supp. at 838; *Givenchy S.A. v. William Stuart Industries, Ltd.,* No. 85 Civ. 9911, 1986 WL 3358, at *1,*3 (S.D.N.Y., Mar. 10, 1986). In light of Plaintiff's silence on this question, and precedent allowing arbitration of both RICO and Lanham Act violations, there is no basis to say Plaintiff's statutory claims are nonarbitrable.

*11 The remaining issue to be determined in a motion to compel arbitration is whether the balance of the proceedings, or any nonarbitrable claims, should be stayed in the interim. "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco,* 815 F.2d at 856 (citing *Moses H. Cone,* 460 U.S. at 20 n. 23). Further, "[b]road stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Id.* Generally, a stay of remaining claims has been found appropriate where such action would "promote judicial economy, avoidance of confusion and possible inconsistent results and would not work undue hardship or prejudice" against the parties. *Acquaire,* 906 F.Supp. at 838. *See also Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.,* 891 F.Supp. 946, 954-5 (S.D.N.Y.1995).

In the instant case, the claims of RICO and Lanham Act violations are based not only on the Internet agreement, but also on an investment contract between GMI and ING Capital Corporation, an audiotext contract between GMI and DirectCell Inc., another audiotext contract between GMI and DirecTel Communication Corp., and a videotext contract with Starus Corporation. *See generally* Compl. ¶¶ 17-50. Plaintiff alleges that these corporations were in fact controlled by Shooker, and that all the contracts were part of the scheme to defraud GMI, with the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



1998 WL 401530
(Cite as: 1998 WL 401530, *11 (S.D.N.Y.))

signing of the Internet agreement positioned as "the principal component" of the alleged illicit plan. *See* Compl. ¶¶ 16, 48. [FN11] While claims against some Defendants are based on other contracts, the allegations against them are still directly tied to their negotiations with Shooker and Anthony Guccione. Moreover, since most of these contracts are for similar if not identical services within the electronic media field, the validity of some may well be influenced by the status of the Internet contract. Thus, the claims stemming from these other contracts are so closely connected to those arising from the Internet agreement, that they would be affected and assisted by awaiting the outcome of its arbitration.

FN11. The Court also notes that although Plaintiff's motion for injunctive relief is directed solely towards the arbitration of the internet agreement, Plaintiff refers to the contracts with DirectCell, DirecTel and ING in their Memorandum of Law as purported "evidence" in support of their allegations of fraud in the factum. *See* Pl.'s Mem. of Law at 7-13. Plaintiff's own argument therefore supports a conclusion that these contracts are closely related.

The Court notes that there is a pending motion by Defendants Shooker, Deluxe, and Anthony Guccione to compel Defendant IEG to arbitrate its cross claim for recision of their subcontract under the Internet agreement. Since that motion's argument is wholly predicated upon the challenge to the Internet agreement now going to arbitration, it too should be stayed until the outcome of the arbitration proceedings regarding the Internet contract.

It is thus apparent to the Court that arbitration of the Internet agreement will likely provide significant insight, if not actually resolve, the claims arising out of the other contracts and directed towards other Defendants. Thus, the remainder of the claims, including the motion for arbitration of the pending cross claim, shall be stayed pending arbitration of the Internet agreement between GMI and Deluxe.

c) *Motion to Seal the Record*

*12 The instant motion papers were filed under a nondisclosure order explicitly limited to endure only until the Court's disposition of said motion. *See* Stipulation and Order of this Court, dated March 5, 1997, Docket entry # 7. [FN12] This nondisclosure order also explicitly covered any cross motion by Defendants to seal the record. *Id.,* ¶ 1.

FN12. Specifically, the Court ordered that pursuant to an agreement by the parties, all papers relevant to the instant motion and cross motion for injunctive relief were to be filed in Chambers until the Court directed otherwise, and distributed only among parties to the litigation until the Court rendered a decision on these motions. *Id.*

On March 29, 1997, Defendant Shooker filed an unopposed motion for a protective order that "all court papers be filed under seal pending a final determination of this action," which, pursuant to the nondisclosure order, was filed in Chambers. *See* Pls.' Reply Mem. of Law at 1, n.1. In this motion, Shooker argues, *inter alia,* that his reputation, business dealings, and the integrity of this litigation will be harmed if GMI and Boffa are allowed unfettered use of court documents to generate media attention. *See* Shooker's Mem. Law at 7-8, 10.

"[T]he decision as to access to [judicial records] is one best left to the sound discretion of the trial court." *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 826 (2d Cir.1997) (citing *Nixon v. Warner Comm., Inc.,* 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) ). There is a strong presumption of public access to judicial records that is "based on the need for federal courts [ ... ] to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995). The weight of this presumption will vary according to the relative importance of that particular judicial document in the adjudication of the litigant's rights. *Id.* at 1049-1050. Where the document in question played only a "negligible role in the performance of Article III duties," the presumption is diminished to "little more than a prediction of public access absent a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



countervailing reason." *Id.* at 1050. Further, documents that are inconsequential to the judicial decision, "such as those passed between the parties in discovery, lie entirely beyond the presumption's reach." *Id.* Once the weight of the presumption of access is ascertained, it is balanced against the competing considerations specific to the case at hand. *Id.*

In the instant case, both parties join in the request to seal the entire record. The documents filed with the Court to date do not reveal information usually considered confidential or highly person in nature. Indeed, Defendant Shooker's concerns are based on protecting his business reputation from any publicity that may result from the RICO and trademark violation claims against him. Even though Defendant Shooker may well be unhappy by the prospect of publicity surrounding this litigation, the arguments set forth here do not provide an adequate basis to place the entire record under seal. The public interest in access to the courts, and the court's own interest in allowing such access, far outweigh Defendant Shooker's generalized concern of negative reaction on his business dealings from the instant lawsuit. If such a rationale were sufficient to block access to court files, the vast majority of lawsuits before this Court would be closed to public view.

