UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, ex rel.
THE SAINT REGIS MOHAWK TRIBE,

                  Plaintiff,

    -against-

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

                Defendants.

Civil Action No: 02-CV-0845 (TJM/DEP)

---

## DECLARATION OF DANIEL A. SEFF, ESQ.

Daniel A. Seff, an attorney duly admitted to practice in the Courts of the State of New York, declares, pursuant to 28 U.S.C. § 1746:

1.     I am an attorney at Barr & Associates, P.C., counsel for the Plaintiff herein, and I make this Declaration in support of Plaintiff's motion to seal a portion of the record herein.

2.     This is an action in which the Saint Regis Mohawk Tribe ("Tribe"), on behalf of the United States of America, seeks to void a January 1998 construction contract between the Tribe and Defendants. The Tribe seeks to void the contract on the ground that neither the Secretary of the Department of the Interior nor the Commissioner of the Bureau of Indian Affairs approved the contract, even though such approval is required pursuant to former 25 U.S.C. § 81 (1958), amended as 25 U.S.C. § 81(a)(e) (2000).

3.     The Complaint was filed on or about June 26, 2002, and Defendants were served on or about July 18, 2002.  On or about August 23, 2002, Defendants moved to dismiss the Complaint on the ground that the Complaint fails to state a cause of action and for lack of subject matter jurisdiction.

4.     As part of its allegations, the Tribe alleges that the subject contract was in direct violation of a determination made by the National Indian Gaming Commission ("NIGC") directing that one Gary Melius, who originally sought to develop a casino at the Tribe's reservation in Akwesasne, not participate in any way in the management of any proposed casino that might be approved by the NIGC.

5.     The Tribe further asserts that Mr. Melius, in fact, had direct involvement in the development of the casino at Akwesasne ("Akwesasne Casino") and owned and controlled both the construction company – whose contract for the construction of the casino the Tribe seeks to void – and the "independent" architectural firm, which was hired to oversee the work of the construction company.  See Complaint at ¶¶ 44-47, a copy of which is attached hereto as Exhibit A and the Affidavit of Lorraine White, Esq. at ¶¶ 12-14, 23-25, and 36-54, a copy of which (minus all exhibits except Exhibit 20) is attached hereto as Exhibit B.

6.     In opposition to the Motion to Dismiss, Plaintiff submitted a Declaration of Mr. Melius (hereinafter "Melius Declaration") executed on August 13, 2000 that supports the Tribe's contention that Mr. Melius retained an interest in the Akwesasne Casino.  In particular, Mr. Melius admits in his Declaration that he was owed $2 million by the manager of the Casino and an additional $5 million as payment of a purported buyout of Melius' interest in the Casino.  White Affidavit at ¶ 42 and Exhibit 20 thereto, at ¶ 8.

7.     The Melius Declaration was executed in connection with an action that he brought in the United States District Court for the Eastern District of New York entitled *Native American Management Corp., et al. v. Park Place Entertainment Corp., et al.*, No. 01-2267 (DRH).  I understand, however, that the Melius Declaration was never filed in the proceeding and that that action has been settled.

8.     In the Melius Declaration, Mr. Melius makes numerous unsubstantiated allegations against a third party, Park Place Entertainment Corp., and its former senior officers who were defendants in Mr. Melius' action in the Eastern District of New York. These allegations of wrongdoing have never been established in a court of law, and it is unlikely that Park Place and these individuals (one of whom is deceased) will have an opportunity to rebut these allegations in this proceeding since those allegations are not relevant to this proceeding.

9.     In light of these unsubstantiated and scurrilous allegations, Park Place has requested that the subject portions of the Melius Declaration be treated as confidential and either be redacted from any copy of the Melius Declaration filed with the Court or that the Melius Declaration be filed under seal.  Further, Park Place has requested that any references to the subject allegations that are made in any papers herein be filed under seal and be kept confidential by the parties herein.  The proposed redactions are fully set forth in Exhibit A to the Declaration of Jason Gross, Esq. submitted herewith.

10.     On or about September 30, 2002, I wrote to Defendants' counsel and requested their consent to treat the Melius Declaration as confidential. A copy of my September 30th letter is attached hereto as Exhibit C.  Defendants' counsel wrote back

the next day and refused to treat this document as confidential. A copy of Loretta Gastwirth, Esq.'s October 1, 2002 letter to me is attached hereto as Exhibit D.

11.     This morning, I spoke by phone with Marlene Budd, Esq., attorney for Defendant Anderson-Blake Construction Corp. (which Mr. Melius owns), and she informed me that she and Mr. Melius are not opposed to treating the Melius Declaration as confidential. I also spoke by phone this morning with Loretta Gastwirth, Esq., attorney for Defendant President R.C. – St. Regis Management Company. She remains adamantly opposed to treating the Melius Declaration as confidential even though I informed her that Ms. Budd has no objection.

12.     Plaintiff therefore respectfully requests an order directing that the subject portions of the Melius Declaration be treated as confidential by the parties; that they be redacted from any filing or filed under seal; and that such Declaration not be distributed to any third persons except in redacted form.

Dated: October 18, 2002

_____
Daniel A. Seff, Esq.

Exhibit
A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA,
ex rel. THE SAINT REGIS MOHAWK TRIBE,

        Plaintiff,

      against-

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

        Defendants.

———————————————————————x

Civil Action No. _____

## COMPLAINT

NOW COMES Plaintiff, the United States of America, by and through Relator, The Saint

Regis Mohawk Tribe, and hereby complains against the Defendants as follows:

## NATURE OF THE ACTION

1.    This is a *qui tam* civil action brought by The Saint Regis Mohawk Tribe (the

"Tribe") on behalf of the United States of America to void a January 1998 construction contract

between the Tribe and Defendants. Neither the Secretary of the Department of the Interior nor

the Commissioner of the Bureau of Indian Affairs approved the contract even though such

approvals were required pursuant to the former 25 U.S.C. § 81 (1958), amended by 25 U.S.C. §

81(a)-(e) (2000). Therefore, the construction contract is null and void.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1345, and 1362, and the former 25 U.S.C. § 81 (1958), amended by 25 U.S.C. §

81(a)-(e) (2000).

& ASSOCIATES, P.C.
ORNEYS AT LAW

MOUNTAIN ROAD
WE, VT 05672

— 802-253-6272
802-253-6055

3. Under the former Section 81, non-Indian parties contracting with Indian tribes must submit certain contracts that are "relative to" Indian lands to the Secretary of the Department of the Interior (through the Bureau of Indian Affairs ("BIA")) for approval. Contracts requiring approval under the former Section 81 are null and void absent such approval.

4. Venue properly lies in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the property that is the subject of this action, namely the Akwesasne Mohawk Casino, is situated in this District. In addition, a substantial part of the events and omissions giving rise to the claim occurred in this District.

## THE PARTIES

5. The Plaintiff in this action is the United States of America.

6. The Tribe, which brings this action in the name of and on behalf of the United States of America pursuant to the former Section 81, is a sovereign tribal entity that appears on the periodic list of federally recognized Indian Tribes published by the United States Department of the Interior. As such, the Tribe exercises all the powers available to sovereign governments. All of the lands of the Tribe's Akwesasne Territory are either held by the Tribal Government or held in trust by the United States Government for the use of Tribe members.

7. Upon information and belief, Defendant President R.C. - St. Regis Management Company ("President") is a New York general partnership with a principal place of business at 333 Earle Ovington Boulevard, Uniondale, New York 11553.

8. Upon information and belief, Defendant Anderson-Blake Construction Corporation ("Anderson-Blake") is a duly authorized New York corporation with a principal place of business at 135 West Gate Drive, Huntington, New York 11743.

## THE STATUTORY SCHEME

9.     At the time the parties entered into the construction contract in question. at all other relevant times, and until March 14, 2000, when Section 81 was amended. the statute read:

> No agreement shall be made by any person with any tribe of Indians. or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective. or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of. or in reference to, annuities, installments, or other moneys. claims. demands. or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States. unless such contract or agreement be executed and approved as follows:
>
> * * * *
>
> Second.   It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
>
> . . . . All contracts or agreements made in violation of this section shall be null and void. . . .

