UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, ex rel.
THE SAINT REGIS MOHAWK TRIBE,

                      Plaintiff,      Civil Action No. 02-CV-0845 (TJM/DEP)

-against-

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

                      Defendants.

---

## DECLARATION OF JASON GROSS, ESQ.

Jason Gross, an attorney duly admitted to practice in the Courts of the State of New York, declares, pursuant to 28 U.S.C. § 1746:

1. I am Corporate Counsel to Park Place Entertainment Corporation (hereinafter "Park Place"), and I make this Declaration in support of Plaintiff's motion to treat portions of the Declaration of Gary Melius (hereinafter "Melius Declaration") as confidential.

2. The Melius Declaration was served on Park Place in an action entitled *Native American Management Corp. et al. v. Park Place Entertainment Corp., et al.*, Civil Action No. 01-2267, which was then pending the Eastern District of New York. The Melius Declaration was never filed in the *Native American* action, and that action was subsequently settled.

3. Because the Melius Declaration relates to matters at issue in an action brought by Defendants herein against the Tribe pending in the Eastern District of New York, a copy of the Melius Declaration was provided to the Tribe, with whom Park Place has a Joint Defense Agreement.

4. I understand that the Tribe has submitted the Melius Declaration as an exhibit to its papers in opposition to Defendants' Motion to Dismiss herein because Mr. Melius makes various statements in that Declaration to the effect that he had a financial interest in the Akwesasne Casino.

5. Also in the Melius Declaration are statements made by Mr. Melius which are irrelevant to the issues in this action and which accuse Park Place and its former President and Chief Executive Officer, the late Arthur Goldberg, and its former Executive Vice President, Clive Cummis, of various acts of wrongdoing.

6. A copy of the Melius Declaration showing the portions sought to be redacted herein in brackets is annexed hereto as Exhibit A.

7. Neither Park Place nor Mr. Cummis will have an opportunity to rebut the allegations contained in the Melius Declaration since those accusations are not in any way relevant to the proceedings herein. Indeed, it is unlikely that the accusations will ever be adjudicated since the action Melius brought against Park Place, the estate of Arthur Goldberg and Mr. Cummis has been settled.

8. It is unnecessary for there to be a public airing of these accusations in the context of this action since those accusations are not in any way relevant to the claims herein, or relevant to the issues raised by Defendants' Motion to Dismiss.

2

9. The Melius Declaration was produced in discovery in another action entitled *Catskill Development, LLC v. Park Place Entertainment Corp.*, Civil Action No. 00-CIV-8660, which was pending in the Southern District of New York. That action has been dismissed after the court granted Park Place's motion for summary judgment and is now on appeal to the Second Circuit Court of Appeals. Park Place is seeking the consent of opposing counsel in that action to designate the document as confidential pursuant to a confidentiality agreement entered into between the parties in that action. Further, Park Place is seeking to designate as confidential references to the subject allegations made in other papers in that action.

10. For all the foregoing reasons, I respectfully request that the Court enter an order directing that the subject portions of the Melius Declaration be treated as confidential by the parties; that they be redacted from any filing or filed under seal; and that such Declaration not be distributed to any third persons except in redacted form.

Dated: October 17, 2002

Jason Gross, Esq.
Corporate Counsel to Park Place
Entertainment Corporation

Exhibit A

LAW OFFICES OF MARLENE L. BUDD
191 New York Avenue
Huntington, New York 11743
(631) 421-3799
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

NATIVE AMERICAN MANAGEMENT
CORPORATION, ANDERSON-BLAKE
CONSTRUCTION CORPORATION,             :  Civil Action No. 01-2267 (DRH)
OHEKA MANAGEMENT CORP. and
GARY ALAN MELIUS,

    Plaintiffs,

-vs-

PARK PLACE ENTERTAINMENT
CORPORATION, CLIVE CUMMIS,
RICHARD B. NESS AND B. HILLMAN
as Executors of THE ESTATE OF
ARTHUR GOLDBERG,

    Defendants.

