SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NASSAU

----------------------------------------X

PRESIDENT R.C.-ST. REGIS MANAGEMENT COMPANY and IVAN KAUFMAN,
Plaintiffs,

- against -

PARK PLACE ENTERTAINMENT CORP., ARTHUR GOLDBERG and CLIVE CUMMIS,
Defendants.

----------------------------------------X

100 Maiden Lane
New York, New York 10038

August 22, 2002
11:00 a.m.
(Record Opened: 11:15 a.m.)

Continued Examination Before Trial of Plaintiff IVAN KAUFMAN, taken by Defendants, pursuant to adjournment of June 18, 2002, before Susan L. Cohen, a Notary Public of the State of New York.

A No.

Q Not even a rough estimate?

A No.

Q Was it more than half?

A I don't know.

Q So if I asked you to draw me a sketch of how much foundation had been poured, would you be able to do that? This is at the time after having signed a management agreement.

A I can't recall.

MR. LEVANDER: You have a leeway, but the percentage of the foundation that was poured at the time he entered into the management agreement, it is not obvious as to why that is relevant to the litigation we have.

MR. HOFF: It is.

THE WITNESS: Let's take a minute.

(Counsel and the witness leave the deposition room and return.)

Q I would like to talk about the acquisition of your Melius and President Riverboat divisions.

I believe you said in the beginning of your deposition that you did not and still to this day have not paid the entire purchase price to Melius; is that correct?

A That's correct.

Q Just so we are clear, of the purchase price, how much did you actually pay?

A I don't recall.

Q Was it somewhere on the order of a half a million dollars, something of that range?

A 750 to a million and a quarter, something like that. Say half a million to a million and a quarter.

Q Do you have some understanding as to how much you are still owing?

A I haven't looked at it.

MR. HOFF: Mark this as Exhibit 71.

(Defendants' Exhibit 71, Fax Cover and Drafts of Agreement for Purchase of Partnership Interest, marked for identification.)

Q The court reporter is handing you Defendant's Exhibit 71, which consists of a fax

cover sheet of a fax from Walter Horn to Gary Melius and Joseph Membrino dated September 24, 1997, and behind the fax cover sheet are two what appear to be draft agreement for purchase of partnership interest. Do you see that?

A Yes.

Q One is entitled "Agreement for Purchase of Partnership Interest"; the other is just entitled "Agreement."

Do you see those?

A Yes.

Q Have you ever seen this document before?

A I believe so.

Q What is it?

A It is an agreement for the purchase of the partnership interest between or among Massena Management Corp., Gary Melius, Native American Management Corp., and PRC St. Regis.

Q Am I correct that this document that is titled "Agreement for Purchase of Partnership Interest" is a draft of the agreement by which you purchased Melius' interest in the management agreement?

A I believe so.

Q Now, you see at the very top of the pages there is a fax line that has page numbers?

A Yes.

Q The one we just looked at is 2 of 35?

A Yes.

Q Why don't you go to 17 of 35.

A Okay.

Q This is a document entitled "Agreement."

Am I correct that this is a draft of the agreement by which you purchased the St. Regis Riverboat entity's interest in the management agreement?

A I believe so.

Q Do you know whether these two agreements were ever actually executed?

A I believe so.

Q Do you know where the copies of the executed agreements are?

A No.

Q Take a look on the first agreement,

the one with Melius, the Melius buyout agreement. If we look at page 4 out of 35 of the fax line, paragraph 4 describes the purchase price?

A Yes.

Q Okay. And that is $4,990,000, correct?

A Right.

Q The paragraph lays out a schedule of payments. Do you see that?

A Yes.

Q The first payment was supposed to have been made when this agreement was signed, and that would have been for $250,000?

A Okay.

Q First of all, does paragraph 4 reflect your understanding of your purchase price for the buyout of Melius?

A Yes.

Q Was the $250,000 signing payment actually made?

A I don't recall whether it was paid then or later on. It is my recollection it was paid; I'm just not sure of the time.

Q Were any other payments described in paragraph 4 actually made to Melius?

A I believe the $500,000 was also made.

Q Any others?

A I don't know.

Q There is a reference in here to the closing date. Was there actually a closing for this transaction?

A I don't recall.

Q Do you have an understanding as to whether there were any specific reasons why Melius had to extricate himself from the management agreement?

A Can you repeat the question, please?

Q Yes. Do you have an understanding as to whether there were any specific reasons why Melius had to sell out his interest in the management agreement?

A He told me he was unable to get approved by the NIGC.

Q Did you have any understanding as to what the NIGC's objection to Mr. Melius was?

