```
 1
 2            UNITED STATES DISTRICT COURT
 3            NORTHERN DISTRICT OF NEW YORK
 4
 5
    UNITED STATES OF AMERICA,     )
 6  ex rel. THE SAINT REGIS       )
    MOHAWK TRIBE,                 )
 7                                ) Case No.
              Plaintiff,          ) 02-CV-0845
 8                                ) (TJM)(DEP)
         vs.                      )
 9                                )
    PRESIDENT R.C.-ST. REGIS      )
10  MANAGEMENT COMPANY and        )
    ANDERSON-BLAKE CONSTRUCTION   )
11  CORPORATION,                  )
              Defendants.         )
12  ------------------------------)
13
14
15         * CONTAINS CONFIDENTIAL PORTIONS *
16
17         DEPOSITION OF IVAN KAUFMAN
18               New York, New York
19           Thursday, April 29, 2004
20
21
22
23  Reported by:
24  KRISTIN KOCH, RPR
25  JOB NO. 1168
```

## Page 18

1  Kaufman
2  tell me, Mr. Kaufman. I am just trying to
3  gather information here today.
4  Now, how much money would you
5  estimate that you, and I am including yourself
6  personally and your entities, has lent to
7  Mr. Melius and his entities over the years
8  since the initial loan?
9  MS. GASTWIRTH: Objection.
10  A. I'd say greater than 50 million.
11  Q. What was the largest outstanding
12  loan balance at any one time that ever existed?
13  I understand that that was over a period of
14  time, but what was the most that he ever owed
15  you at one time?
16  A. Aggregate or a single asset?
17  Q. In the aggregate.
18  MS. GASTWIRTH: You are asking for
19  today?
20  Q. I am saying over the entire time
21  period that you, including yourself and your
22  entities, has lent money to Mr. Melius and his
23  entities, what's the most money he ever owed
24  you in the aggregate at any one time?
25  MS. GASTWIRTH: Objection.

## Page 19

1  Kaufman
2  Go ahead.
3  A. I don't recall.
4  Q. Did he ever owe you $50 million at
5  one time?
6  A. No.
7  Q. 25 million?
8  A. Perhaps.
9  Q. How much does he owe you today?
10  When I say "he," I am referring to Mr. Melius
11  or any entities that he owns or controls.
12  A. I don't know.
13  Q. Is it more than 10 million?
14  A. I don't believe so.
15  Q. It's somewhere between 5 and 10
16  million?
17  A. I'm not sure.
18  Q. What was the most recent time that
19  you or any of your entities lent money to
20  Mr. Melius or any of his entities?
21  MS. GASTWIRTH: Objection. I think
22  that's going beyond the periods --
23  MR. SEFF: Well, we don't know that.
24  MS. GASTWIRTH: Beyond the Complaint
25  and the initiation of his Complaint.

## Page 20

1  Kaufman
2  MR. SEFF: We don't know that until
3  we hear the answer. The answer may not be
4  beyond the period.
5  MS. GASTWIRTH: I have an objection.
6  MR. SEFF: You can answer if you
7  understand the question.
8  A. What was the question?
9  Q. The question was: What was the most
10  recent time that you, meaning you or any of
11  your entities, lent money to Mr. Melius or any
12  of his entities?
13  A. We have an ongoing relationship with
14  Mr. Melius, a lending relationship.
15  Q. You have an ongoing lending
16  relationship; is that right?
17  A. Correct. We have an outstanding
18  relationship with him as a borrower, so there
19  are loans outstanding to Mr. Melius.
20  Q. Is there any particular service that
21  you provide, you and your lending entities,
22  that Mr. Melius can get in terms of loan
23  borrowing that he couldn't get from a bank?
24  MS. GASTWIRTH: Objection.
25  Q. What is the reason why Mr. Melius

## Page 21

1  Kaufman
2  comes to you to borrow money, if you know?
3  MS. GASTWIRTH: Objection.
4  A. That's a ridiculous question.
5  Q. Well, he could borrow money
6  presumably from any number of lenders. What is
7  it about you and your companies that he comes
8  to?
9  MS. GASTWIRTH: Objection.
10  A. We lend billions of dollars. There
11  are reasons why people come to us. We are
12  competitive.
13  Q. Do you offer lower interest rates?
14  What do you offer to compete in the
15  marketplace?
16  MS. GASTWIRTH: Objection.
17  A. I don't know.
18  Q. Now, can you describe the various
19  projects or identify the various projects that
20  you have lent Mr. Melius money for over the
21  years?
22  A. Generally I could talk about some of
23  them. I don't know all of them, but I could
24  talk about some of them.
25  Q. Why don't you list the ones that you

Page 38

1  Kaufman
2  him, did you ever come to learn why it was that
3  the NIGC refused to allow him to have a
4  financial interest in the project?
5      MS. GASTWIRTH: Objection. I don't
6      think that's what the document says. I
7      think you were correctly stating management
8      responsibility or financial interest.
9  Q. Well, what did you do, Mr. Kaufman,
10 you and your entities, to look into a
11 possibility of buying out Mr. Melius? What
12 sort of due diligence did you do prior to
13 making the decision to buy him out?
14     MS. GASTWIRTH: Objection.
15     Go ahead.
16 A. We reviewed market studies of the
17 viability of a casino in that market and
18 whether or not we thought it would be a
19 successful project.
20 Q. Did there come a time when you and
21 Mr. Melius negotiated a price and other terms
22 for the buy-out?
23 A. Yes.
24 Q. Do you recall as you sit here today
25 what the price of the buy-out was?

Page 39

1  Kaufman
2  A. No.
3  Q. Does 4.99 million sound about right?
4  A. Could be. I don't remember the
5  exact terms.
6  Q. I will represent to you that the
7  price was 4.99 million, but leaving that aside,
8  what went into the determination of the price?
9  A. I don't recall.
10 Q. Did you negotiate with Mr. Melius
11 over the buy-out price?
12 A. Yes.
13 Q. Did you also agree to buy out
14 Mr. Melius' partner at the time?
15 A. At what time?
16 Q. When you agreed to buy out
17 Mr. Melius' interest, Mr. Melius' interest was
18 through a company called Native American
19 Management Corp. or NAMC, is that right, if you
20 recall?
21 A. I don't recall.
22     MS. GASTWIRTH: Again, the "you,"
23     are we separating out the "you"? We know
24     the acquisition was through entities.
25 Q. When I say "you," I mean your

Page 40

1  Kaufman
2  entities. I believe your entity was Massena
3  Management Corp. that bought out Mr. Melius'
4  company, NAMC. Mr. Melius, though, had a
5  partner in the project; isn't that right?
6  A. I don't know if the correct term is
7  he had a partner. I don't recall the exact
8  business relationship that existed, whether
9  partner is the right terminology or not.
10 Q. But you had a separate entity,
11 Massena Management, LLC, that bought out
12 another entity, P.R.C.-St. Regis, Inc.?
13 A. That's correct.
14 Q. Who was involved in the discussions
15 other that yourself and Mr. Melius over the
16 buy-out price for NAMC?
17 A. Walter Horn.
18 Q. Anyone else that you can think of?
19 A. No.
20 Q. Now, during the course of the
21 discussions over the possible buy-out of NAMC
22 by your entity, Massena Management Corp., did
23 the subject come up as to which company or
24 companies would serve as the general contractor
25 and architect for the casino project?

