

*President R.C.-St. Regis Management Company*
333 Earle Ovington Boulevard
Suite 900
Uniondale, NY 11553
(516) 832 – 8002 • Fax (516) 832 – 8045

Walter K. Horn
*Senior Vice President*
*General Counsel*

<u>Via Regular Mail</u>

January 5, 2000

Mr. Fred W. Stuckwisch
Director of Contracts
National Indian Gaming Commission
1441 L Street
Washington, DC 20005

Dear Fred,

Per our conversation, I am enclosing herewith our responses to the Document/Information Request. As mentioned, item 5 will be provided upon receipt of the results from the lien search.

As to the completion of the supplemental assessment, Bill Graham has left PBS&J. This of course somewhat complicates the process. However, I am hopeful that we will have the revised assessment in the near future.

Sincerely,

Walter Horn

WH/rl
Enclosure.

**CONFIDENTIAL**　　　　　PRC 021844

# ST. REGIS' AKWASASNE MOHAWK CASINO
# DOCUMENT/INFORMATION REQUEST

1. *Q.* Financial projections through the year 2000.

   *A.* See Attached Exhibit A.

2. *Q.* Copy of annual capital budget approved by the Tribal Gaming Commission prior to opening.

   *A.* An annual capital budget was not submitted to the Tribal Gaming Commission prior to opening. Because the Casino was a start-up operation, there were no plans for capital expenditures in the first year. The only possible capital expenditures would have been the video gaming machine purchases, which were contingent upon New York State's amendment of the compact with the Tribe. The Project Cost Report detailed our budget during the development phase for capital expenditures.

3. *Q.* Evidence that architect approved all construction payments.

   *A.* The requisitions for construction payments were paid as submitted. The project manager, who is also an architect, signed off on them, but there was no separate sign-off by Archon, the architect for the project.

4. *Q.* Listing of all work done and paid for outside the construction contract that arguably could have been done under the construction contract.

   *A.* We believe that the listing of these items has been appropriate. If your staff has questions about certain items, please tell us what they are so that we may address them for you.

5. *Q.* Listing of all liens placed on the facility and the disposition of each, including dates.

   *A.* A lien search is being conducted. The results will be provided when they are received.

6. *Q.* Description of the bidding process used to hire contractors and purchase equipment and the results of that process.

  *A.*   As stated in Item 3 of my letter to Fred W. Stuckwisch dated February 19, 1999, there was no bidding process to select Anderson Blake Construction Corporation as the general contractor, because the firm had been selected prior to Massena's acquisition of any interest in President R.C.-St. Regis Management Company. The process utilized by the general contractor was to solicit three or more bids on any contract over $50,000 and to evaluate the bids received in light of the desire to give preference to Native Americans. Attached as Exhibit B is a list of the contractors utilized. Attached as Exhibit C is the Expenditure and Purchasing Policy for the Casino, which sets forth bidding procedures.

7.   *Q.* Explanation as to why working capital advances ($2,774,245 at August 31) should not be included in the construction and development cost limitation.

  *A.* The working capital advance for the amount of $2,774,245 represents advances made by the Management Company after April 10th (opening date) to fund cash shortfalls related to the day-to-day operation of the Casino. Therefore, as per the Management Agreement, they would not be included in Development Expenses.

8.   *Q.* Amount of interest incurred during the construction period that should be included in the construction and development cost limitation.

  *A.* The interest incurred during the construction period is included in the construction and development cost limitation. These interest amounts were capitalized and included in building cost and furniture, fixtures and equipment. (For an explanation, please refer to FASB34, Generally Accepted Accounting Principals, Capitalization of Interest).

9.   *Q.* Reconciliation of the total construction, architectural, and engineering services costs of $16.3 million per the Project Accounting and Summary Report budget, $16.6 million in actual expenditures reported, and $15.8 million in payments to Anderson Blake.

  *A.* Total construction, architectural and engineering services ("costs") do reconcile to the Project Accounting Summary Report with a Budget of $16.3 million and actual expenditures of $16.3 million. (See attached Exhibit D).

Not all payments for the Costs were made to Anderson Blake. The $800,000 difference between the actual expenditure of $16.6M and the payments to Anderson Blake of $15.8M represents payments to other vendors.

10. Q. Detailed explanation of the amounts shown as "Cumulative Effect Of A Change in Accounting Principle" of $5,225,828 at April 30, $5,027,447 at May 31; $5,078,824 at June 30; $5,156,476 at July 31; and $4,876,733 at August 31, 1999.

    A. See Attached Exhibit E.

11. Q. Justification for maintaining some casino records at Uniondale, NY and others at the casino.

    A. Duplicate records are kept in Uniondale as a back up for disaster recovery. Prior to the establishment of the accounting department and appropriate internal controls at the casino, all disbursements were made from Uniondale.

12. Q. Name and address of the certified public accounting firm required by the contract to be hired to perform accounting services for the gaming operation. Copy of engagement letter.

    A. Arthur Anderson, 101 Eisenhower Parkway, Roseland, NJ 07068-1099. (See Attached Exhibit F.)

13. Q. Explanation of how the accounts – Due from MMC and Due to MMC – on the casino's balance sheets are used and what the balances at the end of each month represent.

    A The accounts were set-up to track Development Expense commitments that the Casino made prior to opening, but had not been received. It was essentially a tracking method, and since the Due to / Due from accounts should have offset the other, there was not a Financial Statement impact on a "net" basis. In September, after Consulting with Arthur Anderson, and to avoid any confusion regarding the accounts, we decided to adjust them off the books.

14. Q. Explanation as to why the monthly payment to the Tribe is treated as a casino operating expense.

        *A.* The monthly payment to the Tribe is treated as a Casino operating expense for internal reporting purposes. For purposes of calculating revenue shares, this amount is not considered an operating expense.

15.   *Q.* Statement as to what involvement Gary Melius, personally and through any companies and employees of companies in which he has had an interest, has had in the project since Ivan Kaufman acquired his interest.

        *A.* Since the time that Massena Management Corp. acquired the interest of Native American Management Corporation (owned by Gary Melius) in President R.C. St. Regis Management Company, Gary Melius has been involved in the project only to the extent of his interest in Anderson Blake Construction. Anderson Blake Construction had been designated as the general contractor for the project in the partnership agreement of President R.C. – St. Regis Management company prior to the involvement of Ivan Kaufman. William Thornton was the project manager for Anderson Blake. In that role, Mr. Thornton provided advice concerning the building to the casino's director of facilities for a period of time after the casino opened to the public.