*13 Even as there has not been a showing to warrant placing the entire record under seal, the Court does find sufficient grounds to continue the nondisclosure order for the papers submitted in conjunction with the instant motions. Certain affidavits filed in support of this motion do contain allegations that could be construed as *ad hominem* attacks on the adverse party. As conceded, Defendant Shooker did participate avidly in similar rejoinders. Indeed, Plaintiffs do not oppose the motion to seal "in light of [Deluxe's] scurrilous but irrelevant allegations" that are "vehemently denied" in Plaintiffs' own papers. *See* Pls.' Reply Mem. at n.1. Despite the fact that both parties could be faulted for mudslinging, the Court agrees that such papers are also highly susceptible to misuse that could cause significant harm to parties, as

their "quasi-official appearance might give them more weight with the uninformed than they were entitled to receive." *Bridge C .A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940, 945 (2d Cir.1983). *See also Parker v. Columbia Broadcasting System, Inc.*, 320 F.2d 937, 938 (2d Cir.1963). Further, the scant weight accorded those portions of the motions that contained such *ad hominem* allegations, leads then to a weaker presumption of access, as such submissions do not play a role in the adjudicative process. The unrestricted availability of this Court's opinion will also lessen any impact on public scrutiny. *See e.g. DiRussa*, 121 F.3d at 827-8 (upholding sealing order of underlying documents, with the concurrent public filing of the district and appellate court opinions).

Upon consideration therefore, the Court finds that the continuation of the nondisclosure order to the designated motion papers is warranted. Therefore, the motions and their affiliated submissions, shall be sealed. The instant opinion, and the remainder of the record in this case, shall not be sealed.

### III. CONCLUSION

For the foregoing reasons, the Court hereby DENIES Plaintiffs' motion to enjoin arbitration, and GRANTS Defendant Deluxe's cross motion to compel arbitration of the Internet contract. The Court hereby DIRECTS that all remaining claims pending before the Court in the instant case are hereby STAYED pending the outcome of the arbitration proceedings.

Pursuant to various orders of this Court, Defendants Shooker, Deluxe, DirectCell International Corporation, and Anthony Guccione II, have been directed to answer, move or otherwise respond to the Complaint within 20 days following the Court's decision on the instant motion. In light of the stay imposed by this Memorandum and Opinion, the deadline for the above-named Defendants to answer, move or otherwise respond to the Complaint is hereby SUSPENDED SINE DIE until such time as the arbitration proceedings on the Internet agreement are concluded.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



1998 WL 401530
**(Cite as: 1998 WL 401530, \*13 (S.D.N.Y.))**

The Court further DIRECTS that the parties notify the Court immediately upon the conclusion of the arbitration proceedings.

**\*14** Defendant Shooker's motion to seal the entire record is hereby DENIED. However, the Court further DIRECTS that the motion papers submitted in accordance with the nondisclosure order be filed under seal. The remainder of the record in this matter, including this Memorandum and Order, shall be kept unsealed.

SO ORDERED.

1998 WL 401530, 1998 WL 401530 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



# APPENDIX  C

1997 WL 797511                                                              Page   1
26 Media L. Rep. 1882
(Cite as: 1997 WL 797511 (N.D.N.Y.))
< KeyCite History >

United States District Court, N.D. New York.

In re Savitt/Adler Litigation

No. 95-CV-1842 (RSP/DRH).

Dec. 23, 1997.

McNamee, Lochner, Titus & Williams, P.C., Attorneys for Intervenor Capitol Newspapers Division of the Hearst Corporation and Berkshire Hathaway, Inc., Albany, New York, Michael J. Grygiel, Esq.

Meredith H. Savitt, Esq., Delmar, New York, for Plaintiff Adler.

Sue H.R. Adler, Esq., Albany, New York, for Plaintiff Savitt.

Snitow & Pauley, New York, New York, for Defendants, Franklyn H. Snitow, Esq., Charles D. Cunningham, Esq., of Counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, D.J.

*1 Capital Newspapers Division of the Hearst Corporation, publisher of the *Albany Times Union* and Berkshire Hathaway, Inc., publisher of the *Buffalo News* (collectively, "press movants") requested an order (1) granting immediate access to defendants' summary judgment motion papers and plaintiffs' cross- motion papers; (2) authorizing their reporters to attend oral argument on the summary judgment motions; and (3) granting them attorneys' fees and costs. For reasons that I discuss below, I grant the press movants' motion in part and deny it in part.

BACKGROUND

In this lawsuit, plaintiffs Meredith H. Savitt and Sue H.R. Adler allege, among other things, that defendants discharged or otherwise discriminated against them because they lacked political connections to the Republican Party or Republican office holders. Along with many other Assistant Attorneys General ("AAGs"), Savitt lost her job several months after defendant Dennis C. Vacco, a Republican, took office as New York's Attorney General in January 1995. Adler resigned shortly thereafter, allegedly in the face of discriminatory treatment.

In November, 1996, I(1) granted the *Albany Times Union* permission to intervene in appeals from discovery and protective orders entered by Magistrate Judges David N. Hurd and David R. Homer and (2) clarified the permissible scope of protective orders governing materials produced in discovery. *See Savitt v. Vacco*, 1996 WL 663888 at * 5-8 (N.D.N.Y. Nov.8, 1996) (the "November 8 Order"). By virtue of the November 8 Order and subsequent orders made by Magistrate Judge Homer, certain documents and portions of deposition transcripts have been sealed. *See, e.g.* Dkt. Nos. 118, 133, 145, and 235.