25 U.S.C. § 81 (1958), amended by 25 U.S.C. § 81(a)-(e) (2000).

## STATEMENT OF FACTS

### THE MANAGEMENT AGREEMENT

10.     On or about November 7, 1997, the Tribe and President entered into the Fourth Amended and Restated Management Agreement (the "Management Agreement") for the development of a casino on the Tribe's Akwesasne Territory known as the Akwesasne Mohawk Casino (the "Casino").  [A copy of the Management Agreement is attached hereto as Exhibit 1.]

11.     The National Indian Gaming Commission approved the Management Agreement in December 1997.

12.     Under the Management Agreement. President was responsible for selecting an architect and a general contractor to design and build the Casino.  Management Agreement ⁋ 6.2(A).

13.     However. President's architect and general contractor selections were subject to the Tribe's approval.  Management Agreement ⁋⁋ 6.3, 6.4.

14.     In addition. the Management Agreement provided that. "[t]he allowable costs and compensation of the general contractor shall be on terms and in an amount to be negotiated by [President]. said terms and amount to be approved by" the Tribe.  Management Agreement ⁋ 6.4.

15.     The Management Agreement also provided that the contract with the general contractor must contain the following terms:

> (i) construction of the [Casino] shall commence within ninety (90) days following the Effective Date; (ii) the general contractor shall exert his best efforts to complete construction within six (6) months of the commencement of construction; (iii) the general contractor shall warrant the construction to be free of defects and unworkmanlike labor for a period of one year subsequent to the date the architect certifies the facility is complete.  [President's] contract with the general contractor shall contain such other provisions for the protection of the parties to the Agreement as deemed appropriate by [President].  Preference in employment of qualified persons by the general contractor shall be extended in the following order of priority: First. members of the TRIBE: second, children and spouses of members of the TRIBE: and third, members of the Canadian St. Regis Mohawk Indian Tribe.

Management Agreement ⁋ 6.4 (emphasis in the original).

## THE CONSTRUCTION CONTRACT

16.     Upon information and belief. on or about January 11. 1998. President and Anderson-Blake entered into an AIA Document A101 Standard Form of Agreement Between Owner and Contractor (1987 ed.) (the "Construction Contract").  [Exhibit 2. hereto.]

4

17.    The work described in the Construction Contract was as follows: "All labor, material, equipment and supervision for the construction of a 55.000 (+-) square foot casino facility and associated site work – As per drawings by Archon." *Id.*, Art. 2.

18.    The Contract Sum identified in the Construction Contract was $14,180,564.00. *Id.*, Art. 4.

19.    President was supposed to make periodic progress payments to Anderson-Blake for only those amounts certified by the architect. *Id.*, Art. 5.1.

20.    The Construction Contract also stated that, "all plans and specifications to be designed by Architect." *Id.*, Art. 9.1.3.

21.    Walter K. Horn, President's Senior Vice President and Secretary, and Richard Bellando, who signed as President of Anderson-Blake, executed the Construction Contract.

## THE JANUARY 14, 1998 LETTER

22.    In a January 14, 1998 letter, President's President. Ivan Kaufman. informed the Tribe that. "we would like to begin the process of obtaining some initial tribal approvals as required in the Management Agreement." [Exhibit 3 hereto. at p. 1.]

23.    In that same letter, Mr. Kaufman stated that, "[t]he Tribe … must approve the architect chosen by the Manager under Section 6.3 of the Management Agreement. as well as approving [sic] the terms and amount of the allowable costs and compensation of the general contractor under Section 6.4 of the Management Agreement." *Id.*

24.     Mr. Kaufman informed the Tribe that, "[w]e have chosen as architect the firm of Archon Design Ltd.. We hereby request the Tribe's approval of this firm by executing on the signature block provided below." *Id.*

25.     In the very next paragraph of the January 14, 1998 letter, Mr. Kaufman stated that, "[w]e have also chosen Anderson Blake Construction Corp. as general contractor for the Facility. The allowable costs and compensation of the general contractor set forth on the construction contract enclosed with this letter, and amount to $14,180,564.00.... We hereby request the Tribe's approval of the terms and amounts of these costs and compensation of the general contractor by executing in the space below." *Id.*

26.     President asked the Tribe to "[p]lease indicate your approval of both the architect and the terms and amounts of the costs and compensation of the general contractor by signing on the space provided below and return the duplicate of this letter directly to the attention of the Manager...." [*Id.* at 2.]

27.     On information and belief, on or about January 14, 1998, Chief Executive Officer Edward D. Smoke, Jr., purporting to act on behalf of the Tribe, approved President's architect and general contractor selections by signing Mr. Kaufman's January 14, 1998 letter.

28.     The Tribe justifiably relied on President's January 14, 1998 letter, believing that its business partner, President, had secured a competent and honest general contractor, as well as an independent architect to, among other things, supervise the general contractor.

29. Upon information and belief, the Construction Contract was never submitted to the Secretary of the Interior or the BIA Commissioner for approval, and neither the Secretary of the Interior nor the BIA Commissioner ever approved the Construction Contract.

## THE PURPORTED ROLE OF ARCHON DESIGN, LTD.

30. The Tribe recently learned through discovery in another litigation that Archon Design Ltd. ("Archon"), the purported architectural firm President hired to "supervise" Anderson-Blake, was nothing more than a name.

31. The purported Archon architect in charge of the Casino project, Warren Schiffman, admitted that he was, at all times, paid by Anderson-Blake. [*See* the April 8, 2002 Affidavit of Warren Schiffman, a copy of which is attached hereto as Exhibit 4.]

32. Moreover, Mr. Schiffman's replacement, Roger Diller, admitted in a deposition that he was employed and paid by Anderson-Blake during the entire time he worked on the Casino project. [*See* R. Diller Dep. (Apr. 10, 2002) at p. 17. The relevant pages of the Diller deposition transcript are attached hereto as Exhibit 5.]

33. The architect has a duty to exercise reasonable care to see that the work is done in a proper manner with proper materials, and to certify payment to the contractor only upon verification that the contractor has performed the work as stated in the application for payment.

34. When dealing with the contractor, the architect acts in a fiduciary capacity for the owner and in this position of trust must represent the owner's best interests. As a fiduciary, the architect has the duty to disclose to the owner all information that is material to the owner's interests.

35. During the construction period, when the architect deals with the contractor and others on behalf of the owner, the architect serves as the owner's agent.

36.     President, which was acting as the Tribe's agent and fiduciary in securing the services of a general contractor and an architect, had the right and the duty to insist that an independent architect formally certify all of Anderson-Blake's monthly requests for payment before President paid Anderson-Blake.

37.     However, neither Archon nor any other architect signed off on the architect's signature line on any of Anderson-Blake's monthly applications for payment.

38.     Upon information and belief, President paid Anderson-Blake's monthly applications without insisting on the certification of an independent architect.

39.     In addition, Archon never approved a December 16, 1998 AIA Document G701 Change Order increasing the Contract Sum by $2,150,033.37 to $16,330,597.37. The G701 form itself states that it is "Not valid until signed by the Owner, Architect and Contractor." [Exhibit 6, hereto.]

40.     Furthermore, when Anderson-Blake submitted its "final" application for payment of $15,828,722 on or about September 1, 2000, purported Archon architect Roger S. Diller signed off on the application. [A copy of the September 1, 2000 application for payment is attached hereto as Exhibit 7.]

41.     Yet, Mr. Diller has admitted that he worked for Anderson-Blake at the time, and that he readily signed the September 1, 2000 application for payment at the request of Anderson-Blake's William Thornton and without attempting to insure its accuracy. [Exhibit 5 hereto, at pp. 47-49.]

42.     The absence of an independent architect overseeing and approving the construction work has already resulted in tangible harm to the Tribe. By way of example, the Tribe learned recently that the Casino's roof – which leaks because it was improperly installed

using inferior materials – needs replacement. This repair alone may cost as much as one million dollars.