### DECLARATION OF GARY ALAN MELIUS

GARY ALAN MELIUS declares as follows:

1. I am the plaintiff in this action and President of plaintiffs Native American Management Corporation, Anderson-Blake Construction Corp. and Oheka Management Corp. I make this declaration in opposition to the defendants' motion to dismiss the amended complaint.

2. I subscribe to the allegations set forth in my amended complaint, which alleges

(1) that I had an agreement with defendant Park Place Entertainment Corp. ("Park Place") that was entered into on or about October 25, 1999; (2) that Arthur Goldberg ("defendant Goldberg") falsely stated that I would be compensated for performing consulting services to Park Place pursuant to the agreement; (3) that Goldberg and Cummis falsely stated that Park Place would be acquiring the management agreement held by President-R.C.-St. Regis Management Company ("President") governing the operations of a casino in Hogansburg, New York (the "Casino") owned by the St. Regis Mohawk Tribe (the "Tribe") and falsely stated that President would have an interest in any future ventures between Park Place and the Tribe for casinos in the Catskills-Monticello area; and (4) that Goldberg defamed me, Anderson-Blake, President and President's owner, Ivan Kaufman, at a meeting held on February 15, 2000 between Park Place, the Tribe and President.

3. By way of background, I think it is important to mention that before the defendants defamed me and my company, I had a very good relationship with the Tribe and with President. These relationships began in the early 1990's and centered around the development and construction of the Casino. Over this time period I acquired significant knowledge about the Tribe, its members and tribal politics. I became to understand the Tribe's interests and goals and personally offered my assistance to them.

4. In fact, my relationship with the Tribe was so special that even though there were changes in control on the tribal council four times, President's contract was reaffirmed each and every time. At that time, Native American Management Corporation had a partnership with President and I was extremely influential in

maintaining the contract. We were the only ones to get their contract reaffirmed after four changes in power. No one else was able to do this. I considered this to be my "claim to fame" with the Tribe and many people in the gaming industry were aware of what I was able to do.

5. I also cultivated a friendly business relationship with Ivan Kaufman. Prior to 1997, Native American Management Corporation owned a 50% interest in President. My other company, Anderson-Blake Construction Corp. was commissioned by President with the approval of the National Indian Gaming Commission ("NIGC") to construct the Casino. And, and up until the defamation occurred, my company Oheka Management Corp. had a line of credit of $15 million, of which $9.5 million was still available, from one of Kaufman's other entities to fund improvements to a catering facility I operate.

6. Over a period of about seven years, we all worked well together, wanted the Casino to prosper and wanted to maintain our relationships.

7. The Casino opened for business in April of 1999. We were all very excited about the Casino's prospects and were looking forward to its financial success.

8. Within a few months, it appeared that the Casino was suffering financially. After efforts were made to improve the situation, President decided to sell his interest in the Casino. The Casino was not profiting, there was existing debt owed to me and others associated with the construction and development of the Casino and there were capital investments that had not been recouped. I was owed $2 million from the construction of the Casino and $5 million for my interest in President.

9. During 1999 and early 2000, President was involved in negotiations with various

entities for the sale of its interest in the Casino and was exploring other investment opportunities to secure financial assistance for the Casino. There were many interested buyers and I was told by Ivan Kaufman, President's owner, that Native American Management Corporation and Anderson-Blake would be paid what was owed to them from the proceeds of the sale. After being introduced to Goldberg and Cummis from Park Place and based upon the promises and assurances made by them, President decided to forego these other opportunities.

11. My initial contacts with Park Place were with its President, Goldberg and began sometime in July, 1999.

12. Then, on or about October 25, 1999, I had a lunch meeting with Goldberg and Senator Alfonse D'Amato in New York City. The Senator was the individual who first advised Goldberg to consult with me.

13. At this meeting, Goldberg indicated he was there on behalf of the company. He talked about Park Place's interest in acquiring President's management agreement and forming a joint venture with President and the Tribe for gambling operations in the Catskills-Monticello area. I indicated to him that I had very good relationships with both the Tribe and Kaufman and that I could assist Park Place in a variety of ways. Senator D'Amato and I advised him of my dealings with the Tribe and the extent of my business relationship with Kaufman and his entities. After listening to what I said, Goldberg agreed to engage my services and to compensate me with an initial payment of $5 million dollars and with an additional $10 million upon the execution of an agreement with the Tribe and Park Place.