A One issue I was told was he had a

prior bankruptcy and just -- that was one reason I was told. I never had a clear picture other than that.

Q Did you ever hear that there were concerns that the NIGC had as to any possible ties Melius had to organized crime?

A No.

Q Was there any discussion between anybody representing President, including yourself, and Melius or any of his representatives with respect to Melius having no further involvement with the Casino? And the time frame I am talking about is at or about the time that you were purchasing his position in the management agreement.

A Can you repeat the question?

Q At or about the time that you were purchasing Melius' interest in the management agreement, did you have any discussions -- this is the royal you with the royal Melius -- with respect to his future involvement with the Casino?

A When I purchased his interest?

Q Yes.

A No.

Q Were there any discussions that you had -- and again, the royal you -- with Melius or any of his representatives about Melius not having any further involvement with the Casino?

A I don't recall.

Q Take a look at paragraph 22. It is page 12 of the fax line, which is page 11 of the document, the paragraph entitled, "Waiver of General Contractor Designation." It says, "Seller and shareholder" -- which is Melius -- "hereby waive and release any claim that either may have on behalf of themselves or any affiliates to be selected and designated as the general contractor for the construction of the project as set forth in section 10.1(4) of the published agreement."

Do you see that?

A Yes.

Q Do you have any understanding of why this provision was put into the buyout agreement?

A I guess I didn't want to be tied to any obligations that might have existed.

Q Are you guessing?

A I am guessing. I am summarizing.

Q Well, you said, "I guess that's why." I wanted to make sure that you were not speculating. I really want to know if you recall.

A I don't recall. I'm just summarizing what I am thinking.

MR. LEVANDER: It's late in the day. You have been at this for a while.

He doesn't want your speculation. We can all infer that, perhaps from the document. He wants to know what you can recall.

THE WITNESS: I don't recall.

Q Does paragraph 22 refresh your recollection as to whether there were any discussions about Melius' future involvement with the Casino.

A No.

Q Going back to the paragraph 4 of the purchase price, can you explain to me why you had not paid the entire amount set forth in paragraph 4?

A Didn't have the money.

Q I'm sorry?

A The operation didn't have the money.

Q What do you mean by that?

A We didn't have the money to pay.

Q Is it your testimony that the purchase price was to be paid out of proceeds from the operations of the Casino?

A No. The partnership, which is obligated to pay the money, had to have the money to pay. It didn't have the money, so it didn't pay.

Q So you didn't capitalize the partnership sufficiently to meet its initial obligation of paying the purchase price to Mr. Melius?

A Can you repeat that question?

Q When you created the partnership in order for it to enter into its business, which is to enter into the management agreement, you did not fund it with sufficient capital in order to pay the purchase price to Melius; is that what you are saying?

A Are you asking me whether I funded

$4 million into the partnership and set it aside for the purpose of funding this?

Q I am asking you if you put enough money into the purchaser, which is Messina Management Corp., in order for Massena Management Corp. to meet its obligations under this agreement?

A I'm not sure I understand your question.

Q From what you are telling me, you never funded Messina Management Corp. with enough money to pay the obligation under this agreement; is that correct?

A No, that's not correct.

Q When you say that Messina Management Corp. didn't have the money, what do you mean by that?

A Our expenses exceeded our revenues.

Q What was the source of the revenue for Messina Management Corp.?

A The source of revenue?

Q Yes.

A From gaming activities.

Q I take it the gaming activities that

you are referring to are those solely resulting from the activities of the Akwasasne Casino?

A Yes.

Q Are you saying that you didn't generate enough revenues from the Akwasasne Casino in order to meet the payout obligations under this agreement? Is that what you are saying?

A I said our expenses exceeded our revenues.

Q This is one of your expenses, correct?

A That's correct.

Q You could have applied your revenues --

A What is that?

Q You could have applied your revenues to paying this obligation, correct?

A I don't know.

Q But it's fair to say that the only source of revenues that would be available to pay the purchase price under this agreement would have been revenues that would be generated from the operations of the Akwasasne

Casino, correct?

A That's fair to say.

Q So would it also be fair to say that in order for Melius to get paid the purchase price, the Casino would have had to have generated sufficient revenues such that there was enough money after expenses to pay the purchase price?

A That's fair to say that. And that is the balance of the purchase price you are referring to.

Q Other than the $750,000 that you had already paid, is that what you are talking about?

A Yes.

Q So would it also be fair to say that it was in Mr. Melius' interest for the Casino to be able to generate sufficient revenues so that Messina Management Corp. could meet the balance of its purchase price obligation under this agreement?

A Yes.

Q Now, with respect to the other agreement with President Riverboat --