Page 41

1  Kaufman
2      MS. GASTWIRTH: Objection.
3  A. I don't recall.
4  Q. Do you know, Mr. Kaufman, as you sit
5  here today, how much of the $4.99 million
6  buy-out price to buy out Mr. Melius' entity,
7  NAMC, has been paid?
8  A. I don't recall what the up-front
9  deposit was, but other than the up-front
10 deposit I don't think any payments were made.
11 Q. Why is that, if you know?
12 A. Because the enterprise is not a
13 successful enterprise. It doesn't have the
14 cash flow to make the payments.
15 Q. Did you understand the buy-out
16 agreement to mean that Mr. Melius was only to
17 be paid if the entity were successful?
18     MS. GASTWIRTH: Objection.
19 A. No.
20 Q. What was your understanding of what
21 the buy-out agreement required in terms of
22 payments for the buy-out?
23 A. That the entity had an obligation to
24 make those payments.
25 Q. I'm sorry, I couldn't hear what you

Page 42

```
 1              Kaufman
 2  said.
 3      A.  That the entity had an obligation to
 4  make those payments.
 5      Q.  Whether or not the entity were
 6  successful?
 7      A.  If the entity had the capability to
 8  make the payments, it would. If it didn't have
 9  the money, it couldn't. It's a question of
10  whether it had capability or not.
11      Q.  So what you are saying is that as a
12  practical matter, regardless of what the
13  buy-out provided in terms of the scheduled
14  payments, if the entity didn't have the money,
15  it wasn't going to make the payments; is that
16  right?
17          MS. GASTWIRTH: Objection. I think
18      you are recharacterizing his testimony.
19          MR. SEFF: I am not. I am just
20      trying to understand his position. We
21      don't have enough time for me to
22      recharacterize his testimony. I just want
23      to understand his position on what was
24      required under the buy-out.
25      A.  If the company doesn't have the cash
```

Page 43

```
 1              Kaufman
 2  to make a payment, it can't make a payment if
 3  it doesn't have the cash. It's not that
 4  complicated a concept. Either the money exists
 5  or it doesn't exist to make a payment. If
 6  there is no money in the entity to make a
 7  payment, it can't make a payment.
 8          MS. GASTWIRTH: I think I sent you,
 9      Dan, yesterday or the day before a lawsuit
10      by NAMC against President for the balance
11      of that acquisition agreement.
12          MR. SEFF: Okay. I have been in
13      transit since then. I didn't see it.
14          MS. GASTWIRTH: And I know Walter
15      had testified about that. It was a
16      follow-up to Walter's testimony.
17      Q.  Mr. Melius' entity sued your entity
18  for the unpaid balance; is that right?
19      A.  I believe so.
20      Q.  What's your position in that case?
21  What's your defense to that suit?
22      A.  I don't know.
23      Q.  Did you hire lawyers to oppose that
24  case?
25      A.  I'm sure we did. I am not familiar
```

Page 44

```
 1              Kaufman
 2  with the details.
 3      Q.  Your buy-out agreement was
 4  ultimately approved by the NIGC; is that right?
 5      A.  Unfortunately.
 6      Q.  Do you recall roughly when that was?
 7      A.  I don't recall a date.
 8      Q.  Beginning of January '98, does that
 9  sound about right?
10      A.  If you have a document, it may
11  refresh my recollection so I could be more
12  accurate. I really don't recall the date.
13      Q.  I don't think I have a document here
14  to help you, but I do recall that Mr. Horn
15  testified that it was January of '98. That's
16  the best I can do for you on that right now.
17          In any event, there came a time when
18  the NIGC approved the buy-out; isn't that
19  right?
20      A.  Yes.
21      Q.  And I think you indicated you made
22  the initial payment or deposit under that
23  agreement and then, as you recall, no
24  subsequent payments were made.
25      A.  I believe so.
```

Page 45

```
 1              Kaufman
 2      Q.  Now, after the buy-out was approved,
 3  what was the next thing that had to happen?
 4      A.  In what sense?
 5      Q.  Was there a need to select a general
 6  contractor to construct the casino?
 7      A.  At what point in time?
 8      Q.  After the buy-out was approved and
 9  the management agreement was approved.
10      A.  I don't recall the --
11      Q.  The chronology?
12      A.  I don't recall the chronology of all
13  the events.
14      Q.  Did there come a time when President
15  R.C.-St. Regis Management Company, the new
16  NIGC-approved manager for the casino project,
17  needed to and did select a general contractor
18  to build the casino?
19      A.  Yes.
20      Q.  Were you involved in the decision of
21  which company to select as general contractor?
22      A.  Yes.
23      Q.  Did the management agreement also
24  require that an architect be selected, if you
25  recall?
```

## Page 46

1 Kaufman
2    A.  I don't recall.
3    Q.  Do you recall discussions over which
4 company would serve as the architect?
5    A.  I don't recall.
6    Q.  Do you know which company was
7 ultimately selected as the general contractor?
8    A.  Yes.
9    Q.  Which company was that?
10    A.  Anderson Blake.
11    Q.  Anderson Blake Construction Corp.?
12    A.  I don't know the whole legal name.
13 We just refer to it as Anderson Blake.
14    Q.  So I will attempt to refer to it
15 that same way from here on.
16       Do you know the name of the company
17 that was selected to be the architect?
18    A.  I don't recall.
19    Q.  Does the name Archon Design Limited
20 sound familiar to you?
21    A.  I don't recall.
22    Q.  What went into the decision-making
23 process to select Anderson Blake as the general
24 contractor?
25    A.  We had a significant number of

## Page 47

1 Kaufman
2 issues. We had a limited amount of time to get
3 started in order to meet the NIGC's
4 requirements. We had the existing plans and
5 specs and foundations that were put in place by
6 the, you know, prior entities that were working
7 on the project, which we received the credit
8 for in our development cost. We had ordered
9 steel. I believe there was ordered steel that
10 had to be taken into consideration. So based
11 on the time frame, based on the history and
12 based on the prior engineerings, it was agreed
13 by my entities as well as the Tribal entities
14 that it would be in our best interests to
15 continue with the prior companies that did all
16 the work and we entered into a fixed price
17 contract with the general contractor.
18    Q.  When you say "the general
19 contractor," you are referring to Anderson
20 Blake; right?
21    A.  Correct.
22    Q.  Had you ever worked with Anderson
23 Blake before on any other projects?
24    A.  It's possible. I don't recall.
25    Q.  Had you ever been involved in any

## Page 48

1 Kaufman
2 other construction projects prior to the casino
3 project?
4    A.  I don't recall.
5      MS. GASTWIRTH: I'm sorry, is that
6    any construction projects?
7      MR. SEFF: Yes.
8      MS. GASTWIRTH: Has he ever been
9    involved in construction projects before?
10    Q.  Your primary business is lending
11 money; is that right?
12    A.  That's correct.
13    Q.  Had you ever lent money on any
14 projects prior to this casino project where
15 Anderson Blake was the general contractor or a
16 contractor?
17    A.  I don't recall.
18    Q.  Had you heard the name Anderson
19 Blake before you got involved in the casino
20 project?
21    A.  I don't recall.
22    Q.  Did you check any references on
23 Anderson Blake before you selected them?
24    A.  I don't recall.
25    Q.  Did you check to see if there were