Because of the existing protective orders, plaintiffs requested permission to file their entire response to defendants' summary judgment motions *in camera*. Plaintiffs represented that (1) the material subject to protective orders was inextricably intertwined with the law and (2) redaction would render the papers incomprehensible. Plaintiffs noted "the public is still free to move to have the material disclosed in part or in toto, without any prejudice to their rights." Letter from Meredith H. Savitt to Court of 9/17/97, Dkt. No. 362 Ex. C. Defendants did not object to plaintiffs' request, and I granted it. Defendants filed all of the papers in support of and opposition to their summary judgment motion and in support of and opposition to plaintiffs' cross- motions for summary judgment *in camera* on November 6, 1997. On November 26, 1997, the press movants requested an order to show cause allowing them to inspect and copy the papers the parties had submitted and to attend oral argument on the summary judgment motion. Dkt. No. 356. I signed an order to show cause making the press movants' application

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



1997 WL 797511

**Page    2**

(Cite as: 1997 WL 797511, *1 (N.D.N.Y.))

returnable on December 15, 1997, and establishing an accelerated briefing schedule. Dkt. No. 358. Defendants cross-moved for an "order permanently sealing those portions of plaintiffs' joint exhibits and joint appendices ... that would expose non- parties to embarrassment and oppression." Notice of Motion, Dkt. No. 362. In the alternative, defendants requested that I seal the contested portions until after determination of the parties' summary judgment motions. *Id.* Plaintiffs took no position on the press movants' request. I heard oral argument on December 15, 1997. After argument, I announced my decision. This memorandum-decision and order explains the basis for that decision and formalizes it.

## DISCUSSION

**\*2** Defendants did not oppose a significant portion of the relief the press movants requested. Specifically, defendants agreed that (1) the press movants were entitled to attend oral argument and (2) the press movants were entitled to unfettered access to the parties' briefs, declarations, and affidavits. Based on this concession, I direct the Clerk to immediately unseal the documents at docket numbers 317 through 340. [FN1] In addition to their briefs, declarations, and affidavits, the plaintiffs filed joint appendices and joint exhibits. The joint exhibits consist in large part of documents relevant to the hiring, rehiring, or failure to rehire various AAGs. They include resumes, evaluations, and letters or memoranda recommending a particular candidate's hiring or rehiring. The joint appendices serve as a sort of road map to the exhibits, pointing out those portions of the exhibits that the plaintiffs believe support their factual contentions. Defendants consent to the unsealing of the joint appendices and joint exhibits provided that the names of and identifying details concerning individual AAGs are redacted. The press movants argue--based both on the First Amendment and the common law presumption of access-- that they should be allowed to examine and copy the joint appendices and joint exhibits in their unredacted form.

FN1. I note that docket number 287 consisting of deposition transcripts from other lawsuits was also filed *in camera.* The record contains no indication that these transcripts should be under seal. Therefore, unless a party files a motion requesting sealing of the transcripts at docket number 287 on or before January 5, 1997, the Clerk must also unseal these transcripts.

### I. The Common Law Presumption of Access

Both the public and the press enjoy a common law right of access to judicial records. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The common law right of access is not absolute, and each court has the right to control its own files to insure that they are not used for improper purposes. *Id.* at 598. However, the party seeking to keep judicial records from public scrutiny has the burden of demonstrating that they should remain sealed. *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 826 (2d Cir.1997). In determining whether specific documents should be open to the public, I must first determine the weight to be given to the presumption of access. *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995). Because the presumption rests on the public's right to monitor the federal courts, the degree to which a particular document should be open to the public "must be governed by the role of the material at issue in the exercise of Article III judicial power." *Id.* at 1048-49. The court must determine where the document in question "fall[s] ... on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.* In general, "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons." *Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982).

Once having determined the weight to be accorded the presumption of access, "a court must balance competing considerations against it." *Amodeo,* 71 F.3d at 1050. "[P]rivacy interests of innocent third parties ... should weigh heavily in a court's balancing

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



equation." *Id.* (internal quotation and citation omitted).   One benchmark for judging the importance of a privacy right is "the degree to which the subject matter is traditionally considered private rather than public." *Id.* at 1051.   In addition, the court should consider the degree of the injury that disclosure will cause and the reliability of the information at issue. *Id.*

**\*3** I consider first the strength of the presumption of access.   Plaintiffs filed the joint appendices and exhibits in opposition to defendants' summary judgment motion and in support of their cross-motion.   Thus these documents as a whole enjoy a strong presumption of access. *Joy,* 692 F.2d at 893.   However, defendants do not seek to bar access to the documents in their entirety.   Rather they seek only to redact names and identifying details.   Neither plaintiffs nor defendants contend that the identity of AAGs that were retained, terminated, or hired has any bearing on the decision of the summary judgment motion.   In defendants' view, the employment related information in the joint exhibits and appendices is completely irrelevant while plaintiffs rely not on the identity of the particular AAGs but rather on their political affiliations and links to various politically prominent individuals. Therefore, the identity of the AAGs will not play a role in the Article III function of deciding this motion, and I conclude that the presumption of access to the names of and identifying details concerning non-party AAGs is relatively weak.   *See Joy,* 692 F.2d at 893 (indicating court may exercise judgment to seal tangentially relevant and potentially damaging information).

Defendants urge that three factors weigh against the presumption of access:   (1) damage to the reputations and privacy interests of non-party AAG's;  (2) damage to morale in the Department of Law;   and (3) damage to the ability of those AAGs who have received negative evaluations to perform their job duties. Press movants urge that each of these arguments rests on speculation.   I conclude that the non-party AAGs' privacy interests are a strong factor weighing against disclosure of their identities.   Because New York exempts the employment histories of public employees and the references of applicants from disclosure under the Freedom of Information Law, N.Y. Pub. Off. L. § 89(2)(b)(i) (McKinney 1988), I conclude that these materials are traditionally considered private and thus the non-party AAGs' privacy interest is entitled to substantial weight in the balancing analysis.   *See Amodeo,* 71 F.3d at 1051.   Moreover, some of the information is potentially quite damaging to non-party AAG's and is unsworn. *See Id.*

Redaction of names and identifying details will protect the strong privacy interest of non-party AAGs while still enabling the public and press to assess (1) the basis for my decision on the summary judgment motion and (2) whether defendant Vacco hired AAGs for political patronage reasons.