43.    In addition, the Tribe recently learned through discovery in another action that Anderson-Blake expensed numerous improper charges to the Casino project including, but not limited to, work performed on Mr. Kaufman's private residence on Long Island. The full extent of Anderson-Blake's overcharges has yet to be determined.

## THE ROLE OF GARY MELIUS

44.    Back on September 19, 1996, National Indian Gaming Commission ("NIGC") Chairman Harold Monteau wrote to then-Chief Edward D. Smoke, Jr., with a copy to President attorney Joseph Membrino, to advise that the NIGC would only approve the Management Agreement if Mr. Gary Melius "retains no financial interest in … the management contract." *Id.* at 1. [A copy of Chairman Monteau's letter is attached hereto as Exhibit 8.]

45.    The Tribe has since learned that Mr. Melius, whom the NIGC forced to sell his "Native American Gaming" company's interest in President (which he sold to current President owner Ivan Kaufman), improperly retained a financial interest in the Management Agreement through his ownership of Archon and Anderson-Blake, which President hired (without seeking competitive bids) to design and build the Casino. [*See* Schiffman Aff., a copy of which is attached hereto as Exhibit 4, and Diller Dep. at p. 19 (attached hereto as Exhibit 5).]

46.    Moreover, most, if not all, of Mr. Kaufman's $5 million purchase of Mr. Melius's interest in President has yet to be paid. [*See* Ivan Kaufman Dep., Jan. 31, 2002, at pp. 119-120, *Catskill Dev. L.L.C. v. Park Place Entm't Corp.*, 00 Civ. 8660 (CM)(GAY), currently pending in the U.S. District Court for the Southern District of New York (the relevant pages of which are attached hereto as Exhibit 9).]

47. Since President still owes Mr. Melius approximately $5 million. and since Mr. Melius owns Anderson-Blake and Archon, Mr. Melius improperly retained a financial interest in the Management Agreement. In other words, President obtained NIGC approval of the Management Agreement by false pretenses. i.e., by failing to disclose Mr. Melius's various interests in that Agreement.

## CAUSE OF ACTION
### *The Construction Contract is Void Pursuant to Former Section 81*

48. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 47 with the same force and effect as if fully set forth herein.

49. The Construction Contract provided for the payment of money in exchange for services "relative to" the Tribe's lands, namely the construction of the Casino. Therefore. pursuant to the former Section 81, the Construction Contract had to be approved by the Secretary of the Interior and the Commissioner of Indian Affairs.

50. Accordingly. pursuant to the former Section 81. the Construction Contract (including the December 16. 1998 AIA Document G701 Change Order) is null and void.

WHEREFORE. Plaintiff prays that this Court enter judgment declaring the Construction Contract and any associated change orders null and void. In addition, Plaintiff requests that the Court grant such other and further relief the Court deems just and proper.

Respectfully submitted.

June 25. 2002
Stowe. Vermont

Barr & Associates, P.C.

By: _____
Russell D. Barr
RDB 3343

125 Mountain Road
Stowe. Vermont 05672
(802) 253-6272
(802 253-6055 (fax)

Attorneys for Relator. The Saint Regis Mohawk
Tribe

Of counsel: Daniel A. Seff

11

Exhibit

B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____x

UNITED STATES OF AMERICA,
ex rel. THE SAINT REGIS MOHAWK TRIBE,

Plaintiff,

against-                                          Case No. 02-CV-0845(TJM)(DEP)

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

Defendants.
_____x

## AFFIDAVIT OF LORRAINE WHITE, ESQ. IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**LORRAINE WHITE, ESQ.**, being duly sworn, deposes and states as follows:

1.      I am the General Counsel of the Saint Regis Mohawk Tribe (hereafter the "Tribe"). I am also an enrolled member of the Tribe. I make this Affidavit in opposition to Defendants' Motion to Dismiss the Complaint, and to introduce documents demonstrating that Defendants' Motion to Dismiss should be denied. Plaintiff's legal arguments are set forth in an accompanying Memorandum of Law.

2.      The documents described herein and attached hereto were obtained either: (a) from the Tribe's files; (b) from discovery in a separate litigation involving the Tribe and Defendant President – R.C. St. Regis Management Company ("President"); (c) from discovery in other litigations involving the Defendants to which the Tribe is not a party; and/or (d) from the files of Mr. Gary Melius, the principal of Defendant Anderson-Blake Construction Corp. ("Anderson-Blake").

3.     This lawsuit arises out a deal between the Tribe and President to develop, construct and operate the Akwesasne Mohawk Casino (the "Casino") on the Tribe's Akwesasne Reserve, which straddles the U.S. – Canadian border near Franklin County, New York, and Cornwall, Ontario.

4.     The complex multi-year history that led up to this lawsuit reveals that President's current owner, Mr. Ivan Kaufman, along with its former owner, Mr. Melius, together tried to fleece the Tribe out of approximately $18 million. They did so by constructing a substandard $8 million Casino building for which they then billed the Tribe $26.5 million (at 13.5% interest). The Tribe instituted this lawsuit in response to their attempted swindle.

### The National Indian Gaming Commission Bars Mr. Melius from the Casino Deal.

5.     Mr. Melius was the Casino's original developer. For several years prior to 1997, his Native American Management Company ("NAMC") owned a fifty percent (50%) interest in President. Mr. Melius was unable to secure National Indian Gaming Commission ("NIGC") approval, however. Eventually, he transferred his interest to Mr. Kaufman, President's current owner.

6.     Originally, Mr. Melius sought fifty percent (50%) of the Casino management fee in exchange for his interest. However, more than a year before the NIGC approved the November 7, 1997 Fourth Amended Management Agreement (the "Management Agreement") between President and the Tribe (**Exhibit 1**), then-NIGC Chairman Harold Monteau directed that Mr. Melius could have no financial interest in or management responsibility for the Casino whatsoever.

7.     On September 19, 1996, Chairman Monteau wrote to then-tribal Chief Executive Officer Edward D. Smoke, Jr. and President attorney Joseph Membrino to advise that the NIGC

would only approve the Management Agreement if Mr. Melius "retains no financial interest in or management responsibility for the management contract." [**Exhibit 2.**]

8.  Chairman Monteau's September 19th letter responds to Mr. Membrino's September 17, 1996 letter to then-NIGC General Counsel Michael Cox. Mr. Membrino's September 17th letter had suggested that the NIGC previously approved the idea of Mr. Melius serving as a "consultant" who would receive fifty percent (50%) of the manager's share of the gaming net revenues "as an obligation of the transferee to Gary Melius and not an obligation under the management contract running from the Tribe to Gary Melius." [**Exhibit 3, at 1-2.**]

9.  Chairman Monteau responded that, "I am very concerned that the [September 17th Membrino] letter is misleading." [**Exhibit 2.**] Chairman Monteau stressed that, "[a]t no time have we agreed that it would be appropriate for Mr. Melius to act as a consultant to the management company." *Id.* The Chairman then stated that, "[w]e have no objections to a buy out of Mr. Melius's share if it is done in such a way that we can ultimately determine that he retains no financial interest in or management responsibility for the management contract." *Id.*

10. Only days after the NIGC banned him from participating in the Casino project, Mr. Melius was quoted in the media as stating that, "[m]y intention is to come back into the deal." *See* Malinda Brent, "Casino Partner Squeezed Out by Adverse Ruling," *Watertown Daily Times*, Sept. 24, 1996, at 25. [**Exhibit 4.**]

11. As explained below, however, Mr. Melius never actually exited "the deal" as he was supposed to.

## Mr. Kaufman Fails to Disclose Mr. Melius's Various Casino Interests to the NIGC.

12.     The September 24, 1997 'buyout agreement' pursuant to which Mr. Kaufman presumably purchased Mr. Melius's Casino interest provides that Mr. Melius and NAMC

> hereby waive and release any claim that either may have on behalf of themselves or any Affiliates to be selected and designated as the general contractor for the construction of the Project as set forth in Section 10.14 of the Partnership Agreement.