14. Goldberg requested that I use my good will, contacts and unique position to urge the Tribe and President to do business with Park Place, provide consulting services and advise Park Place on how to cultivate and maintain a relationship with President and the Tribe, to offer advise on how to structure the buy-out of President's interest, to become involved in tribal politics for the benefit of Park Place to ensure that it would have an arrangement with the Tribe should there be a change in control on the tribal council and to offer advise on how to secure and structure an agreement with the Tribe regarding gambling operations in the Catskills-Monticello area.

15. The services to be performed by me were all in connection with Goldberg's then stated interest to have Park Place acquire President's management contract and to involve President in its future ventures with the Tribe.

16. I informed Goldberg that this would be a good situation for everyone involved given the financial status of the Casino and because my corporations (Anderson-Blake and Native American Management Corporation) would be paid what was due them from the proceeds of the sale.

17. At another face-to-face meeting with Goldberg, which was held shortly after we agreed upon the terms, I recall that Goldberg handwrote on a piece of paper the terms of our arrangement, signed it, handed it to me, I signed it and then he took it back from me. Goldberg told me that he would be holding on to this piece of paper to give it to Cummis. He said that he wanted to keep my involvement with these transactions a secret. He said that if the New Jersey Gaming Commission knew about this, it could be detrimental to their license. He told me that he was

5

giving this paper to Cummis because he was more familiar with licensing issues and that Cummis would be contacting me.

18. Cummis then contacted me soon after my meeting with Goldberg and I met with him regarding my arrangement. Cummis advised that it was in his opinion that I contact Joel Sterns, Esq., an attorney located in Trenton, New Jersey for the purpose of becoming qualified for licensure with the New Jersey Gaming Commission. Cummis said that Joel Sterns was an attorney used by Park Place and that is why he suggested him to me. Cummis said that he would contact Mr. Sterns first on my behalf.

19. After my meeting with Cummis, Goldberg advised me that so long as it was Mr. Sterns' opinion that I would be likely to secure a license, that my agreement would be reaffirmed and formalized and that the handwritten agreement would be released to me.

20. Sometime in late October, 1999, I contacted Joel Sterns to represent me with respect to securing the gaming license as recommended by Cummis.

21. During the next several months, I performed all of the services requested of me by Park Place. That is, I urged the Tribe and President to do business with Park Place, I advised them on how to structure their deals with President and the Tribe, I advised them on how to cultivate a relationship with President and the Tribe and advised them when and how they should approach the Tribe. I was even asked by them to "get in good" with a faction of the Tribe that was in a position to gain control of the council after the tribal elections. Park Place wanted to make sure that even if these other tribe members were elected that they would still be able to

5

deal with the Tribe. In connection with my efforts, I made over 150 phone calls, responded to over 100 phone calls, attended meetings and corresponded with Park Place. I also made numerous calls to various members of the Tribe and traveled several times to meet with the Tribe on behalf of Park Place. All throughout the course of my performance and dealings with defendants, I was and still am a real estate broker duly licensed in the State of New York. I advised Goldberg of this fact during my discussions with him.

22. During this time period, Goldberg repeatedly assured me that I would be compensated and that my agreement would be reaffirmed after they heard from Joel Sterns at which time he would release the handwritten document to me.

23. In or about February, 2000, Joel Sterns contacted Goldberg and told him that based upon his research that I would probably be granted a license by the New Jersey Gaming Commission. Goldberg and Cummis stalled Joel Sterns for another month or so by scheduling meetings to formalize the agreement and then canceling them at the last minute. They never did reaffirm my agreement nor did they provide me with the handwritten one even though they promised me that they would.

24. Sometime in February, 2000, an agreement was made between Park Place, President and the Tribe. According to the agreement, Park Place was purchasing President's interest in the management agreement.

25. Everyone, including myself, was under the impression that Park Place was buying out President. In fact, one of the reasons I was retained by Park Place was to give them advise on how to structure this deal. At no time was there ever any mention

by anyone that Park Place would not be going through with this acquisition.