## Page 49

1 Kaufman
2 any judgements against Anderson Blake?
3    A.  I don't recall.
4    Q.  Any bankruptcies?
5    A.  I don't recall.
6    Q.  Any lawsuits?
7    A.  I don't recall.
8    Q.  Did you check to see if there were
9 any liens against Anderson Blake?
10    A.  I don't recall.
11    Q.  Did you check their corporate
12 filings at all?
13    A.  I don't recall.
14    Q.  Any bank references that you
15 checked?
16    A.  I don't recall.
17    Q.  Did you check their financial
18 liquidity and soundness?
19    A.  I don't recall.
20    Q.  Did you investigate any previous
21 jobs that the company Anderson Blake had worked
22 on?
23    A.  I don't recall.
24    Q.  Did you check to see if any of the
25 principals in Anderson Blake had a criminal

Page 50

1  Kaufman
2  record?
3  A. I don't recall.
4  Q. Now, did you know who the Anderson
5  Blake principal was at the time that you
6  selected Anderson Blake to be the general
7  contractor for the casino?
8  A. Can you repeat the question.
9  Q. Did you know who the owner was of
10 Anderson Blake at the time that you selected
11 Anderson Blake to be the general contractor for
12 the casino?
13 A. I don't recall.
14 Q. Do you recall where Anderson Blake's
15 offices were in or around 1998 when they were
16 chosen to be the general contractor?
17 A. I don't recall.
18 Q. Do you recall who the officers of
19 the company were?
20 A. I don't recall.
21 Q. Directors?
22 A. I don't recall.
23 Q. Shareholders?
24 A. I don't recall.
25 Q. Now, I mentioned the name a couple

Page 51

1  Kaufman
2  of minutes to you Archon Design and I believe
3  you said the name sounded familiar but you
4  weren't sure; is that right?
5  A. That's correct.
6  Q. I will represent to you for the sake
7  of this discussion that Archon Design, we will
8  abbreviate it as Archon, that's A-R-C-H-O-N,
9  was chosen by President to be the architect for
10 the casino.
11     Do you recall any discussions prior
12 to and leading up to the selection of Archon
13 regarding who should serve as the architect?
14 A. I don't remember.
15     MS. GASTWIRTH: If you want to show
16 him some documents, maybe that will help
17 refresh his recollection. He is testifying
18 as he sits here today years later.
19 Q. So would it be fair to say,
20 Mr. Kaufman, that since you don't recall
21 selecting Archon Design, that you wouldn't
22 recall investigating those same categories of
23 issues that I just listed regarding Anderson
24 Blake?
25 A. Yes.

Page 52

1  Kaufman
2  Q. No need for me to list those
3  individually here for Archon?
4  A. Not for me.
5  Q. The answer will be you don't recall?
6  I mean, I will list them if you think it might
7  be helpful.
8  A. No. I answered your question.
9  Q. Okay, thank you.
10     Did you have any understanding,
11 Mr. Kaufman -- and I am representing to you
12 that Archon was selected as the architect, and
13 I am sure your lawyer would chime in if she
14 thought I was misrepresenting the facts, but
15 they were selected as the architect.
16     Did you have any understanding as to
17 whether there was any connection between
18 Anderson Blake and Archon at the time that
19 those companies were selected?
20     MS. GASTWIRTH: Objection. You
21  know, I am not going to chime in. I am
22  going to wait for whatever it is --
23     MR. SEFF: Okay, maybe she won't
24  chime in.
25 Q. I am representing to you that

Page 53

1  Kaufman
2  Archon --
3     MS. GASTWIRTH: Why don't you show
4  him the document. It will help him. He is
5  sitting here with a memory quiz years
6  later.
7     MR. SEFF: There is really not much
8  to show him.
9     MS. GASTWIRTH: There is the January
10 14, 1998, letter agreement.
11    MR. SEFF: I can show you that.
12    MS. GASTWIRTH: Maybe that will help
13 refresh his recollection as to the
14 selection of the general contractor and
15 architect. And that's the one that's a
16 little cut off, but not in a relevant part.
17    MR. SEFF: Right.
18 Q. All right, Mr. Kaufman, I am going
19 to show you a document that's previously been
20 marked as Plaintiff's Exhibit 65. It's a
21 January 14, 1998, letter from you to Edward
22 Smoke on Massena Management, LLC letterhead. I
23 ask you to look at that. It is not a great
24 copy, but it is legible. Take a look at it and
25 tell me if you recall seeing that before.

Page 54

1	Kaufman
2	(Document review.)
3	A. Okay. What's the question?
4	Q. The question is have you ever seen
5	what's been marked as Exhibit 65 before?
6	A. It certainly refreshes my
7	recollection of the events leading up to the
8	selection of the architect and the general
9	contractor.
10	Q. Okay. Tell me what you recall now
11	that you have had a chance to review 65.
12	A. Basically we had a limited amount of
13	time in order to begin construction and
14	complete it. We had existing plans which we
15	submitted with the management agreement which
16	were developed by, I believe, this architect
17	and with this general contractor doing the
18	previous work. We worked with the Tribe to
19	figure out what was the best fit to proceed in
20	order to meet these timetables, and with the
21	Tribe's approval we agreed to select Anderson
22	Blake and Archon, who was previously working on
23	this project, and we created a fixed price
24	contract in terms of the total dollars it would
25	take to build this casino and we were seeking

Page 55

1	Kaufman
2	authorization from the Tribe in order to
3	proceed with Anderson Blake as the contractor
4	and Archon as the architect and do a fixed
5	price contract in order to meet the
6	requirements as imposed by the NIGC.
7	Q. Thank you, Mr. Kaufman.
8	Does reviewing Exhibit 65 refresh
9	your recollection at all as to who the owner
10	was of Anderson Blake?
11	A. No.
12	Q. Does reviewing Exhibit 65 help
13	refresh your recollection at all as to who the
14	owner or owners were of Archon Design?
15	A. No.
16	Q. Did you have any understanding,
17	Mr. Kaufman, of what the management
18	agreement -- and when I say "the management
19	agreement," which I can show you if you want, I
20	am referring to the Fourth Amended and Restated
21	Management Agreement between the Tribe, that is
22	the St. Regis Mohawk Tribe, and President R.C.
23	dated November 7, 1997.
24	Did you have any understanding,
25	Mr. Kaufman, as to what the management

Page 56

1	Kaufman
2	agreement required in terms of a general
3	contractor and an architect?
4	A. I don't recall. I would have to
5	look at the agreement.
6	Q. Was that something that you would
7	have reviewed and been involved in, or was that
8	something that was the responsibility of
9	Mr. Horn or somebody else?
10	A. I might have received advice from
11	Mr. Horn, but clearly, you know, he helps me
12	interpret the management agreements and make
13	sure that we are in compliance with the
14	different agreements.
15	Q. Did you write the letter that's been
16	marked as Exhibit 65? It's signed by you as
17	president of President R.C. Did you write that
18	letter or was that letter written for you?
19	A. I don't recall.
20	Q. Is this the type of thing that you
21	would write or is it something that somebody
22	else would write for you?
23	A. I don't know.
24	Q. But you clearly reviewed it before
25	you signed it; right?

Page 57

1	Kaufman
2	A. I don't recall.
3	Q. You don't recall if you read what's
4	been marked as Exhibit 65 before you signed it?
5	A. It was ten years ago. I can't --
6	eight years ago, whatever it is. I don't
7	remember.
8	Q. Six years ago.
9	A. Six years ago.
10	Q. Do you typically review things
11	before you sign them? Let me get more general.
12	A. Depending on the length of the
13	document and what it's for, but I certainly try
14	to.
15	Q. Is it your testimony that you had no
16	understanding on January 14, 1998, when you
17	signed Exhibit 65, you had no understanding as
18	to who owned Archon?
19	MS. GASTWIRTH: Objection. Are you
20	trying to summarize --
21	MR. SEFF: That's a question.
22	That's not a summary.
23	Q. I said is it your testimony that on
24	January 14, 1998, you had no understanding as
25	to who owned Archon?