II. The First Amendment

The press movants urge, however, that the First Amendment imposes a more stringent burden on the defendants.   Although the public and press have a qualified First Amendment right of access to criminal trials and to documents filed in connection with criminal pretrial motions, *United States v. Wolfson,* 55 F.3d 58, 60 (2d Cir.) (citations omitted), *cert. denied* 516 U.S. 990, 116 S.Ct. 521, 133 L.Ed.2d 429 (1995), as well as to civil trials, *Westmoreland v. Columbia Broadcasting System, Inc. (In re Waiver of Local Rule 7 to Permit Audio-Visual Coverage of the Trial in General William C. Westmoreland v. CBS, Inc.),* 752 F.2d 16, 23 (2d Cir.1984), neither the Second Circuit nor the Supreme Court has held that the public has a First Amendment right of access to documents filed in civil lawsuits. Instead, recent Second Circuit cases considering the right of access to documents filed in civil lawsuits have employed only a common law presumption analysis. *See, e.g. DiRussa,* 121 F.3d at 825-26; *Amodeo,* 71 F.3d at 1047-53.

**\*4** Assuming that the First Amendment protects the public's right of access to submissions made on a summary judgment motion in a civil case, defendants nevertheless

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



have demonstrated that the names of and identifying details concerning non-party AAGs should be redacted. In reaching this conclusion, I apply the balancing test that the Second Circuit used to gauge the public's First Amendment right of access to documents filed in support of a criminal pretrial suppression motion, *see United States v. Biaggi (In re New York Times)*, 828 F.2d 110, 116 (2d Cir.1987). In *New York Times*, the Second Circuit found (1) there is a qualified First Amendment right of access to documents filed in support of a criminal suppression motion but (2) papers could "be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (internal quotations omitted). The court specifically identified "the privacy interests of innocent third parties" as a factor that "should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted." *Id.* Although the court found that a statutory guarantee of privacy does not trump the public's First Amendment right of access, it also found that such an interest is entitled to great weight in the balancing analysis. *Id.* at 115-16. Thus, Section 89(2)(b)(i) of the New York Public Officers Law does not require that I deny access to employment histories of public employees but does serve as an indication both of the importance New York places on the privacy of public employees' employment records and the expectation of privacy that public employees have in these records. The press movants urge that the non-party AAGs' interest in privacy cannot override the public's right to know whether defendants hired the non-party AAGs for patronage reasons rather than because of their qualifications. However, the public can assess the Attorney General's actions without the names of the individual AAGs. The redacted record will reveal what political influence a particular AAG may have had--both by virtue of letters of recommendation and by connection to particular political figures--and the evaluations that the AAG received both before and after hiring. All that will be missing is the identity of the AAG concerned. Because the redaction sought is minimal and largely

unrelated to the public interest, I conclude that defendants have demonstrated both that a higher value will be served by redaction and that their proposed redactions are narrowly tailored to serve that interest. *See New York Times,* 828 F.2d at 116.

Therefore, on or before January 15, 1998, the defendants must file copies of the joint exhibits and appendices that have been redacted to remove the names of non-party AAG's as well as details that may tend to identify them. Three cautions are in order. First, defendants must use the same coding system throughout the exhibits. Thus, if "1" is used to identify an AAG with respect to his or her application or references, "1" must also be used when redacting job evaluations. In this way, the public will be able to determine whether an AAG arguably hired because of his or her political connections also lacked competence. Second, if a particular record has already been made public, it cannot be redacted. Third, in certain instances an AAG may be identifiable because of her or his connection to a political figure; these details-- including the name of the political figure and his or her relationship to the candidate--may not be omitted. Defendants' redacted exhibits and appendices will be open to the public upon filing. The defendants must simultaneously file under seal a copy of each page of an exhibit or appendix that has been redacted along with copies of the unredacted version. If redactions have been inappropriately made, I will direct the defendants to restore the wrongly omitted information.

III. Defendants Cross-Motion

**\*5** Defendants' cross motion for sealing identifying details concerning non- party AAGs is granted to the extent set forth herein. [FN2]

FN2. Based on a statement in defendants' attorneys' declaration, the press movants assumed that defendants requested a permanent injunction barring press movants from releasing the redacted information. Defendants did not request injunctive relief in their notice of motion and I do not interpret counsel's remark that "[a] permanent injunction

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



prohibiting public dissemination of the names and identifying information of AAGs, contained in the joint exhibits and joint appendices, will preserve their reputations and privacy interests while, at the same time, permit the press movants access to the substantive information which purportedly supports plaintiffs' claims" as a request for a permanent injunction.  *See* Snitow Decl. ¶ 4.

## IV. Attorneys' Fees

Press movants requested attorneys' fees without citation to an authorizing statute or case law.   Moreover, press movants did not submit an accounting of their hours.   Should press movants wish to pursue their request for attorneys' fees, they must submit a request supported both by contemporaneous time records and a memorandum of law within fourteen days of the date of this memorandum-decision and order.   Any party from whom the press movants seek attorneys' fees may respond within fourteen days of service of press movants' papers.

## CONCLUSION

The press-movants' motion is granted to the extent set forth herein and otherwise denied; defendants' cross-motion is granted to the extent set forth herein and otherwise denied.

IT IS SO ORDERED.