Agreement for Purchase of Partnership Interest (Sept. 24, 1997), at ¶ 22 (the "Buyout Agreement"). [**Exhibit 5.**]  This waiver was consistent with the NIGC's directive that Mr. Melius could have no role in the Casino. [*See* Exhibit 2.]

13.     And yet, when Mr. Kaufman submitted the Management Agreement for NIGC approval, he did not disclose that Mr. Melius (and/or NAMC, which Mr. Melius owns) retained a financial interest in the Management Agreement. *See* Attachment 1 to the Management Agreement, which lists Mr. Kaufman as the only individual with a direct or indirect financial interest. [**Exhibit 6.**] *See also* Exhibit 1, ¶ 9.2.

14.     Nor did Mr. Kaufman disclose that Melius-owned companies would serve as the Casino's general contractor *and* architect, or that Mr. Melius would retain any management responsibility for the Casino.  However, it later came to light that Mr. Melius secretly retained a substantial financial interest in the Management Agreement, surreptitiously acted as Casino's general contractor and architect, and secretly wielded management responsibility for the Casino.

## The NIGC Approves the Management Agreement.

15.     The NIGC approved the Management Agreement on December 26, 1997.  Under the Management Agreement, President was responsible for selecting an architect and a general contractor to design and build the Casino. *See* Exhibit 1, ¶ 6.2(A).

4

16. President's selections were subject to the Tribe's approval. *Id.*, ¶¶ 6.3, 6.4. Similarly, the Management Agreement provided that, "[t]he allowable costs and compensation of the general contractor shall be on terms and in an amount to be negotiated by [President], said terms and amount to be approved by" the Tribe. *Id.*, ¶ 6.4.

17. Moreover, the Management Agreement required President to select and hire an architect to "design" the Casino and "supervise the completion of all the construction, development, improvements, and related activities undertaken pursuant to the terms and conditions of the contract with the general contractor...." *Id.*, ¶ 6.3.

**The January 14, 1998 Agreement and the Construction Contract Fail to Disclose Mr. Melius's Interests, and are Never Submitted for Federal Approval.**

18. In a January 14, 1998 letter (the "January 14, 1998 Agreement"), Mr. Kaufman informed the Tribe's Mr. Smoke that, "[w]e have chosen as architect the firm of Archon Design Ltd.. We hereby request the Tribe's approval of this firm by executing on the signature block provided below." [**Exhibit 7**, at 1.]

19. In the next paragraph, Mr. Kaufman stated that, "We have also chosen Anderson Blake Construction Corp. as general contractor for the Facility." The January 14th letter, which enclosed a copy of a construction contract (the "Construction Contract" (**Exhibit 8**)), stated that Anderson-Blake would be paid $14,180,564.00. [Exhibit 7, at 1.]

20. President asked Mr. Smoke to "[p]lease indicate your approval of both the architect and the terms and amounts of the costs and compensation of the general contractor by signing on the space provided below and return the duplicate of this letter directly to the attention of the Manager...." *Id.* at 2.

21. Mr. Smoke apparently signed the January 14, 1998 Agreement and returned it to Mr. Kaufman.

22.     Neither the January 14, 1998 Agreement nor the enclosed Construction Contract was ever submitted to the U.S. Department of Interior's Bureau of Indian Affairs ("BIA") or the NIGC for approval.

23.     Moreover, neither document revealed that Mr. Melius owned Archon Design Ltd. ("Archon") and Anderson-Blake.

24.     The purported Archon architect in charge of the Casino project, Warren Schiffman, admitted recently that he was, at all times, employed by and paid by Anderson-Blake and/or yet another Melius-owned company known as "Castle Ventures Ltd." [*See* the April 8, 2002 Affidavit of Warren Schiffman, at ¶¶ 3-7, 14 (**Exhibit 9**).]

25.     Moreover, Mr. Schiffman's replacement, Roger Diller, admitted during an April 10, 2002 deposition that his boss is Mr. Melius, and that Mr. Melius owns Anderson-Blake and Archon.  Mr. Diller also testified that he was employed and paid by Anderson-Blake during the entire time he worked on the Casino project.  [**Exhibit 10**, at 9:16 to 9:22; 17:2 to 19:25; 25:19 to 25:24; and 26:20 to 27:11.]

**The Lack of an Independent Architect Overseeing the Casino's Construction Resulted in an Inferior Casino Building and Substantial Tangible Harm to the Tribe.**

26.     President, which was acting as the Tribe's agent and fiduciary in securing the services of a general contractor and an architect, had the right and the duty under the Construction Contract to insist that an independent architect formally certify all of Anderson-Blake's monthly requests for payment before President paid Anderson-Blake.  [*See* Exhibit 8, Article 5.]

27.     However, neither Mr. Schiffman, Mr. Diller, nor any other architect signed off on the architect's signature line on any of Anderson-Blake's monthly applications for payment.

[Copies of the monthly applications are attached as **Exhibit 11.**] The only signatory on these applications is Anderson-Blake's construction manager, Mr. William Thornton.

28.     It later came to light that President paid Anderson-Blake's monthly applications without insisting on an independent architect's certification. When asked about this subject, Mr. Schiffman stated that, "I do not know why Anderson Blake never presented me with a Certificate for Payment or asked me to sign such a document between 1997 and 1999." [Exhibit 9, at ¶ 16.]

29.     Furthermore, when Anderson-Blake submitted its "final" application for payment to President on or about September 1, 2000, for a total of $15,828,722, purported Archon architect Roger Diller signed off on the application. [A copy of the September 1, 2000 final payment application is attached as **Exhibit 12.**]

30.     Mr. Diller, who admitted that he worked for Anderson-Blake at the time, readily signed the September 1, 2000 application for payment at the request of Mr. Thornton without doing "much of anything to know if it was accurate." [Exhibit 10, at 47:4 to 49:14.]

31.     The lack of an independent architect overseeing and approving the Casino construction work resulted in an inferior Casino building and substantial tangible harm to the Tribe. As a general matter, there was no independent verification of Anderson-Blake's work or its associated expenses, which allowed Anderson-Blake to essentially do whatever it wanted and charge whatever it felt like charging.

32.     By way of example, the Tribe learned recently that the Casino's roof – which leaks because it was improperly installed using inferior materials – needs replacement. This repair alone may cost the Tribe as much as $1 million. [*See* **Exhibit 13.**]

33.     In addition, on or about December 15, 2000, the Tribe sued several entities and individuals, including Anderson-Blake, over the severe environmental contamination that

occurred on the Tribe's Akwesasne Reserve during the Casino's construction. [A copy of the Tribe's Complaint in *Saint Regis Mohawk Tribe v. Anderson-Blake Constr. Corp. et al.*, Civ. Action No. 00-CV-1938 (TJM/GLS), currently pending in this Court. is attached hereto as **Exhibit 14**.]

34.    The Tribe also learned through discovery in a separate lawsuit between President and the Tribe that Anderson-Blake expensed numerous improper charges to the Casino project including, but not limited to, work performed on Mr. Kaufman's private residence on Long Island. [*See* **Exhibit 15**.]

35.    The full extent of Anderson-Blake's overcharges has yet to be determined. but meanwhile President is suing the Tribe in New York Supreme Court to collect $26.5 million in alleged "Development Expenses" (plus 13.5% interest) for a building that was recently appraised at approximately $8 million. [*See* **Exhibit 16**, at 4.]

**Mr. Melius Was Never Actually 'Bought Out' as Required by the NIGC.**

36.    In his September 19, 1996 letter, Chairman Monteau directed that Mr. Melius had to be 'bought out' in such a way that he retained no financial interest in the Management Agreement. [*See* **Exhibit 2**.] However, the Tribe learned recently that Mr. Kaufman never actually 'bought out' Mr. Melius's interest. Rather, Mr. Kaufman's purported $5 million purchase of that interest was financed by an apparently interest-free 'loan' from Mr. Melius himself that President has yet to repay. [*See* Ivan Kaufman Dep.. Jan. 31. 2002, at 119:25-120:16, *Catskill Dev. L.L.C. v. Park Place Entm't Corp.*, No. 00 Civ. 8660 (CM)(GAY), a recently dismissed case from the U.S. District Court for the Southern District of New York (the relevant pages of which are attached hereto as **Exhibit 17**). Note that neither the Tribe nor President was a party to this litigation.]