26. Until April, 2000, we all thought that Park Place would keep its promises and live up to its obligations and I continued to render services based upon the repeated assurances to pay me, to reaffirm my agreement, to release the handwritten agreement and based upon their promise to buy President's contract and include it in future ventures with the Tribe in Monticello.

27. To my shock, Goldberg and Cummis were making these promises to me and President so that they could establish their own relationship with the Tribe and gain for themselves the exclusive right to manage the Tribe's future gaming operations in the Catskills-Monticello area. Their scheme was accomplished on or about April 14, 2000 when an agreement was executed between the Tribe and Park Place.

28. They also made these false promises to dissuade President from dealing with other potential purchaser's and concocted this scheme to make them all disappear.

29. It became crystal clear that Park Place never had any intention of buying out President's interest or of having President involved in any of their future gaming ventures. Goldberg and Cummis lured me into this deal and made certain promises only to make their own deal with the Tribe behind everyone's back and cut us completely out of the picture.

30. Park Place was able to enter into an exclusive arrangement with the Tribe because it engaged in conduct designed to ruin my relationship and President's relationship with the Tribe. This was all part of Park Place's scheme. They were extremely conniving and deceitful in their approach. They made all kinds of

promises to me so that I would cajole the Tribe for them all so that they could then cultivate their own relationship with the Tribe. They knew that I would assist them because of the money that was due to my companies from President and that I could expect payment from the proceeds of the sale of President's interest.

31. So, once they established a relationship with the Tribe, as a result of my efforts and advise to them, they set out to ruin my relationship with the Tribe.

32. In order to destroy my relationship with the Tribe, and cause the Tribe to trust and deal only with Park Place, Goldberg intentionally made defamatory statements about me, Anderson-Blake and President.

33. At a meeting held on February 15, 2000, Goldberg met with members of the Tribe and a representative of President was in attendance. At this meeting, Goldberg stated that the construction costs for the Casino incurred by Anderson-Blake were inflated, that Anderson-Blake was a shell corporation and that Melius took the money and did not pay the subcontractors. He also stated that Melius said that he had the Tribe in his pocket. Other statements were made by Goldberg concerning President which were false.

34. These statements were made in the presence of members of the Tribe. Under the circumstances, Goldberg knew that these statements would be taken very seriously by the Tribe and would damage my reputation, my companies reputation and President's reputation.

35. As a result of these statements, the Tribe decided to have nothing further to do with me, Anderson-Blake or President. In fact, the Tribe shortly thereafter

9

breached the management agreement, ordered the revocation of President's key managers' gaming licenses and escorted them from the Casino. The statements made by Goldberg completely destroyed my reputation and that of my companies.

36. Because of the actions of Goldberg and Cummis, President no longer was the manager of the Casino, it would not be paid for its interest in the management agreement as promised by Goldberg and Cummis, the remaining construction and development costs of the Casino would not be paid-off from the proceeds of the sale, President would not be able to repay those who invested in the project, including one of my entities, and neither President nor I nor any of my entities have any further prospects of doing business with the Tribe. Their conduct also strained my relationship with President and his entities. Due to their actions, Arbor National Funding will no longer extend credit to my company Oheka Management Corp.

37. Before Park Place entered the picture, I had a good relationship with the Tribe and with President and looked forward to future projects with them both. After I expended time and effort to assist Park Place with the Tribe, Park Place eliminated those prospects.

38. I was the one who helped Park Place with the Tribe, I was the one who gave them advise on how to cultivate a relationship with them, I was the one who gave them advise on tribal politics and I was the one who gave them advise on how to structure its deals.

39. After giving them all of this advise, they then turned around and destroyed my good name and engaged in a fraudulent scheme to secure an agreement with the

Tribe to the exclusion of everyone else.

40. They even perpetuated their fraud after they accomplished their goal.

41. As part of the discovery in a case I brought against the NIGC for privacy act violations, the NIGC subpoenaed documents from Park Place.

42. The NIGC requested Park Place to provide them with any documents regarding my involvement in their ventures with the Tribe.