15 (Pages 54 to 57)

TSG REPORTING, INC. 212-702-9580

Page 58

1       Kaufman
2    A. I don't recall.
3    Q. Is it your testimony that you had no
4  understanding as to who owned Anderson Blake on
5  January 14, 1998?
6    A. I don't recall.
7    Q. Were you involved in the negotiation
8  of the price for the construction contract with
9  the general contractor, Anderson Blake?
10   A. I don't recall.
11   Q. Exhibit 65 states that the amount of
12 the construction contract is, rounding, 14.2
13 million?
14       MS. GASTWIRTH: 14.1 or --
15       MR. SEFF: Well, it's 14.18 million.
16       MS. GASTWIRTH: Okay.
17   Q. Anything about that number that
18 refreshes your recollection as to whether you
19 were involved in the negotiation of it?
20   A. I don't recall.
21   Q. Now, Mr. Horn signed the
22 construction contract on behalf of President.
23       Do you recall whether you reviewed
24 the construction contract before it was
25 executed by Mr. Horn?

Page 59

1       Kaufman
2    A. I don't recall.
3    Q. If I were to show you the
4  construction contract, would that possibly help
5  refresh your recollection?
6    A. I don't know.
7    Q. All right, Mr. Kaufman, I am going
8  to show you two documents that have been
9  previously marked as deposition Exhibits 56 and
10 63. Exhibit 56 is an AIA Form A101 and Exhibit
11 63 is an AIA Form A201, and together they make
12 up what we are referring to here together as
13 the construction contract. Why don't you take
14 a look at those two exhibits.
15       MS. GASTWIRTH: I can put my
16    objection on the record in the meantime. I
17    don't know that what's been marked as
18    Exhibit 63 was ever produced by any party
19    in this action and I believe that last time
20    you represented you got it off the
21    Internet. It's not a document that's
22    within anyone's files. I know it's
23    referenced in the prior Exhibit 56, but I
24    don't think that document existed in the
25    parties' files.

Page 60

1       Kaufman
2       MR. SEFF: Okay, your objection is
3    noted.
4    Q. Mr. Kaufman, I guess the first
5  question is have you seen what's been marked as
6  Exhibit 56 before?
7    A. I don't remember.
8    Q. Same answer as to 63?
9    A. Yes.
10   Q. Anything about looking at those two
11 documents that refreshes your recollection as
12 to whether you were involved in the negotiation
13 of the price for the construction contract or
14 any of the other terms?
15   A. No.
16       MS. GASTWIRTH: Can we take a short
17    break.
18       MR. SEFF: Yes.
19       (Recess was taken from 9:25 to
20    9:43.)
21       (Record read.)
22   Q. Mr. Kaufman, did President select
23 Archon as the architect under the belief that
24 it was independent of Anderson Blake?
25   A. What do you mean by "independent"?

Page 61

1       Kaufman
2    Q. Separate ownership.
3    A. I don't recall.
4    Q. What, if anything, Mr. Kaufman, did
5  President do to ensure that Archon and Anderson
6  Blake were independent of each other?
7    A. I don't recall.
8    Q. Did President require --
9       MS. GASTWIRTH: I'm sorry.
10      (Discussion off the record.)
11   Q. Did President require an independent
12 architect certification on Anderson Blake's
13 applications for payments before it released
14 payments to Anderson Blake?
15   A. I don't recall.
16   Q. Who at President authorized periodic
17 payments to Anderson Blake? Would that be you?
18      MS. GASTWIRTH: Objection.
19      MR. SEFF: If you understand the
20    question, you can answer.
21   A. I don't remember the process that we
22 used.
23   Q. Now, after the buy-out, which for
24 the sake of this discussion we are assuming was
25 approved by the NIGC in January of 1998, what,

Page 62

1  Kaufman
2  if any, role did Mr. Melius play in connection
3  with the casino?
4      MS. GASTWIRTH: Objection.
5  Q. Construction and development.
6  A. Which buy-out are you referring to?
7  Q. I am referring to Massena Management
8  Corp.'s buy-out of NAMC.
9  A. And what was your question?
10 Q. After that buy-out was approved by
11 NAMC, which I am representing was in or around
12 January of 1998, what role or roles, if any,
13 did Mr. Gary Melius play in the casino project?
14     MS. GASTWIRTH: Objection to "casino
15 project."
16 Q. And by "casino project," that's
17 project with a lower case P, I am including
18 anything and everything that had to do with
19 getting the casino up and running.
20     MS. GASTWIRTH: That's what I am
21 objecting to.
22     Go ahead and answer it, if you can.
23     MR. SEFF: Just on the record here,
24 what's objectionable about that?
25     MS. GASTWIRTH: Because it involves

Page 63

1  Kaufman
2  a multitude of things as you have defined
3  it in various interrogatories and document
4  requests.
5      MR. SEFF: I am trying to be --
6      MS. GASTWIRTH: Financing,
7  development, et cetera.
8      MR. SEFF: I am trying to be as
9  broad as possible here. I am trying to be
10 completely --
11     MS. GASTWIRTH: Well, then it is
12 compound and confusing, but if the witness
13 can answer it, he can answer it.
14     MR. SEFF: If it's confusing, I can
15 try to rephrase it, but I am trying to be,
16 Mr. Kaufman, so you understand my question,
17 as broad as possible here.
18 Q. What role or roles or functions did
19 Mr. Melius play in any aspect of the casino
20 project?
21 A. I can't answer such a general and
22 broad question. I'd appreciate if you could be
23 more specific.
24 Q. All right. Did he have any
25 management role in the casino?

Page 64

1      Kaufman
2  A. No.
3  Q. Did he have any financial role in
4  the casino?
5  A. No.
6  Q. Did he have any role in hiring
7  personnel?
8  A. You have to be more specific with
9  that question.
10     THE WITNESS: Excuse me just a
11 second.
12     MR. SEFF: Note on the record that
13 Mr. Kaufman is receiving a call and note
14 the time and take us off the record.
15     (Recess was taken from 9:48 to
16 9:49.)
17 Q. Mr. Kaufman, rather than me
18 attempting to list specific functions that
19 Mr. Melius may have been involved in and asking
20 you if he had a role, I can do that, but why
21 don't you first tell me everything you recall
22 that he did do in connection with the casino
23 after the buy-out, and then if there is more
24 precise breaking down that needs to be done, we
25 will try to do that, but maybe we could save

Page 65

1      Kaufman
2  time if you tell me everything that you
3  remember now.
4  A. It's too general and too broad. I
5  can't answer such a broad question. It was
6  over a several-year period. If you have a
7  specific question, I will try and answer it.
8  Q. Let's try to break the time frame
9  down. In between January of '98, which is when
10 the buy-out was approved, and April of '99,
11 which is when the casino opened for business,
12 what function or roles did Mr. Melius play in
13 the project?
14     MS. GASTWIRTH: Objection.
15     Go ahead.
16 A. I can't recall.
17 Q. You don't recall?
18 A. It's a very long period of time and
19 a very complicated process, so you would have
20 to be more specific in your question.
21 Q. I don't have anything in particular
22 in mind when I am asking the question. I am
23 testing your memory here. I am asking you to
24 tell me what you remember.
25     Do you remember meeting with him in