1997 WL 797511, 1997 WL 797511 (N.D.N.Y.), 26 Media L. Rep. 1882

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



# APPENDIX  D

2002 WL 31094782
--- F.Supp.2d ---
(Cite as: 2002 WL 31094782 (E.D.N.Y.))
< KeyCite History >

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.

UNITED STATES of America,
v.
Carrie L. CHANDLER a/k/a, "Gail T. Wilson," a/k/a "Amy L. Glasper," a/k/a "Amy L. Walker," a/k/a "Carrie L. White," Defendant.

No. 92-CR-679 (ADS).

Sept. 19, 2002.

Following affirmance of her convictions, defendant sought disclosure from the Court of various documents. The District Court, Spatt, J., held that: (1) defendant was not entitled to probation records; (2) defendant was not entitled to unseal affirmation used in her conviction; (3) defendant was not entitled to free copies of court documents; (4) defendant was not entitled to a copy of her presentence investigation report (PSI).

Request denied.

[1] Records ⬅ 31

326k31

[1] Records ⬅ 51
326k51

United States Probation Department, as arm of United States District Court, is exempt from the disclosure requirements of the Freedom of Information Act (FOIA) and the Privacy Act. 5 U.S.C.A. §§ 551, 552a.

[2] Records ⬅ 32
326k32

Access to sealed court records is ordinarily obtained by a request addressed to the discretion of the trial court which determines the question of the relevant circumstances.

[3] Records ⬅ 32
326k32

The party seeking to maintain judicial records under seal bears the burden of proof.

[4] Records ⬅ 32
326k32

"Judicial documents," presumptively subject to public inspection, are items that are relevant to the performance of the judicial function and useful in the judicial process, directly affect an adjudication, or determine litigants' substantive rights.

[5] Records ⬅ 32
326k32

Witness' affirmation which defendant sought to unseal was a "judicial document," and thus it was presumptively subject to public inspection; jury heard testimony regarding its unredacted portions in defendant's trial, and it was used in determining her sentence.

[6] Records ⬅ 32
326k32

Although witness' affirmation which defendant sought to unseal for use to impeach witness in trial of pending civil action was judicial document, weak presumption of public access was overcome by privacy interests of people who were falsely accused in affirmation of sexual activity; moreover, denial of application would not impede defendant's ability to impeach witness, and it was not certain that case would proceed to trial.

[7] Records ⬅ 15
326k15

Since defendant's criminal case had concluded, and her judgment of conviction had been affirmed on appeal, she was not entitled to free copies of court documents under the Criminal Justice Act, when she could review them in the clerk's office and make copies of them and without a court order. 18 U.S.C.A. §

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



2002 WL 31094782
**(Cite as: 2002 WL 31094782 (E.D.N.Y.))**

Page   2

3006A.

[8] Records ⟨⇒ 31
326k31

[8] Records ⟨⇒ 60
326k60

Presentence Investigation Report (PSI) created by United States Department of Probation was a court document exempt from disclosure under the Privacy Act and the Freedom of Information Act (FOIA). 5 U.S.C.A. § 551; 5 U.S.C. § 552a.
 Roslynn R. Mauskopf, United States Attorney, Central Islip, NY, by: Burton T. Ryan, Assistant United States Attorney.

 Carrie L. Chandler, Brooklyn, NY, Defendant Pro Se.

 SPATT, District Judge.

 *1 On July 12, 1994, a jury found Carrie L. Chandler ("Chandler" or the "defendant") guilty of (1) possessing and using five or more false identification documents in violation of 18 U.S.C. § 1028(a)(3); (2) making a false statement in the application and use of a passport in violation of 18 U.S.C. § 1542; and (3) bank fraud in violation of 18 U.S.C. § 1344. On September 16, 1994, this Court sentenced Chandler to twenty-one months imprisonment and five years supervised release and directed that she pay restitution in the amount of $4,898 to Household Finance Bank. The Court also ordered that Chandler was to receive psychiatric treatment. On October 23, 1996, the Second Circuit Court of Appeals affirmed the judgment of conviction. *See United States v. Chandler*, 98 F.3d 711 (2d Cir.1996). According to the Government, the defendant's supervised release terminated on December 28, 1999, and she has not fulfilled the restitution requirement. Presently before the Court are three requests by Chandler for the Court to provide her with various documents. The Court will review the requests chronologically.

 A. The September 17, 2001 Request for Probation Department Documents

 Chandler requests the following documents from the file maintained by the United States Department of Probation: (1) monthly supervision reports for May through September 1996 with photocopies of Chandler's pay stubs from those months; (2) a memorandum, dated May 23, 1999, from United States Probation Officer Gregory Carter to the Court, requesting a modification of probation; and (3) all of Chandler's medical reports, including but not limited to the psychiatric evaluation by one Dr. Berger. Chandler contends that she is entitled to the memorandum and medical reports because they were previously provided to her. She maintains that she is entitled to copies of her monthly supervision reports because the Government conceded as much during a Modification of Probation Hearing that was held in 1999. The Government opposes her request.

 Chandler has provided no legal authority in support of her application for the records maintained by the Probation Department. Nor has she indicated why she wants the Probation Department documents. Although in one of her subsequent requests, Chandler states that she needs certain other documents to assist her in preparing a lawsuit she filed in the Souther District of New York against the New York State Division of Parole, she does not indicate that the Probation Department documents are necessary to that lawsuit.