37.     During a March 13, 2002 deposition in a New York State Court litigation between President and Park Place Entertainment Corp., Mr. Kaufman testified that he paid Mr. Melius "a small percentage of the total purchase price up front and agreed to pay the balance over a five year period." [*See* Ivan Kaufman Dep., Mar. 13, 2002, at p. 236, *President R.C. – St. Regis Mgmt. Co. and Ivan Kaufman v. Park Place Entm't Corp. et al.*, Index No. 00-008931, currently pending in New York Supreme Court, Nassau County (the relevant pages of which are attached hereto as **Exhibit 18**). Note that the Tribe is not a party to this litigation.]

38.     In this same State Court litigation, Mr. Kaufman again testified that the purchase price was approximately $5 million. *Id.* at 237. He also stated that he did not believe Mr. Melius has been paid the ninety percent of the purchase price that President financed through Mr. Melius. *Id.* at 241. Mr. Kaufman indicated that President "[p]robably" was the entity that acquired Mr. Melius's interest, but Mr. Kaufman was certain that he did not provide a personal guarantee to Mr. Melius. *Id.* at 242-43. When asked, "[d]id you ever advise the [NIGC] that Mr. Melius had not been paid on your acquisition?", Mr. Kaufman replied, "I don't know." *Id.* at 243-44.

39.     Mr. Kaufman could not recall whether he and Mr. Melius ever discussed repayment of the roughly $4.5 million Mr. Melius is still owed, or whether Mr. Melius ever threatened to sue or take other action to recover the loaned funds. *Id.* at 242.

40.     During an August 22, 2002 deposition in this same State Court litigation between President and Park Place, Mr. Kaufman again testified that he paid Mr. Melius only a small fraction of the approximately $5 million purchase price. He also testified that the only potential income source available to pay Mr. Melius the remainder was Casino-generated revenues. [*See* Ivan Kaufman Dep., Aug. 22, 2002, at 754:23 to 766:23, *President R.C. – St. Regis Mgmt. Co.*

*and Ivan Kaufman v. Park Place Entm't Corp. et al.*, Index No. 00-008931 (the relevant pages of which are attached hereto as **Exhibit 19**).]

41.     Hence, Mr. Kaufman and Mr. Melius never complied with the payment schedule set out in the Buyout Agreement. [*See* Exhibit 5, at ¶ 4.] Moreover, since Mr. Kaufman intended to pay Mr. Melius out of Casino revenues, it is apparent that Mr. Melius retained a financial interest in the Management Agreement in violation of the NIGC Chairman's directive that he could not do so. [*See* Exhibit 2.]

**Mr. Melius's Multi-Million Dollar Casino Investment.**

42.     Mr. Melius admitted in a sworn August 2000 Declaration that he became concerned about the Casino's struggling financial situation shortly after it opened in April 1999 because *President owed him $7 million at that point*. Mr. Melius stated that:

> Within a few months of [the April 1999] opening, it appeared that the Casino was suffering financially.... The Casino was not profiting, there was existing debt owed to me and others associated with the construction and development of the Casino and there were capital investments that had not been recouped. *I was owed $2 million from the construction of the Casino and $5 million for my interest in President.*

[Declaration of Gary Alan Melius (Aug. 13, 2000) ("Melius Decl."), at ¶ 8 (emphasis added), a copy of which is attached hereto as **Exhibit 20**.]

43.     Mr. Melius executed this Declaration in connection with a suit he brought in the U.S. District Court for the Eastern District of New York entitled, *Native American Mgmt. Corp. et al. v. Park Place Entm't Corp. et al.*, No. 01-2267 (DRH). The Tribe was not a party to that suit, which has since settled.

44.     In paragraph 36, Mr. Melius discusses his fear that, "President would not be able to repay those who invested in the [Casino] project, *including one of my entities*...." Exhibit 20,

at ¶ 36 (emphasis added). *See also id.* at ¶¶ 16, 29, 30, 35, 48 (where Mr. Melius discusses his financial interest in the Casino).

45.     A recently unearthed spreadsheet with calculations as of December 31, 1998, and estimates through March 31, 1999, indicates that nearly $10 million in so-called "soft costs" were built into the cost of constructing the Casino.  This document suggests that Mr. Melius had as much as a fifty (50) percent equity stake in the Casino.  [**Exhibit 21.**]

**Mr. Melius's Role as the Casino's General Contractor and Architect.**

46.     Mr. Melius also retained a financial interest in the Casino through his ownership of Archon and Anderson-Blake, which President hired in January 1998 – without seeking competitive bids or obtaining BIA or NIGC approval – to design and build the Casino.

47.     President hired Mr. Melius's Anderson-Blake as General Contractor less than three weeks after the NIGC approved the Management Agreement.  Yet, the Buyout Agreement pursuant to which President presumably purchased Mr. Melius's Casino interest expressly provides that no Melius-affiliated companies would serve as the Casino's general contractor. [*See* Exhibit 5, at ¶ 22.]

48.     In addition to creating a financial interest in the Management Agreement and violating the Buyout Agreement, the fact that President hired Mr. Melius's companies to design and construct the Casino seemingly runs afoul of Chairman Monteau's September 19, 1996 statement that, "[a]t no time have we agreed that it would be appropriate for Mr. Melius to act as a consultant to the management company."  [*See* Exhibit 2.]

**Mr. Melius's Role as the Casino's *De Facto* Manager.**

49.     Not only did Mr. Melius retain a substantial financial interest in the Management Agreement as the Casino's general contractor, architect and largest individual investor/creditor,

he also apparently functioned as the Casino's *de facto* manager, as well. For example, a recently obtained May 18, 1999 memo from then-Casino General Manager and C.E.O. John Ferrucci to Mr. Melius concerning billboard advertising demonstrates that Mr. Melius was involved in the Casino's day-to-day operations after it opened. [*See* **Exhibit 22**.]

50. Further evidence of Mr. Melius's Casino management role appears in a June 7, 1999 memo concerning a June 2, 1999 meeting that was held to discuss various Casino issues including gaming machines, security, budget forecasts, and busing of patrons. The memo is from Mr. John Natalone of Arbor National Commercial Mortgage, LLC (another one of Mr. Kaufman's companies), to the "File." The document seems to indicate that Mr. Natalone copied the meeting's participants -- Mr. Kaufman, President's General Counsel, Walter K. Horn, Esq., *and* Mr. Melius. [**Exhibit 23**.]

51. Mr. Ferrucci's September 10, 1999 memorandum to Mr. Kaufman is further confirmation of Mr. Melius's Casino management role. [*See* **Exhibit 24**.] In his memo, Mr. Ferrucci complains to Mr. Kaufman about a number of management-related issues. Mr. Ferrucci was particularly distressed about Mr. William Thornton's decision-making power over such issues as the hiring of housekeepers, security officers, and valet attendants. *Id.* at 1. Mr. Ferrucci was likewise upset over Mr. Thornton's design for a Casino restaurant and bar. *Id.* at 2.

52. Significantly, Mr. Thornton was the Anderson-Blake construction manager who oversaw the Casino's construction, i.e., he worked directly for Mr. Melius. As Mr. Ferrucci states, apparently sarcastically, "[e]veryone here is amazed by his versatility" because "[w]e thought he was a construction supervisor." *Id.* at 1.

53. At one point, Mr. Melius even had a New York State Police officer, Captain Alfred Crary, monitoring the Casino for him and sending him 'FOR GARY'S EYES ONLY'

memos regarding various managerial-related issues. Telling quotes from Captain Crary's memos (copies of which are attached as **Exhibit 25**) include the following:

- "I tried to speak up for John Ferrucci as you asked but I dont [sic] find a very receptive audience – Rumor he won't be around long…. Lots of talk about getting rid of E. King. Boy, that was a bad choice."