43. [Park Place, in its responses, failed to disclose documents which establish my involvement.]

44. [In a recorded telephone conversation with Cummis, I asked him about his failure to provide documents to the NIGC showing me in the deal. In response to my statement that this was done, Cummis said three times "that's correct." One of the documents which shows me in the deal is the handwritten agreement signed by me and Goldberg. This document, as well as others, were not provided to the NIGC pursuant to its subpoena.]

45. [I find it astonishing that the Executive Vice President of Park Place and a partner in a prestigious law firm would intentionally withhold information from a federal agency and defy a federal subpoena. This clearly shows his complete disregard for the judicial process, federal authorities and gaming commissions.]

46. As an aside, I believe this Court should know that I was never found unqualified by the NIGC as the defendants have claimed in their papers. The NIGC never made such a finding which they confirmed in a letter to me. The Judge in that case found this as well.

47. Also, I am not the only party who has brought an action against Park Place

11

regarding the actions of Goldberg and Cummis. President and Kaufman have a case pending against them in the Supreme Court of Nassau County entitled <u>President R.C.-St. Regis Management Company and Ivan Kaufman v. Park Place Entertainment Corp., Arthur Goldberg and Clive Cummis</u>, Index No. 00-008931.

48. In sum, the extent of my services to defendants [the existence of a handwritten agreement signed by Goldberg and me, the defendants' admission that there are subpoenaed documents that were withheld by them which show that I was involved in the ventures,] and the fact that I was and am a real estate broker duly licensed in the State of New York, should result in a denial of defendants' motion to dismiss the breach of contract and related claims. There should also be a denial of defendants' motion to dismiss the defamation and fraud counts. It is clear that Goldberg defamed me and my entities by his comments which then caused the Tribe to stop doing business with me, my entities and President resulting in significant reputational damages and lost profits. These lost profits include construction work that would have been performed by Anderson-Blake on other gambling facilities planned by the Tribe. It is also clear that defendants engaged in a fraudulent and deceptive scheme in which they made numerous promises which they never intended to honor all so that I would help them with the Tribe. They promised payment to me for my services, they promised to acquire President's interest in the management agreement which would benefit my companies and they promised to include President in any of their future ventures with the Tribe which would also benefit my entities. After a relationship was cultivated with the Tribe as a result of my efforts, they destroyed my relationship

with the Tribe and President and destroyed President's relationship with the Tribe all so that they could secure their own agreement with the Tribe. They reneged on their promise to acquire President and include it any future gaming operations with the Tribe which caused me and my entities significant damages. I further was caused to expend my time, effort and funds in performing my services as a result of defendants' fraud and incurred travel and other related costs.

49. For these reasons, I respectfully request this Court to deny defendants' motion to dismiss the amended complaint and grant plaintiffs leave to serve and file a second amended complaint in the event this Court believes that the amended complaint is deficient in any respect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of August, 2000
Cold Spring Hills, New York

GARY ALAN MELIUS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____x

UNITED STATES OF AMERICA,
ex rel. THE SAINT REGIS MOHAWK TRIBE,

                       Plaintiff,

     against-                         Case No. 02-CV-0845(TJM)(DEP)

PRESIDENT R.C. – ST. REGIS
MANAGEMENT COMPANY and
ANDERSON-BLAKE CONSTRUCTION
CORPORATION,

                       Defendants.
_____x

## CERTIFICATE OF SERVICE

      On October 18, 2002, I caused copies of (1) an Order to Show Cause; and (2) a Memorandum of Law in Support of Plaintiff's Motion to Seal Certain Papers Herein, together with the accompanying Declarations of Daniel A. Seff, Esq. (with Exhibits) and Jason Gross, Esq. (with exhibit), via Federal Express, as follows:

| | |
|---|---|
| Marlene L. Budd, Esq. | Loretta M. Gastwirth, Esq. |
| Law Offices of Marlene L. Budd | Meltzer, Lippe & Goldstein, LLP |
| 176 West 21st Street | 190 Willis Avenue |
| Huntington Station, NY 11746 | Mineola, NY 11746 |

_____
DANIEL A. SEFF