Page 66

```
1              Kaufman
2   connection with the casino between January of
3   '98 and April of '99?
4       A.  I'm sure I did meet with him.
5       Q.  Okay, and when you met with him,
6   what did you discuss with him?
7       A.  I don't remember.
8       Q.  Do you remember anything about your
9   meetings with Mr. Melius between January of '98
10  and April of '99?
11      A.  Not in a general sense.
12      Q.  In any sense.
13      A.  Ask me a specific question and I
14  will try and answer it. I just can't -- you
15  know, this is over a period of a couple of
16  years, a very involved relationship. I just
17  can't draw in general recollection senses to a
18  general question that's not specific, so if you
19  have a specific question, I will answer it. I
20  can't answer a general question.
21      Q.  Let's try this one. Between January
22  '98 and April '99, did you ever discuss the
23  financing of the casino with Mr. Melius?
24      A.  I don't recall.
25      Q.  Between those dates, did you discuss
```

Page 67

```
1              Kaufman
2   personnel issues with Mr. Melius?
3       A.  I don't recall.
4       Q.  Between those dates, did you discuss
5   insurance issues with Mr. Melius?
6       A.  I don't recall.
7       Q.  Between those dates, did you discuss
8   liquor license issues with Mr. Melius?
9       A.  I don't recall.
10      Q.  I am trying to provide specific
11  categories in response to your concerns about
12  the broadness of my question. So far in each
13  instance you don't have any additional
14  recollection.
15          What specific categories of
16  information do you recall discussing with
17  Mr. Melius?
18          MS. GASTWIRTH: I think that's been
19      asked and answered.
20          MR. SEFF: Well, I am trying to help
21      the witness recall.
22          MS. GASTWIRTH: I know, but he is
23      doing the best he can. You have a list, so
24      keep going.
25      Q.  Well, if we are going to do it that
```

Page 68

```
1              Kaufman
2   way, I am going to broaden the dates,
3   Mr. Kaufman —
4           MS. GASTWIRTH: Is that going to
5       help you?
6       Q.  I am going to broaden the dates and
7   ask specific questions.
8           MS. GASTWIRTH: Why don't you show
9       him particular documents.
10          MR. SEFF: I tell you what, I will
11      do it the way I want and then you can do
12      what you want to do when it's your turn.
13          MS. GASTWIRTH: All right. That's
14      okay.
15      Q.  I am going to broaden the dates from
16  January of '98 to April of 2000. During that
17  time period, was Mr. Melius involved in the
18  effort to obtain financing for the casino?
19          MS. GASTWIRTH: Objection to the
20      form, "involved." We had this objection
21      last time, but go ahead and answer.
22          MR. SEFF: If you understand the
23      question, you can answer.
24          MS. GASTWIRTH: Note my continuous
25      objection so I don't interrupt the
```

Page 69

```
1              Kaufman
2   questions each time.
3           MR. SEFF: Thank you.
4       Q.  Just to be precise, "involved," I am
5   not assigning any secret definition to it.
6   It's the dictionary definition, meaning having
7   anything to do with.
8           Between January '98 and April 2000,
9   was Mr. Melius involved in any efforts to
10  obtain financing for the casino?
11      A.  I don't recall.
12      Q.  During that time period, was
13  Mr. Melius involved in the hiring of a security
14  consultant for the casino?
15      A.  I don't recall.
16      Q.  During that time period, was
17  Mr. Melius involved in the drafting of a pledge
18  agreement for the Miller Schroeder loans?
19      A.  I don't recall.
20      Q.  During that time period, was
21  Mr. Melius involved in the process of selecting
22  the gaming machines, i.e., the video lottery
23  terminals to install in the casino?
24      A.  I don't recall.
25      Q.  During that time period, was
```

Page 70

```
 1                 Kaufman
 2    Mr. Melius involved in the effort to get the
 3    NIGC to increase the development expense cap
 4    from 20 million to approximately 28 million?
 5        A.   I don't recall.
 6             MR. SEFF: Off the record.
 7             (Recess was taken from 9:54 to
 8    9:56.)
 9        Q.   Mr. Kaufman, during the time period
10    we have been discussing, which I have defined
11    as January 1998 to April 2000, was Mr. Melius
12    involved in the effort to obtain liquor
13    licenses for the casino?
14        A.   What do you mean by that?
15        Q.   Did he have any involvement at all,
16    did he play any role whatsoever in the effort
17    to obtain liquor licenses?
18        A.   I do recall that he did give us some
19    introductions. I don't remember the time
20    frame, but I do remember him introducing us to
21    some people that may have helped facilitate us
22    moving forward.
23        Q.   Was that the extent of his
24    involvement, making an introduction?
25        A.   I believe so.
```

Page 71

```
 1                 Kaufman
 2        Q.   During the time period that I have
 3    defined, did Mr. Melius have any involvement in
 4    the casino marketing?
 5        A.   I don't recall.
 6        Q.   During the time period we have been
 7    discussing, was Mr. Melius involved in the
 8    effort to set up a plane proposal for the
 9    casino, and by "plane" I am talking about
10    airplanes?
11        A.   I don't recall.
12        Q.   During the time period we have been
13    discussing, was Mr. Melius involved in the
14    effort to obtain Department of Transportation
15    approval for casino road signs and billboards?
16        A.   I don't recall.
17        Q.   This is related to the liquor
18    question I asked you a moment ago. During the
19    time period we have been discussing, was
20    Mr. Melius involved in the effort to obtain an
21    amendment to the casino liquor licenses to
22    allow waitress service of beer and wine at the
23    gaming tables?
24        A.   I don't recall.
25        Q.   Was Mr. Melius involved in casino
```

Page 72

```
 1                 Kaufman
 2    marketing and, in particular, Canadian media
 3    buying?
 4        A.   I don't recall.
 5        Q.   Now, in June of '99 did Mr. Melius
 6    attend a meeting with you, Mr. Natalone and
 7    Mr. Horn at which state police, state Racing
 8    and Wagering Board and Tribal Gaming Commission
 9    issues were discussed?
10             MS. GASTWIRTH: Can you read that
11       back one more time.
12        Q.   In June of '99 did Mr. Melius attend
13    a meeting with you, Mr. Horn and Mr. Natalone
14    at which state police, state Racing and
15    Wagering Board and Tribal Gaming Commission
16    issues were discussed?
17             MS. GASTWIRTH: Objection.
18        A.   I don't recall.
19        Q.   Do you recall a June '99 meeting
20    attended by yourself, Mr. Horn, Mr. Natalone
21    and Mr. Melius at which casino security issues
22    were discussed?
23        A.   I don't recall.
24        Q.   Do you recall a June '99 meeting
25    with those participants at which Canadian
```