 [1] Chandler is not entitled to the documents. A legal authority that might provide a basis for Chandler's request would the Freedom of Information Act, 5 U.S.C. § 551 *et. seq.* ("FOIA") or the Privacy Act, 5 U.S.C. § 552a. The FOIA and the Privacy Act require agencies of the executive branch to make "agency records" available to individuals provided certain requirements are met. 5 U.S.C. §§ 552(a)(3), 552(a)(4); 5 U.S.C. §§ 552a(1), 552a(g)(1)(A), (B), (C), and (D). The FOIA describes "agency" for both statutes as follows:
 *2 [T]he term "agency" as defined section 551(1) of this title includes any executive department, military department, Government corporation, Government

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f). The United States Courts are expressly exempt from the definition of the word "agency". 5 U.S.C. § 551(1)(B), and the Probation Department is an arm of the Untied States District Court, *see Dorman v. Higgins,* 821 F.2d 133, 137 (2d Cir.1991); *Rankin v. United States Probation Department,* 1989 WL 14067 *1 (E.D.Pa. Feb.21, 1989). Therefore, the Probation Department is exempt from the disclosure requirements of the FOIA and the Privacy Act. *See Lindsey v. Bureau of Prisons,* 736 F.2d 1462, 1464 (11th Cir.1984); *United States v. Charmer Indus.,* 711 F.2d 1164, 1170 n. 6 (2d Cir.1983) (a court document is not within the purview of the Privacy Act or the FOIA); *Schwartz v. U.S. Department of Justice,* 1995 WL 675642 *7 (S.D.N.Y. Nov. 14, 1995); *Rankin,* 1989 WL 14067 *1. Accordingly, the Court denies Chandler's request for the three types of Probation Department records because she has provided no legal authority for their disclosure; she has not explained the reason she requires these documents; and the Privacy Act and the FOIA do not require the Probation Department to provide her with the documents she seeks.

B. The March 15, 2002 Request for the Sealed Affirmation of Gregory Glasper

In a letter dated March 15, 2002, Chandler asks this Court to unseal the affirmation of one Gregory Glasper ("Glasper"), which Chandler states she sought to enter in evidence during her criminal trial. Chandler, in her request, and the Government, in its opposition papers, state that the contents of the affirmation were false. Chandler and the Government also state that the Court declined to enter the affirmation in evidence, and the Government states that the Court sealed the document to preserve it should it be needed on appeal.

Chandler explains that she seeks the affirmation to use against Glasper in the trial

of her civil action pending in the Southern District of New York. Chandler claims that Glasper wrote letters to the New York State Division of Parole and the New York City Police Department that "were the catalysts to the Parole and NYPD conduct that is now being challenged." Chandler asserts that she "reasonably anticipate[s] that the defendants will allege that they engaged in certain conduct against me based upon the allegations made by Mr. Glasper," and she seeks to impeach Glasper's credibility with the affirmation. Chandler argues that the Court should unseal the affirmation and provide her with a copy because the only reason she does not currently possess a copy is that she lost much of the record in this case when she was evicted from her home in 1998.

*3 The Government opposes Chandler's request, arguing that the need for the document is uncertain; the scope of cross-examination is a matter best left to the trial judge; Chandler is already aware of the contents of the affirmation and, thus, does not require the affirmation to cross-examine Glasper; and, if a compelling need for the production of the document occurs, Chandler will inform the trial judge of the existence of the documents. In sum, the Government asserts that Chandler has failed to present the Court with a compelling need for an order unsealing the affirmation.

[2][3][4] "[A]ccess to sealed court records is ordinarily obtained by a request addressed to the discretion of the trial court which determines the question of the relevant circumstances." *United States v. Davis,* 702 F.3d 418, 423 (2d Cir.1983). The party seeking to maintain judicial records under seal bears the burden of proof. *See United States v. Amodeo,* 71 F.3d 1044, 1047 (2d Cir.1995) (*Amodeo II* ); *United States v. Amodeo,* 44 F.3d 141, 146 (2d Cir.1995) (*Amodeo I* ). The first question before the Court is whether the affirmation is a "judicial document." *See SEC v. The Street.com,* 273 F.3d 222, 232-33 (2d Cir.2001). "Judicial documents" are items that are "relevant to the performance of the judicial function and useful in the judicial process," *Amodeo I,* 44 F.3d at 145; "directly affect an adjudication," *Amodeo*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



*II*, 71 F.3d at 1049; or "determin[e] litigants' substantive rights," *Id. See The Street.com*, 273 F.3d at 233.

[5] The Court denied the defendant's request to admit the document in evidence. However, the Court redacted portions of the affidavit it found were inappropriate and scandalous and permitted Chandler and the Government to question Glasper about the remainder of its contents. On cross-examination by the Government, Glasper admitted that portions of the affirmation were not true. The affirmation also played a role in the sentencing proceedings when the Government sought an upward enhancement of Chandler's sentence based on the allegation that she suborned Glasper's perjury in the affirmation. The Court held that the Government failed to introduce sufficient evidence linking Chandler to the creation of the affirmation. The Court finds that the affirmation is a judicial document because the jury heard testimony regarding its unredacted portions, and the Court used it in determining Chandler's sentence. Because the Glasper affirmation is a judicial document, it is presumptively subject to public inspection. *Amodeo I*, 44 F.3d at 146; *see The Street.com*, 273 F.3d at 233.

[6] The next question to be resolved is the weight that should be given to the presumption favoring access. In *Amodeo II*, the Second Circuit explained that:
[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of the Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.
*4 *Amodeo II*, 71 F.3d at 1049. The Court finds that in this case, the presumption favoring access is weak. Those monitoring the federal courts have the same access to the information regarding the affirmation as did the jury, because Glasper testified about its unredacted portions during the trial. In addition, although the Court considered the

affirmation in determining the appropriate sentence, it did not review the contents of the affirmation. Rather, it reviewed Glasper's testimony regarding the affirmation and determined that the Government had not introduced sufficient evidence to link Chandler to the creation of the affirmation. Accordingly, the public has access to the information the Court used to conclude that Chandler should not receive an upward departure based on the Glasper affirmation. Thus, the Court finds that the presumption of access to the Glasper affirmation is weak.