- "As of Sunday everyone was still walking thru [sic] the pits as there were no security ropes or chains. They also dont [sic] seem to have any emergency book with phone numbers etc."

- "You wont [sic] make a lot of money with a cap on your ATM machines of $200."

- "[A]s of Sunday those [C]anadians who wished to continue their play by trading in US for Can money left because you have no place to trade. These things will cost you revenue. I spoke to Terrance at the check cashing booth[.] [H]e's going to make sure he has enough Can on hand[.]"

- "3/23 up to reservation and to Casino site looking at security and murals – matter previously reported on."

- "… [Y]our friends are protecting your interests."

- "… [C]hecked out security from a distance. With all the activity and people coming and going 24 hours a day I think you are out of the woods, so to speak, until after the opening."

- "While in Montreal contacted friends with RCMP and Surete and a friend at Casino Security. Prognosis is for no problems of an organized fashion for the foreseeable [sic] future but all three areas remind that there might be a loose canon [sic] or two so WATCH OUT – youre [sic] on the RES."

- "… [M]uch of your equipment and tools have grown legs and walked away. Anyway, all seems attended to except that the generatora [sic], while having been moved, are still unprotected by any barriers and are in a POOR location (vis-a-vis) the woods. Good luck with that."

- "At Casino met Ferrucci and Matteo and both were more cordial so I guess you must have said something."

54. Captain Crary's memos indicate that Mr. Kaufman and Mr. Melius ignored Chairman Monteau's command that Mr. Melius was to have no management responsibility for the management contract.

### The Tribal Gaming Commission Terminates President for Mismanagement.

55. President managed the Casino from its April 11, 1999 opening day until April 17, 2000.

56. On April 17, 2000, the Saint Regis Mohawk Tribal Gaming Commission (the "Gaming Commission"), having found that President committed numerous Management Agreement breaches, suspended the licenses of key President personnel. Thereafter, the Tribe assumed management duties at the Casino.

57. The Gaming Commission's findings concerning President's Management Agreement breaches are contained in two Declarations dated February 29, 2000, and April 17, 2000. [Copies of the Declarations are attached hereto **Exhibit 26** and **Exhibit 27**.] Among the Gaming Commission's findings were the following:

- President failed to provide supporting documentation for over $20,000,000.00 in alleged Casino Development Expenses;

- President selected a general contractor by a method other than competitive bid;

- President selected a general contractor with an undisclosed and improper financial interest in the Management Agreement;

- President failed to obtain an independent architect's certification of the general contractor's requests for over $15.8 million in alleged construction costs;

- President failed to insure that numerous subcontractors were properly paid;

- President failed to provide supporting documentation for over $4,100,000.00 in alleged pre-development expenses;

- President mismanaged and apparently abused the Casino's bank accounts and accounting system;

- President failed to reimburse New York State for its expenses in overseeing the Casino; and

- President failed to obtain the proper NIGC license for the Casino's then-General Manager.

58. On July 31, 2000, the Tribe formally terminated the Management Agreement after President failed to cure the Management Agreement breaches previously identified by the Gaming Commission. [*See* Exhibit 1, at ¶¶ 10.4 to 10.7.]

59. The Tribe has managed the Casino since April 17, 2000.

60. Further your Affiant sayeth not.

Dated: September 27, 2002
Akwesasne Territory

By: _Lorraine N. White_
LORRAINE WHITE, ESQ.

Sworn and subscribed to this 27 day of September, 2002.

_Karen M. Benn_
Notary Public

My commission expires: 5/16/2006

KAREN M. BENN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 4929045
QUALIFIED IN ST. LAWRENCE COUNTY
COMMISSION EXPIRES MAY 16, 2006.

15

**EXHIBIT 20 TO THE AFFIDAVIT OF LORRAINE WHITE, ESQ. IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

LAW OFFICES OF MARLENE L. BUDD
191 New York Avenue
Huntington, New York 11743
(631) 421-3799
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIVE AMERICAN MANAGEMENT CORPORATION, ANDERSON-BLAKE CONSTRUCTION CORPORATION, OHEKA MANAGEMENT CORP. and GARY ALAN MELIUS,<br><br>     Plaintiffs,<br><br>-vs-<br><br>PARK PLACE ENTERTAINMENT CORPORATION, CLIVE CUMMIS, RICHARD B. NESS AND B. HILLMAN as Executors of THE ESTATE OF ARTHUR GOLDBERG,<br><br>     Defendants, | Civil Action No. 01-2267 (DRH) |

## DECLARATION OF GARY ALAN MELIUS

GARY ALAN MELIUS declares as follows:

1.    I am the plaintiff in this action and President of plaintiffs Native American Management Corporation, Anderson-Blake Construction Corp. and Oheka Management Corp. I make this declaration in opposition to the defendants' motion to dismiss the amended complaint.

2.    I subscribe to the allegations set forth in my amended complaint, which alleges

CONFIDENTIAL

(1) that I had an agreement with defendant Park Place Entertainment Corp. ("Park Place") that was entered into on or about October 25, 1999; (2) that Arthur Goldberg ("defendant Goldberg") falsely stated that I would be compensated for performing consulting services to Park Place pursuant to the agreement; (3) that Goldberg and Cummis falsely stated that Park Place would be acquiring the management agreement held by President-R.C.-St. Regis Management Company ("President") governing the operations of a casino in Hogansburg, New York (the "Casino") owned by the St. Regis Mohawk Tribe (the "Tribe") and falsely stated that President would have an interest in any future ventures between Park Place and the Tribe for casinos in the Catskills-Monticello area; and (4) that Goldberg defamed me, Anderson-Blake, President and President's owner, Ivan Kaufman, at a meeting held on February 15, 2000 between Park Place, the Tribe and President.

3.      By way of background, I think it is important to mention that before the defendants defamed me and my company, I had a very good relationship with the Tribe and with President. These relationships began in the early 1990's and centered around the development and construction of the Casino. Over this time period I acquired significant knowledge about the Tribe, its members and tribal politics. I became to understand the Tribe's interests and goals and personally offered my assistance to them.

4.      In fact, my relationship with the Tribe was so special that even though there were changes in control on the tribal council four times, President's contract was reaffirmed each and every time. At that time, Native American Management Corporation had a partnership with President and I was extremely influential in

2

CONFIDENTIAL

maintaining the contract. We were the only ones to get their contract reaffirmed after four changes in power. No one else was able to do this. I considered this to be my "claim to fame" with the Tribe and many people in the gaming industry were aware of what I was able to do.

5.    I also cultivated a friendly business relationship with Ivan Kaufman. Prior to 1997, Native American Management Corporation owned a 50% interest in President. My other company, Anderson-Blake Construction Corp. was commissioned by President with the approval of the National Indian Gaming Commission ("NIGC") to construct the Casino. And, and up until the defamation occurred, my company Oheka Management Corp. had a line of credit of $15 million, of which $9.5 million was still available, from one of Kaufman's other entities to fund improvements to a catering facility I operate.

6.    Over a period of about seven years, we all worked well together, wanted the Casino to prosper and wanted to maintain our relationships.

7.    The Casino opened for business in April of 1999. We were all very excited about the Casino's prospects and were looking forward to its financial success.

8.    Within a few months, it appeared that the Casino was suffering financially. After efforts were made to improve the situation, President decided to sell his interest in the Casino. The Casino was not profiting, there was existing debt owed to me and others associated with the construction and development of the Casino and there were capital investments that had not been recouped. I was owed $2 million from the construction of the Casino and $5 million for my interest in President.

9.    During 1999 and early 2000, President was involved in negotiations with various

3

CONFIDENTIAL

entities for the sale of its interest in the Casino and was exploring other investment opportunities to secure financial assistance for the Casino. There were many interested buyers and I was told by Ivan Kaufman, President's owner, that Native American Management Corporation and Anderson-Blake would be paid what was owed to them from the proceeds of the sale. After being introduced to Goldberg and Cummis from Park Place and based upon the promises and assurances made by them, President decided to forego these other opportunities.