Page 73

```
 1                 Kaufman
 2    casino attendance issues were discussed?
 3        A.   I don't recall.
 4        Q.   Do you recall a June '99 meeting
 5    attended by those participants at which state
 6    approval of video poker was discussed?
 7        A.   I don't recall.
 8        Q.   Do you recall a June '99 meeting
 9    attended by those participants, which is
10    yourself, Mr. Melius, Mr. Horn and
11    Mr. Natalone, at which the addition of keno and
12    lightning bingo was discussed?
13        A.   I don't recall.
14        Q.   Do you recall a June '99 meeting
15    attended by those participants at which casino
16    attendants and bussing goals were discussed?
17        A.   I don't recall.
18        Q.   Do you recall a June '99 meeting,
19    Mr. Kaufman, attended by yourself, Mr. Horn,
20    Mr. Natalone and Mr. Melius?
21             MS. GASTWIRTH: Objection.
22        Q.   Separate and apart from the subject
23    matter that was discussed at the meeting, do
24    you recall a meeting with those people?
25        A.   Do I recall being in a room with all
```

Page 74

1  Kaufman
2  those people at the same time?
3  Q. In June of 1999.
4  A. I don't recall.
5  Q. Do you ever recall being in a room
6  with Mr. Horn, Mr. Natalone, yourself and
7  Mr. Melius?
8  A. It's possible.
9  Q. Between January of '98 and April of
10 2000, it's possible?
11 A. It's possible.
12 Q. Do you recall a specific meeting at
13 any time during that window of time with those
14 people?
15     MS. GASTWIRTH: Asked and answered.
16 A. I don't recall.
17 Q. I have been asking about June '99.
18 I am broadening it now.
19     MR. SEFF: To what period?
20 Q. January '98 to April 2000.
21 A. I don't recall.
22 Q. I take it then from that answer that
23 you don't recall discussing any specific topics
24 with that group of people; is that right?
25     MS. GASTWIRTH: For that same time

Page 75

1  Kaufman
2  period?
3  A. That's correct.
4  Q. That time period, January '98 to
5  April 2000, those four people; you, Mr. Horn,
6  Mr. Natalone, Mr. Melius. You don't recall
7  discussing any particular topics with those
8  four people during that time?
9  A. In the room at the same time, no.
10 Q. Or, you know, some combination of
11 being in a room and on a phone.
12 A. I don't recall.
13 Q. Do you recall Mr. Melius being
14 involved in marketing the casino's 4th of July
15 weekend activities, that is 4th of July weekend
16 1999?
17 A. I don't recall.
18 Q. Do you recall if in or around June
19 of '99 Mr. Melius was involved in the hiring of
20 a casino consultant to advise on the casino's
21 operational, accounting and marketing structure
22 and strategy?
23 A. I missed the beginning of that
24 question.
25 Q. In June of '99, in or around June of

Page 76

1  Kaufman
2  '99, do you recall if Mr. Melius was involved
3  in the hiring of a consultant to advise on the
4  casino's operational, accounting and marketing
5  structure and strategy?
6  A. I don't recall.
7  Q. Do you recall if Mr. Melius was
8  provided with copies of monthly casino
9  financial reports during the period of April
10 '99 to April 2000?
11 A. I don't recall.
12 Q. Did you ever direct anyone at either
13 President or Arbor, any of the Arbor entities
14 or either of the Massena entities to provide
15 Mr. Melius with casino financial results?
16 A. I don't recall.
17 Q. Do you know Mr. William Thornton?
18 A. Yes.
19 Q. Who is Mr. Thornton and what was his
20 role in the casino, if you know?
21     MS. GASTWIRTH: Objection.
22 Q. Who is Mr. Thornton?
23 A. Who?
24 Q. Yes.
25 A. What do you mean by "who"?

Page 77

1  Kaufman
2  Q. What role did he play in the casino?
3  A. He is a man.
4  Q. I know that, but what role did he
5  play in the casino?
6  A. He was on site and he was a go-to
7  guy. He was a guy on site responsible for
8  basically building the project.
9  Q. Who did he work for, if you know?
10 A. Anderson Blake.
11 Q. Did he have any other roles in the
12 casino other than being the go-to guy for
13 construction?
14     MS. GASTWIRTH: Objection.
15 Q. If you know.
16 A. He was a construction guy.
17 Q. Was he ever involved in casino
18 personnel and staffing decisions?
19 A. Only as it related to the building
20 of the facility and construction.
21 Q. What about housekeepers?
22 A. Only as it related to the building
23 of the facility and construction.
24 Q. Do you know if Mr. Thornton played
25 any role in decisions over how many

Page 78

1      Kaufman
2  housekeepers to hire for the casino?
3      MS. GASTWIRTH: Objection.
4      A. It depends whether it had to do with
5  maintenance requirement, cleaning, waxing.
6  These are all interrelated issues.
7      Q. How about security officers?
8      A. It depends on, I guess, some layout
9  issues. I mean, some of these were all
10 interrelated based on the facility.
11     Q. How about valet attendants?
12     A. That's possible too.
13     Q. What possible role would
14 Mr. Thornton of Anderson Blake have in how many
15 valet attendants to hire?
16     MS. GASTWIRTH: If you know.
17     Q. If you know.
18     A. Just in terms of the logistics, the
19 locations where certain things were going to be
20 built, the roads, you know, the drop-offs, you
21 know, all as it relates to different technical
22 aspects of the facility, construction, design,
23 all things of that nature. There is a lot of
24 cross-over in some of these issues.
25     Q. Did you authorize Mr. Thornton to

Page 79

1      Kaufman
2  play a role in any personnel and staffing
3  decisions?
4      A. He worked with the on-site people to
5  make sure that the facility met the
6  requirements of the plan.
7      Q. Thank you for that answer, but that
8  wasn't my question. My question is did you
9  ever authorize Mr. Thornton to play a role in
10 staffing decisions?
11     MS. GASTWIRTH: Objection. I think
12     he answered your question, but go ahead and
13     answer it.
14     MR. SEFF: I suppose it was a
15     partial answer.
16     Q. Did you ever have a conversation
17 with Mr. Thornton in which you authorized or
18 deputized him to play a role in staffing
19 decisions?
20     A. I didn't deputize anybody. I am not
21 a deputizer.
22     Q. Okay, or authorizer.
23     A. I think that I would very much
24 appreciate his input into our decision-making
25 process to allow us to make sure that the

Page 80

1      Kaufman
2  facility met our needs.
3      Q. So you welcomed his input?
4      A. We welcome everybody's input.
5      Q. During the period of October of '99
6  to March of 2000, was Mr. Melius involved in
7  the attempted sale of President's interest in
8  the management agreement to outside entities?
9      A. I don't recall the period of time.
10     Q. Well, leaving the period of time
11 aside, was Mr. Melius ever involved in the
12 attempted sale of President's interest in the
13 casino management agreement to outside
14 entities?
15     MS. GASTWIRTH: Note my continuing
16     objection to "involved." It's been quite a
17     few pages.
18     Go ahead and answer it, if you can.
19     MR. SEFF: Again, she is objecting
20     to "involved," but by "involved" I am
21     attempting to be as broad as possible to
22     include any possible role.
23     MS. GASTWIRTH: So that if there was
24     a discussion, that would be involved, or if
25     there was a note, a memo --

Page 81

1      Kaufman
2      MR. SEFF: I can't be more specific
3      until I hear what the answer is as to the
4      involvement.
5      A. I think Mr. Melius -- can I call him
6  Gary?
7      Q. You can call him Gary.
8      A. I think Gary made some introductions
9  of companies or people to us.
10     Q. Possible purchasers?
11     A. I guess purchasers, investors. I'm
12 not sure of the different capacities.
13     Q. Any other involvement by Gary, or I
14 will call him Mr. Melius, but feel free to call
15 him Gary if you like, anything else that
16 Mr. Melius did on the subject of attempting to
17 sell President's interest other than make
18 introductions?
19     A. I don't recall.
20     Q. Do you recall whether he negotiated
21 any possible investment or purchase terms with
22 outside investors?
23     A. I don't recall.
24     Q. Now, was Mr. Melius involved in any
25 way in the effort to sell President's interest

Page 82

1 Kaufman
2 in the casino management contract to Park Place
3 Entertainment Corp.?
4 A. He made an introduction.
5 Q. Do you recall who he introduced you
6 to?
7 A. I don't know whether it was -- I
8 don't know whether he introduced us to Park
9 Place or it was Senator Damato introduced us to
10 Park Place. I forgot exactly how that came
11 about.
12 Q. Beyond making the introduction, did
13 Mr. Melius play any other role in the effort to
14 sell President's interest to Park Place?
15 A. I don't recall.
16 THE WITNESS: I need to take a
17 break. Excuse me.
18 (Recess was taken from 10:10 to
19 10:18.)
20 (Record read.)
21 Q. Mr. Kaufman, did you ever have any
22 discussions with Mr. Melius regarding the
23 construction of the casino between January of
24 '98 and April of 2000?
25 A. Yes.