Next, the Court must turn to any countervailing factors that must be weighed against the presumption of access. *See Amodeo II*, 71 F.3d at 1050. Here, the countervailing factor is protecting the privacy interests of those mentioned in the affirmation. The affirmation contains scandalous allegations regarding the sexual activity of several people. These allegations are apparently false, and their release to the public could harm the reputation and lives of those mentioned. Indeed, "courts have the power to insure that their records are not 'used to gratify private spite or promote public scandal,' and have 'refused to permit their files to serve as reservoirs of libelous statements for press consumption.' " *Amodeo II*, 71 F.3d at 1051 (quoting *Nixon v. Warner Communications, Inc.* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978)).

In balancing these factors, the Court notes that denying Chandler's application will not impede her ability to impeach Glasper. During Chandler's criminal trial, Glasper admitted under oath that portions of the affirmation were not true. Thus, Chandler could use the trial testimony about the affirmation to impeach Glasper in her civil trial. The Court also notes that Chandler's present motion is based on her assumption that her case will proceed to a trial, that Glasper will be available to testify, and that the trial court will permit Chandler to question him about the affirmation. That all of these events will occur is by no means certain.

In sum, the Court denies Chandler's request

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



2002 WL 31094782
(Cite as: 2002 WL 31094782, *4 (E.D.N.Y.))

to unseal the Glasper affirmation because although it is a judicial document, it is accorded a weak presumption of public access that is overcome when balanced with countervailing concerns.

C. The April 26, 2002 Request for (1) Trial Transcripts; (2) *Fatico* Hearing Transcripts; (3) "Jencks Act Materials;"; (4) the Second Superseding Indictment; and (5) the Presentence Investigation Report

[7] In a letter dated April 26, 2002, Chandler requests the following documents: (1) trial transcripts; (2) *Fatico* hearing transcripts; (3) "Jencks Act Materials"; (4) the Second Superseding Indictment; and (5) the Presentence Investigation Report ("PSI"). She also renews her request for a copy of the Glasper affirmation. The Second Superseding Indictment and the transcripts from Chandler's criminal trial and *Fatico* hearing are public documents available in the court file which is located in the Clerk's Office. Chandler can review them in the Clerk's Office and make copies of them and does not require a court order to do so. To the extent that Chandler requests free copies of these documents, that request is denied. Chandler's criminal case has concluded, and her judgment of conviction has been affirmed on appeal. Therefore, she is not entitled to free copies of court documents under the Criminal Justice Act.

*5 Chandler's request for "Jencks Act Materials" is denied because Chandler fails to specify the information, documents, or statements she seeks. The Court cannot evaluate such a vague request.

[8] Chandler's request for a copy of the PSI also is denied. The PSI is a document created by the Department of Probation and provided to the Court prior to sentencing. As such, it is a court document, and for the reasons discussed above, neither the Privacy Act nor the FOIA require the Court to provide her with a copy of it. Notably, the Supreme Court has held that the FOIA empowers the subject of a PSI to obtain his or her PSI from the FBI or the United States Parole Commission, if

either of those executive branch agencies has a copy of the PSI. *See United State Department of Justice v. Julian,* 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988). However, the Court's holding does not affect the exclusion of the United States Courts from the FOIA or the Privacy Act. Accordingly, Chandler's request for a copy of her PSI is denied.

Based on the foregoing, it is hereby

ORDERED, that Chandler's requests for copies of (1) the Probation Department Records; (2) trial transcripts; (3) transcripts from the *Fatico* hearing; (4) "Jencks Act Materials"; (5) the Second Superseding Indictment; and (6) the PSI are DENIED; and it is further

ORDERED, that Chandler's request for an order unsealing the affirmation of Gregory Glasper is DENIED.

SO ORDERED.

2002 WL 31094782, 2002 WL 31094782 (E.D.N.Y.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



# APPENDIX E

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1549228 (S.D.N.Y.))
< KeyCite Citations >

Page   1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Paula STERBENS, et al., Plaintiffs,

v.

SOUND SHORE MEDICAL CENTER OF WESTCHESTER, et al., Defendants.

No. 01 CIV. 5980 SASKNF.

Dec. 5, 2001.

Steven Arensen, Esq., Arensen, Dittmar & Karban, New York.

Hetal Desai Hodges, Esq., L'Abbate, Balkan, Colavita & Contini, L .L.P., Garden City.

MEMORANDUM and ORDER

FOX, Magistrate J.

I. INTRODUCTION

*1 In this action, which contains, *inter alia,* allegations of sex discrimination and pregnancy discrimination, the parties are engaged in discovery. A dispute has arisen concerning whether certain documents the defendants have should be classified as confidential and be withheld from public disclosure pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. Defendants Sound Shore Medical Center of Westchester and Kathy Hagan (collectively "Sound Shore") urge that a protective order be issued by the Court to prevent disclosure to non-parties of certain personnel documents and documents that reflect the organization of its corporate structure. Plaintiffs oppose Sound Shore's request. They maintain that to grant Sound Shore's request would not be in keeping with applicable case law or the presumption in favor of public access to court records. Sound Shore has submitted the documents in question for *in camera* review. The Court has reviewed the documents and, for the reasons which follow, Sound Shore's application that the documents be withheld from public disclosure is granted in part and denied in part.