11. My initial contacts with Park Place were with its President, Goldberg and began sometime in July, 1999.

12. Then, on or about October 25, 1999, I had a lunch meeting with Goldberg and Senator Alfonse D'Amato in New York City. The Senator was the individual who first advised Goldberg to consult with me.

13. At this meeting, Goldberg indicated he was there on behalf of the company. He talked about Park Place's interest in acquiring President's management agreement and forming a joint venture with President and the Tribe for gambling operations in the Catskills-Monticello area. I indicated to him that I had very good relationships with both the Tribe and Kaufman and that I could assist Park Place in a variety of ways. Senator D'Amato and I advised him of my dealings with the Tribe and the extent of my business relationship with Kaufman and his entities. After listening to what I said, Goldberg agreed to engage my services and to compensate me with an initial payment of $5 million dollars and with an additional $10 million upon the execution of an agreement with the Tribe and Park Place.

4

CONFIDENTIAL

14. Goldberg requested that I use my good will, contacts and unique position to urge the Tribe and President to do business with Park Place, provide consulting services and advise Park Place on how to cultivate and maintain a relationship with President and the Tribe, to offer advise on how to structure the buy-out of President's interest, to become involved in tribal politics for the benefit of Park Place to ensure that it would have an arrangement with the Tribe should there be a change in control on the tribal council and to offer advise on how to secure and structure an agreement with the Tribe regarding gambling operations in the Catskills-Monticello area.

15. The services to be performed by me were all in connection with Goldberg's then stated interest to have Park Place acquire President's management contract and to involve President in its future ventures with the Tribe.

16. I informed Goldberg that this would be a good situation for everyone involved given the financial status of the Casino and because my corporations (Anderson-Blake and Native American Management Corporation) would be paid what was due them from the proceeds of the sale.

17. At another face-to-face meeting with Goldberg, which was held shortly after we agreed upon the terms, I recall that Goldberg handwrote on a piece of paper the terms of our arrangement, signed it, handed it to me, I signed it and then he took it back from me. Goldberg told me that he would be holding on to this piece of paper to give it to Cummis. He said that he wanted to keep my involvement with these transactions a secret. He said that if the New Jersey Gaming Commission knew about this, it could be detrimental to their license. He told me that he was

5

CONFIDENTIAL

giving this paper to Cummis because he was more familiar with licensing issues and that Cummis would be contacting me.

18. Cummis then contacted me soon after my meeting with Goldberg and I met with him regarding my arrangement. Cummis advised that it was in his opinion that I contact Joel Sterns, Esq., an attorney located in Trenton, New Jersey for the purpose of becoming qualified for licensure with the New Jersey Gaming Commission. Cummis said that Joel Sterns was an attorney used by Park Place and that is why he suggested him to me. Cummis said that he would contact Mr. Sterns first on my behalf.

19. After my meeting with Cummis, Goldberg advised me that so long as it was Mr. Sterns' opinion that I would be likely to secure a license, that my agreement would be reaffirmed and formalized and that the handwritten agreement would be released to me.

20. Sometime in late October, 1999, I contacted Joel Sterns to represent me with respect to securing the gaming license as recommended by Cummis.

21. During the next several months, I performed all of the services requested of me by Park Place. That is, I urged the Tribe and President to do business with Park Place, I advised them on how to structure their deals with President and the Tribe, I advised them on how to cultivate a relationship with President and the Tribe and advised them when and how they should approach the Tribe. I was even asked by them to "get in good" with a faction of the Tribe that was in a position to gain control of the council after the tribal elections. Park Place wanted to make sure that even if these other tribe members were elected that they would still be able to

6

CONFIDENTIAL

deal with the Tribe. In connection with my efforts, I made over 150 phone calls, responded to over 100 phone calls, attended meetings and corresponded with Park Place. I also made numerous calls to various members of the Tribe and traveled several times to meet with the Tribe on behalf of Park Place. All throughout the course of my performance and dealings with defendants, I was and still am a real estate broker duly licensed in the State of New York. I advised Goldberg of this fact during my discussions with him.

22. During this time period, Goldberg repeatedly assured me that I would be compensated and that my agreement would be reaffirmed after they heard from Joel Sterns at which time he would release the handwritten document to me.

23. In or about February, 2000, Joel Sterns contacted Goldberg and told him that based upon his research that I would probably be granted a license by the New Jersey Gaming Commission. Goldberg and Cummis stalled Joel Sterns for another month or so by scheduling meetings to formalize the agreement and then canceling them at the last minute. They never did reaffirm my agreement nor did they provide me with the handwritten one even though they promised me that they would.

24. Sometime in February, 2000, an agreement was made between Park Place, President and the Tribe. According to the agreement, Park Place was purchasing President's interest in the management agreement.

25. Everyone, including myself, was under the impression that Park Place was buying out President. In fact, one of the reasons I was retained by Park Place was to give them advise on how to structure this deal. At no time was there ever any mention

7

CONFIDENTIAL

by anyone that Park Place would not be going through with this acquisition.

26. Until April, 2000, we all thought that Park Place would keep its promises and live up to its obligations and I continued to render services based upon the repeated assurances to pay me, to reaffirm my agreement, to release the handwritten agreement and based upon their promise to buy President's contract and include it in future ventures with the Tribe in Monticello.

27. To my shock, Goldberg and Cummis were making these promises to me and President so that they could establish their own relationship with the Tribe and gain for themselves the exclusive right to manage the Tribe's future gaming operations in the Catskills-Monticello area. Their scheme was accomplished on or about April 14, 2000 when an agreement was executed between the Tribe and Park Place.

28. They also made these false promises to dissuade President from dealing with other potential purchaser's and concocted this scheme to make them all disappear.

29. It became crystal clear that Park Place never had any intention of buying out President's interest or of having President involved in any of their future gaming ventures. Goldberg and Cummis lured me into this deal and made certain promises only to make their own deal with the Tribe behind everyone's back and cut us completely out of the picture.

30. Park Place was able to enter into an exclusive arrangement with the Tribe because it engaged in conduct designed to ruin my relationship and President's relationship with the Tribe. This was all part of Park Place's scheme. They were extremely conniving and deceitful in their approach. They made all kinds of

8

CONFIDENTIAL

promises to me so that I would cajole the Tribe for them all so that they could then cultivate their own relationship with the Tribe. They knew that I would assist them because of the money that was due to my companies from President and that I could expect payment from the proceeds of the sale of President's interest.

31. So, once they established a relationship with the Tribe, as a result of my efforts and advise to them, they set out to ruin my relationship with the Tribe.

32. In order to destroy my relationship with the Tribe, and cause the Tribe to trust and deal only with Park Place, Goldberg intentionally made defamatory statements about me, Anderson-Blake and President.

33. At a meeting held on February 15, 2000, Goldberg met with members of the Tribe and a representative of President was in attendance. At this meeting, Goldberg stated that the construction costs for the Casino incurred by Anderson-Blake were inflated, that Anderson-Blake was a shell corporation and that Melius took the money and did not pay the subcontractors. He also stated that Melius said that he had the Tribe in his pocket. Other statements were made by Goldberg concerning President which were false.

34. These statements were made in the presence of members of the Tribe. Under the circumstances, Goldberg knew that these statements would be taken very seriously by the Tribe and would damage my reputation, my companies reputation and President's reputation.

35. As a result of these statements, the Tribe decided to have nothing further to do with me, Anderson-Blake or President. In fact, the Tribe shortly thereafter

9

CONFIDENTIAL

breached the management agreement, ordered the revocation of President's key managers' gaming licenses and escorted them from the Casino. The statements made by Goldberg completely destroyed my reputation and that of my companies.

36. Because of the actions of Goldberg and Cummis, President no longer was the manager of the Casino, it would not be paid for its interest in the management agreement as promised by Goldberg and Cummis, the remaining construction and development costs of the Casino would not be paid-off from the proceeds of the sale, President would not be able to repay those who invested in the project, including one of my entities, and neither President nor I nor any of my entities have any further prospects of doing business with the Tribe. Their conduct also strained my relationship with President and his entities. Due to their actions, Arbor National Funding will no longer extend credit to my company Oheka Management Corp.