Page 83

1 Kaufman
2 Q. What do you recall about your
3 discussion or discussions with Mr. Melius
4 concerning the casino's construction?
5 MS. GASTWIRTH: During that period
6 of time?
7 MR. SEFF: Yes.
8 A. I guess there were numerous
9 discussions, but the ability to bring it in on
10 time, it was critical to get started, we had
11 discussions about the steel. You know, we had
12 meetings with Ed Smoke actually in my offices
13 with Gary regarding the ability to get the job
14 done.
15 Q. Anything else that you recall about
16 your discussions?
17 A. Those were the general parameters.
18 Q. Why would you be discussing the
19 subject of, as you say, bringing it in on time
20 with Mr. Melius?
21 His entity was bought out by your
22 entity in or around January of '98. As I
23 understand it, construction commenced sometime
24 that spring of '98 and the casino ultimately
25 opened in April of '99.

Page 84

1 Kaufman
2 Why would you be discussing the
3 issue of bringing the construction in on time
4 with Mr. Melius, if you recall?
5 A. I think if you go back to my earlier
6 testimony, the issue of adopting the existing
7 plans, hiring Anderson Blake and operating in a
8 certain timetable, we decided along with the
9 Tribal gaming people, the Tribe or the elected
10 officials of the Tribe, to hire Anderson Blake
11 and to basically pick up and not miss a beat in
12 terms of all the previous work that was done,
13 and since Gary was involved with Anderson Blake
14 and had the most knowledge, there were
15 discussions that we all had together in terms
16 of being able to operate off of plans that were
17 a few years old and being able to go forward in
18 a seamless way.
19 Q. What was Gary's involvement with
20 Anderson Blake?
21 A. In what sense?
22 Q. I thought you had testified earlier
23 that you didn't recall whether he was involved
24 with Anderson Blake. You just said a second
25 ago that he was involved with Anderson Blake

Page 85

1 Kaufman
2 and I am asking you what was his involvement?
3 MS. GASTWIRTH: Objection. I don't
4 think that was his testimony.
5 A. I think you should look at my
6 testimony if you say what my testimony is so
7 you don't --
8 Q. I can't look at it yet, because I
9 don't have the transcript, but leaving that
10 issue aside, what was Gary's involvement with
11 Anderson Blake as far as you knew during the
12 period of January '98 to April 2000?
13 A. He was involved in the development
14 of the plans and the construction and the
15 ordering of steel and the design and the whole
16 process. This was years and years worth of
17 work. We got approved and we had to break
18 ground within 90 days. We basically had to
19 take years worth of work. The footings were
20 put in. You know, Gary and his enterprises
21 spent 4 to 5 million dollars already in
22 developing the footings for the casino and all
23 of this was done by entities that he was
24 involved with. They had done the plans. All
25 the plans that were submitted to the NIGC were

Page 86

1  Kaufman
2  stuff that we basically just adopted.
3  MS. GASTWIRTH: I think your
4  previous questions were very specific when
5  you asked him -- I don't know if you asked
6  him if he was president or a particular
7  officer, and I think that's what the source
8  of confusion is, of Anderson Blake.
9  MR. SEFF: We will be able to review
10 the record when the transcript is
11 available.
12 MS. GASTWIRTH: Just so you
13 understand, that's --
14 MR. SEFF: Well, it's in the book,
15 whatever it is. We will review it when
16 it's available.
17 MS. GASTWIRTH: Well, you have got
18 his testimony now.
19 MR. SEFF: We got his testimony then
20 and we got his testimony now.
21 MS. GASTWIRTH: Well, I think you
22 asked, if we go back in the record and we
23 can actually take the time to go back --
24 MR. SEFF: Let's not do that. We
25 can look at it at a time later.

Page 87

1  Kaufman
2  A. I would appreciate when you
3  characterize what I say, you either
4  characterize it correctly or go back in the
5  record, because you are confusing me and you
6  are trying to put words about my testimony
7  which are confusing.
8  Q. That's not my intent.
9  A. But that's what's happening and it's
10 difficult for me to try and answer a question
11 accurately if you are going to recharacterize
12 the way I have answered the question.
13 Q. My recollection, Mr. Kaufman -- I am
14 certainly not intentionally trying to confuse
15 you and I apologize if it's happening
16 unintentionally. My recollection of your
17 testimony earlier today is I asked you if you
18 knew who owned Anderson Blake and you said you
19 didn't recall.
20 MS. GASTWIRTH: That's correct.
21 A. That's correct.
22 MS. GASTWIRTH: You were asking for
23 a particular ownership. Now you are asking
24 for did he work with Anderson Blake. You
25 didn't ask --

Page 88

1  Kaufman
2  MR. SEFF: Okay, let's clarify it
3  further then. It was just an honest
4  misunderstanding then.
5  MS. GASTWIRTH: Well, that's why I
6  tried clearing it up.
7  MR. SEFF: Let's clarify it now.
8  That's why we are here.
9  Q. Did you understand, Mr. Kaufman,
10 that Mr. Melius, Gary Melius, had an ownership
11 interest in Anderson Blake during the period of
12 January '98 to April 2000?
13 A. I did not know the ownership
14 structure of Anderson Blake.
15 Q. Whatever the structure was, did you
16 have any understanding of whether Mr. Melius
17 had an interest in it?
18 A. What do you mean by "interest"?
19 Q. A financial interest. Stock,
20 ownership, anything.
21 A. I did not know the ownership
22 structure of Anderson Blake. I did not know
23 Gary's -- what his percentage of ownership was
24 within Anderson Blake. I am not -- I wasn't
25 aware of what his ownership percentage was or

Page 89

1  Kaufman
2  was not.
3  Q. Did you know it was more than zero?
4  A. I didn't know the ownership
5  structure.
6  Q. Again, the structure -- maybe we are
7  talking about the same thing but we are using
8  different words here. I am not so concerned
9  with the structure as I am with the financial
10 interest. It could be a corporation, it could
11 be a partnership, it could be a sole
12 proprietorship, it could be an LLC. I am not
13 interested in that aspect of it. I am
14 interested in what you knew at the time about
15 his financial interest in the company of any
16 sort, whether it was stock --
17 A. Of which company?
18 Q. Anderson Blake Construction Corp.
19 A. I didn't know the ownership
20 structure. I didn't know what his financial
21 ownership was within Anderson Blake.
22 Q. If any.
23 A. If it was 1 percent, 99 percent, 50
24 percent. I did not know the ownership
25 structure.