II. DISCUSSION

The scope of discovery, under the Federal Rules of Civil Procedure, is broad. Parties to an action may obtain discovery regarding any matter that is not privileged, if it is relevant to the claim or defense of any party to the action. Moreover, upon a showing of good cause, a court may order discovery of any matter relevant to the subject matter involved in the pending action. *See* Fed.R.Civ.P. 26(b)(1)

Discovery is presumptively open to public scrutiny unless a valid protective order directs otherwise. *See In re "Agent Orange" Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir.1987). Under Fed.R.Civ.P. 26(c), a court, upon a showing of good cause, may "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). The party seeking a protective order has the burden of showing that good cause exists for issuance of the order. *See In re Agent Orange,* 821 F.2d at 145. To establish good cause under Rule 26(c), courts require a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Akron Beacon Journal v. Metropolitan Life Ins. Co.,* No. 94 Civ. 1402, 1995 WL 234710, at *10 (S.D.N.Y. April 20, 1995)(quoting *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 [3d Cir.1986] ). In the context of a claim of confidential business information, "this standard demands that the company prove that disclosure will result in a clearly defined and very serious injury to its business." *Gelb v. American Tel. & Tel. Co.,* 813 F.Supp. 1022, 1034 (S.D.N.Y.1993)(internal quotations omitted) (citations omitted). In determining the weight to be accorded an assertion of a right of privacy, courts should consider whether the subject matter is traditionally considered private rather than public, the nature and degree of injury, and the reliability of the information. *See United States v. Amodeo, et al .,* 71 F.3d 1044, 1050-51 (2d

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1549228, *1 (S.D.N.Y.))

Page   2

Cir.1995).

*2 Sound Shore submitted four categories of documents for *in camera* inspection; the Court's analysis of each category of documents follows:

*Category I: Tables of Organization and Position Control Documents*

The tables of organization submitted by Sound Shore consist of diagrams depicting the hierarchical structure of the administrative component of Sound Shore's finance department and medical, nursing home, and extended care facilities. The "position control documents" submitted by Sound Shore consist of records of administrative positions within its finance department, the occupants of those positions, and the number of hours of weekly employment associated with each position, for the years 1995, 1997, 1999 and 2000. The "position control documents" do not include explicit references to salaries or salary histories.

Sound Shore contends that disclosure of these documents to persons who are not parties to the action will injure its business because the information contained in them could be used by competitors to "lure away employees and potential patients," and to interfere with "the marketing of its medical and extended care services." In addition, Sound Shore opposes publication of the material to non-parties on the ground that the documents contain job title and job-related references to Sound Shore employees who are not parties to this action.

No showing has been made that Sound Shore's documents which reflect the organization of its corporate structure and the "position control documents" contain valuable commercial information that could adversely affect Sound Shore's competitive position in the healthcare market. All that is before the Court are Sound Shore's conclusory allegations respecting the adverse consequences to it that disclosure of this material to non-parties would have. Sound Shore's conclusory statements regarding the effects of disclosure of these documents to non-parties fall short of the specificity required to

establish good cause for a protective order. Further, no showing has been made that the privacy interests of the parties whose names appear in these documents outweigh the public's presumptive right of access to discovery materials.

Accordingly, the Court finds that the documents that reflect the organization of Sound Shore's corporate structure and "position control documents" need not be protected from public disclosure.

*Category II: Memorandum of John R.Spicer*

The memorandum of Sound Shore executive John R. Spicer ("Spicer Memorandum") records the substance of a conversation that took place on April 5, 2000, between Mr. Spicer and defendant Charles Thevnin, an employee of Sound Shore. Sound Shore contends that the Spicer Memorandum should be withheld from public view because of "the sensitive nature of the litigation" in this case and the need to protect the parties from "annoyance, embarrassment, and oppression," as contemplated by Fed.R.Civ.P. 26(c). Plaintiffs contend that Sound Shore's position with respect to the Spicer Memorandum is untenable in light of the defenses it has asserted to the allegations of sexual harassment made in this action. Specifically, plaintiffs argue that, since Sound Shore will probably rely on the Spicer Memorandum to establish that it exercised reasonable care to prevent and correct any misconduct of the type alleged in the complaint, the document is likely to play a significant role in determining the litigants' rights in this action. Consequently, according to plaintiffs, the Court should accord "strong weight to the public's interest in access" to this document.

*3 The Court finds that Sound Shore has met its burden and shown good cause for the protective order with respect to the Spicer Memorandum. Public disclosure of the contents of the Spicer Memorandum has a high potential for embarrassment or harm to defendant Charles Thevnin. Therefore, the privacy interest of this defendant constitutes an exception to the presumption of public

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



access. The plaintiffs will not suffer any prejudice by the granting of the protective order with respect to this document because they will still be able to prosecute their action.

Accordingly, the Court finds that the information contained in the Spicer Memorandum should be withheld from public disclosure.

*Category III: Personnel File of Charles Thevnin*

The personnel file of Charles Thevnin contains documents pertaining to employment, health, financial, and personal data that are typically viewed as private. The documents in the personnel file, for the most part, pertain to private rather than public matters. The quantum of documents that are of a sensitive and private nature is such that withholding the entire personnel file from disclosure to non-parties is warranted. In addition, the Court finds that disclosure of the information contained in the documents which touch upon private and sensitive matters has a high potential for causing embarrassment or harm to defendant Thevnin. Accordingly, the Court finds that the information contained in the personnel file of defendant Charles Thevnin should not be disclosed to the public.

*Category IV: Personnel File of Kathy Hagan*

The personnel file of Kathy Hagan contains documents pertaining to employment, health, financial, and personal data that are typically viewed as private. As noted in connection with the documents described in Category III, above, a large portion of the documents included in this file pertain to private matters, such that disclosure of the information contained in them is potentially embarrassing or harmful to this defendant. Accordingly, the Court finds that the information contained in the personnel file of defendant Kathy Hagan should not be disclosed to the public.

### III. CONCLUSION

For the reasons set forth above, Sound Shore's application for a protective order is denied with respect to the documents described as

Category I and granted with respect to the documents described as Categories II, III and IV. The items that comprise Categories II, III and IV shall be disclosed to the plaintiffs and shall not be disclosed by them to the public or be used by them for any purpose other than the prosecution of this action.

SO ORDERED:

2001 WL 1549228 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