37. Before Park Place entered the picture, I had a good relationship with the Tribe and with President and looked forward to future projects with them both. After I expended time and effort to assist Park Place with the Tribe, Park Place eliminated those prospects.

38. I was the one who helped Park Place with the Tribe, I was the one who gave them advise on how to cultivate a relationship with them, I was the one who gave them advise on tribal politics and I was the one who gave them advise on how to structure its deals.

39. After giving them all of this advise, they then turned around and destroyed my good name and engaged in a fraudulent scheme to secure an agreement with the

10

CONFIDENTIAL

Tribe to the exclusion of everyone else.

40. They even perpetuated their fraud after they accomplished their goal.

41. As part of the discovery in a case I brought against the NIGC for privacy act violations, the NIGC subpoenaed documents from Park Place.

42. The NIGC requested Park Place to provide them with any documents regarding my involvement in their ventures with the Tribe.

43. Park Place, in its responses, failed to disclose documents which establish my involvement.

44. In a recorded telephone conversation with Cummis, I asked him about his failure to provide documents to the NIGC showing me in the deal. In response to my statement that this was done, Cummis said three times "that's correct." One of the documents which shows me in the deal is the handwritten agreement signed by me and Goldberg. This document, as well as others, were not provided to the NIGC pursuant to its subpoena.

45. I find it astonishing that the Executive Vice President of Park Place and a partner in a prestigious law firm would intentionally withhold information from a federal agency and defy a federal subpoena. This clearly shows his complete disregard for the judicial process, federal authorities and gaming commissions.

46. As an aside, I believe this Court should know that I was never found unqualified by the NIGC as the defendants have claimed in their papers. The NIGC never made such a finding which they confirmed in a letter to me. The Judge in that case found this as well.

47. Also, I am not the only party who has brought an action against Park Place

CONFIDENTIAL

regarding the actions of Goldberg and Cummis. President and Kaufman have a case pending against them in the Supreme Court of Nassau County entitled President R.C.-St. Regis Management Company and Ivan Kaufman v. Park Place Entertainment Corp., Arthur Goldberg and Clive Cummis, Index No. 00-008931.

48.     In sum, the extent of my services to defendants, the existence of a handwritten agreement signed by Goldberg and me, the defendants' admission that there are subpoenaed documents that were withheld by them which show that I was involved in the ventures, and the fact that I was and am a real estate broker duly licensed in the State of New York, should result in a denial of defendants' motion to dismiss the breach of contract and related claims. There should also be a denial of defendants' motion to dismiss the defamation and fraud counts. It is clear that Goldberg defamed me and my entities by his comments which then caused the Tribe to stop doing business with me, my entities and President resulting in significant reputational damages and lost profits. These lost profits include construction work that would have been performed by Anderson-Blake on other gambling facilities planned by the Tribe. It is also clear that defendants engaged in a fraudulent and deceptive scheme in which they made numerous promises which they never intended to honor all so that I would help them with the Tribe. They promised payment to me for my services, they promised to acquire President's interest in the management agreement which would benefit my companies and they promised to include President in any of their future ventures with the Tribe which would also benefit my entities. After a relationship was cultivated with the Tribe as a result of my efforts, they destroyed my relationship

12

CONFIDENTIAL

with the Tribe and President and destroyed President's relationship with the Tribe all so that they could secure their own agreement with the Tribe. They reneged on their promise to acquire President and include it any future gaming operations with the Tribe which caused me and my entities significant damages. I further was caused to expend my time, effort and funds in performing my services as a result of defendants' fraud and incurred travel and other related costs.

49. For these reasons, I respectfully request this Court to deny defendants' motion to dismiss the amended complaint and grant plaintiffs leave to serve and file a second amended complaint in the event this Court believes that the amended complaint is deficient in any respect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of August, 2000
Cold Spring Hills, New York

GARY ALAN MELIUS

13

CONFIDENTIAL

# Exhibit C

# BARR & ASSOCIATES, P.C.

ATTORNEYS AT LAW
125 MOUNTAIN ROAD
STOWE, VERMONT 05672

RUSSELL D. BARR**
JENNIFER J. LAJOIE*
DANIEL A. SEFF**

JOYCE-MARIE ROBERTSON, LAW CLERK

** MEMBER VT AND NY BARS
* MEMBER VT BAR

TEL: (802) 253-6272
FAX: (802) 253-6055
www.barrlaw.com

NEW YORK OFFICE
777 THIRD AVENUE
35TH FLOOR
NEW YORK, NEW YORK 10017
TEL: (212) 486-3910
FAX: (212) 973-0540

September 30, 2002

## VIA FEDERAL EXPRESS

Marlene L. Budd, Esq.
Law Offices of Marlene L. Budd
176 West 21st Street
Huntington Station, NY 11746

Loretta M. Gastwirth, Esq.
Meltzer, Lippe & Goldstein, LLP
190 Willis Avenue
Mineola, NY 11746

    Re:    *U.S. ex rel. The Saint Regis Mohawk Tribe vs. President, et al.*, No. 02-CV-845(TJM)(DEP)

Dear Loretta and Marlene:

Enclosed are our papers opposing your Motion to Dismiss and your Motion for Rule 11 Sanctions. The originals are in the package to Loretta and a set of copies is in Marlene's package. I did it this way because I am assuming that Loretta will file the originals with the Court after your reply papers are finalized.

I do want to alert you to a document attached to Lorraine White's Affidavit that we have stamped "CONFIDENTIAL." It is Exhibit 20, the August 13, 2000 Declaration of Gary Melius. That document contains unsubstantiated and highly charged allegations about Park Place Entertainment Corp. and Mr. Clive Cummis. Moreover, neither PPE nor Mr. Cummis is a party to this case and they are unable to defend themselves against Mr. Melius's allegations. Therefore, before any papers are filed with the Court, it is imperative that we enter into a confidentiality agreement concerning Exhibit 20. Thanks.

Sincerely yours,

Daniel A. Seff

Enclosures

cc:    Saint Regis Mohawk Tribe

# Exhibit D

LAW OFFICES

# MELTZER, LIPPE, GOLDSTEIN & SCHLISSEL, LLP

THE CHANCERY

100 WILLIS AVENUE, MINEOLA, NY 11501

TELEPHONE: (516) 747-0300

FACSIMILE: (516) 747-0653

INTERNET: www.mlg.com

*Loretta M. Gastwirth, Esq.*
*Ext. 224*

*Fax No. (516) 747-9363*
*Email: lgastwirth@mlg.com*

October 1, 2002

## VIA FACSIMILE AND REGULAR MAIL

Daniel Seff, Esq.
Barr & Associates, P.C.
125 Mountain Road
Stowe, VT 05672

Re:     **United States of America, ex rel. The St. Regis Mohawk Tribe**
         **v. President R.C. - St. Regis Management Company and**
         **Anderson-Blake Construction Corporation**
         **Case No. :02-CV-0845 (TJM)(DEP); Our File No.: 2468-19**

Dear Daniel:

I received the original copy of your motion papers with no additional copy set. You were required under the Local Rules to serve me with my copy set and an original set to be filed. My firm's copying costs are $ 6.70 (.20 cents a page at 335 pages). Please send a check to my firm in that amount.

Furthermore, two of the documents you emailed, the White Affidavit and the Seff Declaration, could not be opened. In the future, please email the documents in PDF format so that we won't have difficulties opening the documents.

We will not agree to any confidentiality with respect to the Melius Declaration. You proffered it and used it. Moreover, there is nothing confidential in the document itself and your receipt of it from a third party indicates that it was openly available to others as well as to you. Please be advised that I will file your originals as I received them.

Very truly yours,

Loretta M. Gastwirth

LMG:tc
cc: Marlene Budd, Esq. - Via Facsimile

MLG:269558.1