Page 90

1 Kaufman
2 Q. And you didn't inquire, I gather?
3 A. I don't recall. I mean, there was
4 no -- he was involved in the enterprise, he was
5 involved in, you know, Anderson Blake. I never
6 knew the ownership. I didn't know the
7 ownership structure.
8 Q. So as far as you knew, he could have
9 owned zero percent or he could have owned a
10 hundred percent?
11 A. Correct.
12 Q. And you didn't inquire or you don't
13 recall if you inquired?
14 A. I don't recall.
15 Q. And I gather the same would go for
16 Archon, you don't know the ownership structure
17 of Archon?
18 A. That's correct.
19 Q. And you don't know what percentage,
20 if any, he owned of Archon?
21 A. That's correct.
22 Q. And you don't recall if you
23 inquired?
24 A. I don't recall.
25 MR. SEFF: Off the record.

Page 91

1 Kaufman
2 (Discussion off the record.)
3 Q. Just getting back to this issue with
4 Mr. Melius and Anderson Blake, separate and
5 apart from any ownership interest he may have
6 had, what business role or roles did he play in
7 Anderson Blake? Was he in a decision-making
8 capacity at Anderson Blake?
9 A. I don't know.
10 Q. Who at Anderson Blake did you know
11 had the capacity or the authority to make
12 decisions?
13 A. Bill Thornton, I believe, was the
14 active member that I interfaced with from time
15 to time.
16 Q. Did you ever hear the name Richard
17 Bellando?
18 A. I don't recall.
19 Q. I take it from that answer that you
20 don't recall interfacing with Mr. Bellando; is
21 that right?
22 A. Yes, I just don't recall.
23 Q. Do you know who the President of
24 Anderson Blake Construction was in January of
25 '98 when that construction contract was signed?

Page 92

1 Kaufman
2 A. No.
3 Q. All right, Mr. Kaufman, I am going
4 to show you a document that's previously been
5 marked as deposition Exhibit 17 and ask you to
6 take a look at that. My question will be have
7 you ever seen it before.
8 (Document review.)
9 A. I don't recall.
10 Q. You don't recall if you have seen
11 Exhibit 17 before? Is that what you said? I
12 didn't hear it.
13 A. That's correct.
14 Q. It appears to be a fax cover sheet
15 from David Larson to Mr. Melius. Do you know
16 David Larson?
17 A. The name sounds familiar, but I
18 don't recall who he is.
19 Q. It appears to be on company
20 stationery, a company called B&L Financial,
21 Inc., out of Minnesota. Is that company
22 familiar to you?
23 A. No.
24 Q. It's addressed to Mr. Melius at
25 President R.C.-St. Regis Management Company.

Page 93

1 Kaufman
2 Did Mr. Melius have any role in
3 President R.C.-St. Regis Management Company in
4 November of 1998?
5 A. No.
6 Q. Mr. Kaufman, do you recognize the
7 handwriting in the upper right-hand corner of
8 Exhibit 17 where it says "St. Regis, Miller
9 Schroeder"?
10 A. No.
11 Q. How about the handwriting in the
12 middle of the document in the section beginning
13 with the words "related to our conversation"
14 where there are a series of lines with numbers
15 entered on them, do you recognize that
16 handwriting?
17 A. No.
18 Q. Were you aware, Mr. Kaufman, that
19 Mr. Larson and Mr. Melius were speaking in
20 November of 1998 regarding the installation of
21 VLTs in the casino?
22 MS. GASTWIRTH: Objection.
23 Q. If you know.
24 A. I have no recollection.
25 Q. Any idea why Mr. Larson would be

Page 246

1    Kaufman
2    was going to be my next question.
3    Q. Mr. Kaufman, this is a contract
4    between President and Archon and it's signed on
5    behalf of Archon on the last page by
6    Mr. Schiffman and there is a signature line
7    there to the left of Mr. Schiffman's signature
8    for your signature, although this copy is
9    unsigned, and my question was going to be do
10   you recall if you ever signed this document. I
11   gather from Loretta's comment that there is a
12   signed version.
13       MS. GASTWIRTH: But I don't know
14   where you got this one from.
15       MR. SEFF: Well, if there is a
16   signed version that you have, I would be
17   interested to see it.
18       MS. GASTWIRTH: I think we produced
19   it. I don't know where you got this as an
20   exhibit for today.
21       MR. SEFF: Well, this has previously
22   been marked. This has been used before.
23       MS. GASTWIRTH: I know, but it
24   doesn't mean that these were documents that
25   we produced.

Page 247

1    Kaufman
2    Q. The question is did you ultimately
3    sign this contract, if you know?
4    A. I don't recall.
5        MR. SEFF: But, Loretta, you believe
6    that he did?
7        MS. GASTWIRTH: I don't know if it
8    was him or Walter.
9        MR. SEFF: Well, the construction
10   contract was Walter.
11       MS. GASTWIRTH: My recollection is
12   these numbers came from the Tribe.
13       MR. SEFF: That's true.
14       MS. GASTWIRTH: I actually had to
15   Bates stamp those, but this one doesn't
16   have those numbers, so...
17       MR. SEFF: If you have a signed
18   version of it that hasn't been produced, we
19   would like it.
20       MS. GASTWIRTH: We have produced it.
21   It's in the 50,000 pages that are out there
22   in the case --
23       MR. SEFF: It's buried in there, is
24   what you are saying.
25       MS. GASTWIRTH: Right. I can't

Page 248

1    Kaufman
2    really go back and look for it. I can't
3    look at these documents anymore. It takes
4    up an entire wall in my file room.
5        MR. SEFF: It takes up more than a
6    wall in our office, if it makes you feel
7    any better.
8        MS. GASTWIRTH: It's a waste of
9    trees.
10   Q. Mr. Kaufman, do you know the name Al
11   or Alfred Crary, C-R-A-R-Y?
12   A. What?
13   Q. Do you know the name Alfred Crary?
14   A. It sounds familiar.
15   Q. Who is Mr. Crary, if you know?
16   A. I don't have a clear recollection.
17   Maybe you can facilitate my recollection.
18   Q. I am looking for a document that
19   might do that.
20       All right, Mr. Kaufman, I am going
21   to show you a document that's previously been
22   marked as Exhibit 14 and ask you to take a look
23   at that letter and tell me if you have ever
24   seen it before.
25       (Document review.)

Page 249

1    Kaufman
2    A. No, I haven't seen it.
3    Q. I see you smiling.
4    A. It does refresh my recollection.
5    Q. I see you smiling and almost
6    laughing there. What about that letter is
7    causing you to grin, if anything?
8    A. Just the circumstances.
9    Q. What about the circumstances of --
10   we will work off the same copy here. I
11   apologize.
12       Who is Mr. Crary? Now that you have
13   had a chance to look at Exhibit 14, who is he?
14   A. He was an ex-state police guy and
15   for some reason Gary -- and I never knew Gary
16   actually made him an offer, but Gary had
17   recommended him to call me for a position of
18   head of security or something involving
19   security. I did meet him. I wasn't overly
20   impressed with him. I never made him an offer.
21   But now I have this -- Gary must have told him
22   that he would get an offer, actually made him
23   an offer, and we never made him an offer.
24   Q. What Mr. Melius says in Exhibit 14
25   to Mr. Crary is -- I read it slightly